Jeremy C. Lieb
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, FRIENDS OF THE EARTH, and GREENPEACE, INC.,<br><br>    *Plaintiffs*,<br><br>      v.<br><br>BUREAU OF LAND MANAGEMENT; UNITED STATES FISH AND WILDLIFE SERVICE; UNITED STATES DEPARTMENT OF THE INTERIOR; DAVID BERNHARDT, in his official capacity as Secretary of the Interior; and CHAD B. PADGETT, in his official capacity as Alaska State Director of Bureau of Land Management,<br><br>    *Defendants*. | Case No. 3:20-cv-00308-HRH |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
### (5 U.S.C. §§ 701-706; 42 U.S.C. § 4332; 16 U.S.C. § 1536)

**INTRODUCTION**

1.      This action arises from the Bureau of Land Management's (BLM) approval of ConocoPhillips Alaska Incorporated's (ConocoPhillips) Willow Master Development Plan ("Willow Project" or "Project"), a massive oil and gas development project in the National Petroleum Reserve-Alaska (the "Reserve"). The final environmental impact statement (EIS) prepared by BLM for the Project does not meet the requirements of the National Environmental Policy Act (NEPA). The Project also relies on a biological opinion issued by United States Fish and Wildlife Service ("Fish and Wildlife Service" or "Service") that fails to comply with the requirements of the Endangered Species Act (ESA).

2.      The 23-million-acre Reserve is recognized as a globally important ecological resource. It is home to a diversity of species, including caribou, polar bears, brown bears, muskoxen, and millions of migratory birds, among many other species. This landscape and its values are central to the livelihood and traditional practices of the Iñupiaq people living in the region.

3.      On October 26, 2020, BLM signed a record of decision (ROD) approving ConocoPhillips' Willow Project. The massive project could include five drill sites, a central processing facility, an operations center, 37 miles of gravel roads, up to 700 miles of ice roads during construction, 263 miles of resupply ice roads during operations, one or two airstrips, up to 386 miles of pipelines, and a gravel mine site in the Reserve. BLM estimates the Project will produce 586 million barrels of oil, resulting in approximately

259 million metric tons $CO_2$ emissions over its 30-year life.

4. The Willow Project will have far-reaching impacts across the Reserve, the North Slope, and beyond. The Project represents a significant expansion into previously undeveloped areas of the Reserve, including large areas within the ecologically important Judy Creek and Fish Creek watersheds, and areas within the Teshekpuk Lake and Colville River Special Areas. The Project will disturb wildlife, destroy wetlands, and permanently alter rural lifestyles and traditional cultural practices dependent on food resources like fish and caribou. The Project will further imperil polar bears that are already threatened from climate change and the expansion of oil and gas development in the Arctic. And the Project's enormous greenhouse gas emissions are inconsistent with the urgent need to transition away from fossil fuels. Developing a massive new Arctic oil formation is a threat to the global climate and an already dramatically warming Arctic region.

5. Defendants' approval of the Willow Project is unlawful. BLM's final Environmental Impact Statement (EIS) violates NEPA by failing to consider reasonable alternatives that could reduce adverse impacts, including any alternatives that are meaningfully different from ConocoPhillips' proposed project, failing to accurately describe and analyze the significance of greenhouse gas emissions from the Willow Project, and failing to adequately discuss the magnitude and nature of potential direct, indirect, and cumulative impacts to caribou. The Fish and Wildlife Service's polar bear biological opinion violates the ESA by relying on uncertain, future compliance with the

Marine Mammal Protection Act (MMPA). The Service also failed to issue an incidental take statement as required by the ESA. Several of the agencies' failures here—the failure to account for foreign consumption in assessing climate change impacts caused by the Project and the reliance on uncertain, future mitigation measures in the polar bear biological opinion, in particular—mirror those the U.S. Court of Appeals for the Ninth Circuit recently held unlawful in rejecting the approval of another oil development project in the Arctic. *See Ctr. for Biological Diversity v. Bernhardt*, No. 18-73400, 2020 WL 7135484 (9th Cir. Dec. 7, 2020). The Court should vacate BLM's Record of Decision (ROD) approving the Willow Project and the Service's biological opinion.

## JURISDICTION AND VENUE

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361, 2201-02. Venue is appropriate under 28 U.S.C. § 1391(e).

## PLAINTIFFS

7. Plaintiff Center for Biological Diversity (the Center) is a national, non-profit organization, with offices across the country and in La Paz, Mexico. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands, and public health. The Center has more than 81,800 members. The Center is actively involved in species and habitat protection issues throughout the United States, including protection of the Arctic and wildlife threatened by oil and gas leasing, exploration, and development. As part of these efforts, the Center

works to protect Arctic wildlife that lives in and near the Reserve from the numerous harms inherent in oil and gas leasing, exploration, and development, including noise pollution, habitat destruction, oil spills, and greenhouse gas pollution that exacerbates the climate crisis.

8.    Plaintiff Friends of the Earth is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation.  Friends of the Earth is a membership organization consisting of nearly 120,000 members, including more than 300 members who live in Alaska, and more than 1.5 million activists nationwide.  Friends of the Earth is also a member of Friends of the Earth-International, which is a network of grassroots groups in 74 countries worldwide.  Friends of the Earth's mission is to protect our natural environment, including air, water, and land, and to create a more healthy and just world. Friends of the Earth utilizes public education, advocacy, legislative processes, and litigation to achieve its organizational goals.  Friends of the Earth is concerned about the potential adverse impacts that fossil fuel exploration and development activities in Alaska's Arctic, including in the Reserve, have on the climate and people, fish, birds, and other species that depend on this region.  Therefore, on behalf of its members and activists, Friends of the Earth actively engages in advocacy to influence U.S. energy and environmental policies affecting Alaska's Arctic.

9.    Plaintiff Greenpeace, Inc., is a non-profit corporation organized under the laws of the State of California, with its principal place of business in Washington, D.C. Its mission is to promote the protection and preservation of the environment.  Greenpeace

is an independent campaigning organization that uses peaceful, creative action to expose global environmental problems and to force solutions that are essential for a green and peaceful future. Greenpeace has over 840,000 active supporters in the United States. For more than a decade, Greenpeace has been a lead advocacy organization working to raise awareness of global warming and the protection of wildlife, and to press for serious cuts in greenhouse gas emissions through local, national, and global action. In the United States, Greenpeace has run campaigns aimed at stopping global warming by phasing out fossil fuel use and promoting renewable energy systems. As a part of these efforts, Greenpeace has actively worked to protect the Arctic from the harmful effects of oil and gas activities.

10.    Members of Plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including the Willow Project area and adjacent areas, for various purposes, including subsistence activities, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment. Members of Plaintiff groups also use or otherwise enjoy migratory wildlife that depend on the region. The Willow Project, as described and approved in BLM's final EIS and ROD, will directly and irreparably injure these interests.

11.    Plaintiffs submitted comments to BLM on the Project's draft and supplemental draft EISs. Each of the Plaintiff groups monitors the use of public lands in the Reserve and compliance with the laws respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and

practices that protect the natural and cultural values and sustainable resources of these lands. It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law for the management of these public lands. The interests and organizational purposes of the plaintiffs will be directly and irreparably injured by Defendants' violations of law as described in this complaint.

## DEFENDANTS

12.     Defendant BLM is the agency of the United States Department of the Interior entrusted with the conservation and management of resources within the Reserve and that issued the EIS challenged in this action.

13.     Defendant Fish and Wildlife Service is the federal agency within the Department of the Interior responsible for administration of the ESA as it relates to terrestrial animals and some marine mammals, including polar bears.

14.     Defendant United States Department of the Interior is agency of the United States responsible for oversight of BLM and the Service.

15.     Defendant David Bernhardt is sued in his official capacity as Secretary of the United States Department of the Interior. Secretary of the Interior (Secretary) is the highest position within the Department of the Interior, has ultimate responsibility for overseeing the Department and its agencies and ensuring their compliance with all applicable federal laws, and specific responsibilities related to the administration of the

Reserve. Defendant Bernhardt signed the ROD challenged herein.

16. Defendant Chad B. Padgett is sued in his official capacity as Alaska State Director of BLM. Defendant Padgett signed the ROD challenged herein.

## STATEMENT OF FACTS

### I. The Reserve

17. President Warren G. Harding set aside the 23-million-acre Reserve in 1923. The Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, wetlands, upland areas, and sensitive coastal resources. It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species. This landscape and wildlife are central to the livelihood and traditional practices of Iñupiaq people living in the region.

18. In 1976, Congress passed, and subsequently amended in 1980, the Naval Petroleum Reserves Production Act ("Reserves Act"), which transferred jurisdiction over the Reserve from the Navy to the Secretary of the Interior, in recognition of the area's significant ecological value and the need to protect it. Pub. L. 94-258, Title I §§ 102-03, 90 Stat. 303-04 (codified at 42 U.S.C. §§ 6502-6503). The Reserves Act created a management structure for the Reserve separate from other public land laws, including the Mineral Leasing Act. 42 U.S.C. § 6502 (withdrawal from entry and disposition under public land laws).

19. Because of the world-class wildlife and subsistence values of the Reserve,

the Reserves Act requires that the Secretary must protect and conserve these other resources and uses in the Reserve any time the Secretary authorizes oil and gas leasing, exploration, and development. *Id*. §§ 6504(a), 6506a(b). The Reserves Act requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources" of the Reserve. *Id*. § 6506a(b). Surface values of the Reserve may be protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve, including within Special Areas. 43 C.F.R. § 2361.1(e)(1). This includes the authority to require a suspension of operations and production if BLM determines that it is in the interest of conservation or "mitigates reasonably foreseeable and significantly adverse effects on surface resources." 43 C.F.R. § 3135.2(a)(1), (3).

20.     The Reserves Act further requires the Secretary to provide "maximum protection" to areas containing "significant subsistence, recreational, fish and wildlife, or historical or scenic value." 42 U.S.C. § 6504(a). "Special [A]reas are "areas within the [R]eserve identified by the Secretary of the Interior as having significant subsistence, recreational, fish and wildlife, or historical or scenic value and, therefore, warranting maximum protection of such values to the extent consistent with the requirements of the Act for the exploration of the Reserve." 43 C.F.R. § 2361.0-5(f).

21.     Pursuant to this authority, in 1977 the Secretary designated regions around Teshekpuk Lake and the Colville River, among others, as Special Areas within the

Case 3:20-cv-00308-HRH   Document 1   Filed 12/21/20   Page 9 of 33

Reserve.  42 Fed. Reg. 28,723, 28,723 (June 3, 1977).

22.     The Teshekpuk Lake Special Area protects essential caribou habitat, subsistence resources and uses, and world-class water- and shorebird nesting, staging, and molting habitat.  The Teshekpuk Lake Special Area provides calving, insect relief, and wintering areas for the approximately 56,000 caribou of the Teshekpuk Caribou Herd.

23.     The Colville River Special Area lies along the Colville River and two of its larger tributaries, the Kogosukruk and Kikiakrorak rivers, and encompasses 2.44 million acres.  The Special Area was designated to assure maximum protection of its subsistence, wildlife, recreational, and other identified values, such as the unique bluff and riparian habitats associated with the Colville River and its tributaries.  It protects the largest and most productive river delta in Arctic Alaska, which supports populations of pink and chum salmon, burbot, broad whitefish, Arctic cisco, and other fish species, and provides habitat for peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

## II.     BLM's Management of the Reserve

24.     In 2013, the Department of the Interior issued a comprehensive management plan covering the entire Reserve, which it called an Integrated Activity Plan (2013 Integrated Activity Plan).  This plan designated approximately 52 percent (11.8 million acres) of the Reserve as available for oil and gas leasing and development, subject to requirements to protect other values.

25.     Although portions of the Reserve have been available for oil and gas leasing since 1980, BLM did not permit any development projects on federal lands within the Reserve until 2015, when it approved ConocoPhillips' Greater Mooses Tooth 1 (GMT-1) development, which extended oil and gas infrastructure west from the existing Alpine development.

26.     In 2018, BLM approved ConocoPhillips' Greater Mooses Tooth 2 (GMT-2) development.  GMT-2 has extended the road and pipeline network further west into the Reserve towards the Willow Project area and areas closed to leasing around Teshekpuk Lake.

## III.     The Willow Project

27.     In May 2018, ConocoPhillips sent a letter to BLM requesting approval of its proposed Willow Project, and in August 2018, BLM published notice of its intent to prepare an EIS for the Project.  83 Fed. Reg. 38,725 (Aug. 7, 2018).

28.     The Willow Project would be located in the especially ecologically sensitive and culturally important northeastern portion of the Reserve, including within parts of the Teshekpuk Lake and Colville River Special Areas and immediately adjacent to areas within the Teshekpuk Lake Special Area closed to oil and gas leasing under the 2013 Integrated Activity Plan.

29.     On August 30, 2019, BLM released a draft EIS for the Willow Project. 83 Fed. Reg. 45,801 (Aug. 30, 2019).

30.     The draft EIS considered a no-action alternative and three action alternatives.  Alternative B, ConocoPhillips' proposed action, would include five drill sites, a central processing facility, an operations center, an air strip, and a gravel mine. The drill sites would be connected to the processing center by a network of pipelines and gravel roads and the Project would be connected back to the existing GMT-2 development by a gravel access road.

31.     The two other action alternatives are not meaningfully different from Alternative B.  Alternative C would eliminate the gravel road connection between the processing facility and drill site BT1 and would add a second airstrip.  Alternative D would not include a gravel access road to GMT-2, but would instead include annual construction of a resupply ice road.

32.     Under all action alternatives in the draft EIS, ConocoPhillips would construct an artificial island in Harrison Bay to transport large sealift modules during construction, and transport those modules over ice roads to the project area.  BLM concluded in the draft EIS that transport of construction modules from existing dock facilities on ice roads crossing the Colville River was not feasible.

33.     On March 26, 2020, BLM released a supplemental draft EIS to evaluate a new module delivery alternative that it had previously determined was not feasible— delivering 3,000- to 4,000-ton modules via the existing Oliktok Dock and an ice road crossing the Colville River—along with constructing a freshwater reservoir and adding three boat ramps for subsistence access.  85 Fed. Reg. 17,094 (Mar. 26, 2020).

34.     Members of the public submitted detailed comments on BLM's draft and supplemental draft EISs, which, among other things, pointed out that the draft and supplemental draft EISs failed to consider reasonable alternatives, failed to provide adequate process for public involvement, and failed to take a hard look at the direct, indirect, and cumulative impacts from the Project, including by failing to accurately estimate and analyze the significance of greenhouse gas emissions from the Project, and failing to adequately consider the impacts of the Project to caribou.

35.     Among other reasonable alternatives, Plaintiffs, and others, requested that BLM consider an alternative that would prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas, which would limit impacts to these particularly important areas that have been designated for maximum protection, and an alternative that would permit drilling only during the winter season and eliminate construction of permanent roads, which would mitigate disturbance to nesting birds, caribou fall migration, and summer and fall subsistence activities, reduce the risk of well blowout during the open water season, and significantly reduce the gravel needed for the project.

36.     On August 14, 2020, BLM announced its publication of the final EIS for the Willow Project.  85 Fed. Reg. 49,677 (Aug. 14, 2020).  In the final EIS, BLM identified ConocoPhillips' proposal—Alternative B and Module Delivery Option 3 (the Colville River ice crossing)—as its preferred alternative.

37.     Because the Willow Project may affect threatened or endangered species,

including polar bears, BLM consulted with the Fish and Wildlife Service pursuant to Section 7 of the ESA. The Service issued a biological opinion addressing the Willow Project's effects on Steller's eiders, spectacled eiders, northern sea otters, and polar bears, and areas designated as critical habitat, on October 16, 2020. The biological opinion concluded that the Willow Project is not likely to adversely affect Steller's eiders or northern sea otters, and that it was likely to adversely affect, but not jeopardize the continued existence of, spectacled eiders and polar bears. The biological opinion also concluded that the Willow Project is not likely to adversely affect critical habitat for any listed species. On October 26, 2020, BLM signed a ROD approving ConocoPhillips' Willow Project. The ROD approved ConocoPhillips' proposed project—Alternative B and Module Delivery Option 3.

38.     The Willow Project, as described in the final EIS and ROD, will include up to five drill sites, a central processing facility, an operations center, up to 700 miles of ice road during construction, including an 80-mile heavy-haul ice road crossing the Colville River, 263 miles of resupply ice roads during operations, an airstrip, up to 386 miles of pipelines, and a gravel mine site in the Reserve. BLM predicts the Project will have peak production of over 160,000 barrels of oil per day, producing approximately 586 million barrels of oil over its 30-year life.

## A. BLM's Consideration of Alternatives

39.     BLM considered the same three action alternatives in the final EIS it considered in the draft EIS.  These alternatives are not meaningfully different.  Each alternative would permit ConocoPhillips to construct the core infrastructure it proposed in the locations it proposed, including the same number of well pads, the same pad size and placement, and the same road and/or pipeline alignment.

40.     BLM improperly limited the alternatives it considered based on ConocoPhillips' preferences, rather than BLM's legal mandates and the Project's public purpose.  It failed to consider any meaningfully different alternatives, including any alternative that would reduce the number of drill pads or otherwise change the layout or reduce the size of the Willow Project, an alternative that would eliminate infrastructure within the Teshekpuk Lake and Colville River Special Areas, or a winter-only drilling alternative.

41.     The Teshekpuk Lake and Colville River Special Areas have been designated by the Secretary because of their extraordinary ecological and cultural values. The Reserves Act requires that Special Areas be managed to ensure "maximum protection" of their surface values.  42 U.S.C. § 6504(a).  All alternatives considered in the final EIS include drill pads and other infrastructure within Special Areas.  An alternative that prohibited infrastructure in Special Areas would reduce the impact to these important areas.

42.     A roadless, seasonal drilling alternative, would mitigate disturbance to

nesting birds, fall caribou migration, and summer and fall subsistence activities. It would

also reduce well blowout risks, eliminate the footprint of, and year-round barrier created

by, gravel roads, and would require significantly less gravel. The nearby CD-3

development is currently operated only seasonally, with ice road access, demonstrating

that this alternative is feasible.

### B. The Willow Project's Greenhouse Gas Emissions

43. Human activity, especially the burning of fossil fuels, has increased the

concentration of greenhouse gases in the atmosphere and caused Earth's climate to warm

at an accelerating rate over the past century. This warming is projected to continue, with

potentially catastrophic consequences, if left unchecked.

44. The world is already experiencing impacts from climate change, with

drought and extreme weather events becoming increasingly common. Climatic change

and greenhouse gas emissions are having dramatic impacts on plant and animal species

and habitat, threatening both human and other species' resiliency and ability to adapt to

these changes.

45. The effects of warming in Arctic Alaska have been especially severe.

Alaska has warmed more than twice as fast as the rest of the United States over the past

60 years, and the Arctic is expected to warm by an additional 10°F to 12°F this century.

This rapid warming presents myriad disruptions to Arctic ecosystems, including in the

Reserve. In the Arctic, climate change is causing, and will continue to cause, sea-level

rise, sea-ice melt, river flow changes, and permafrost thaw.

46.     Extensive research demonstrates the urgent need to reduce greenhouse gas emissions on an enormous scale.  According to the Intergovernmental Panel on Climate Change, to limit warming below 2°C, a level beyond which impacts from warming may be catastrophic to humans and other life on earth, global emissions must decline by 20% relative to 2010 levels by 2030, and reach zero by 2075.

47.     This necessary transition leaves no room in the global carbon budget for developing new fossil fuel discoveries, especially in the Arctic.

48.     The Willow Project will result in substantial greenhouse gas emissions— more than 258 million metric tons $CO_2$ equivalent ($CO_{2e}$) over the life of the project. BLM estimates that the annual average greenhouse gas emissions resulting from the Project will be approximately equal to all other Alaska North Slope emissions combined.

49.     The final EIS, however, concludes that the preferred alternative will result in a "net" change from baseline greenhouse gas emissions of only 35 million metric tons $CO_{2e}$, less than 14 % of the Project's total direct and indirect emissions.  BLM reached this implausible conclusion through a flawed application of a market simulation model (MarketSim) developed by BOEM, which attempts to predict how oil production from a project would substitute for (or displace) production of other energy sources.

50.     BLM's use of MarketSim arbitrarily excludes the project's effects on foreign oil and gas consumption, without justification and without any appropriate adjustment.  This error results in a substantial underestimate of emissions.  The Ninth

Circuit recently rejected BOEM's nearly identical analysis of downstream greenhouse gas emissions from burning oil that would be produced by another proposed Arctic oil development project. *Ctr. for Biological Diversity*, No. 18-73400, 2020 WL 7135484. BLM also has not disclosed its full analysis, key assumptions, and data used in its runs of the market simulation tool, and it relies on unsupported assumptions, including that demand for oil will remain largely constant over the next 70 years.

51. BLM's conclusion that nearly all oil produced from the Project would displace other energy sources is implausible and inconsistent with evidence from BOEM's market model and the consensus of credible scientific research on energy substitution, which demonstrate a much more modest substitution effect of about 50% for new fossil fuel production

52. The final EIS also misleadingly compares peak annual emissions from the Willow Project to total U.S. emissions in 2017, disregarding evidence that U.S. emissions have been falling and will continue to fall over the life of this project, thereby understating the proportion of U.S. emissions the Project will likely produce. Emissions from the Willow Project will be a much larger proportion of total annual U.S. emissions than BLM estimates.

53. Even this misleading comparison shows that annual emissions from the Willow Project will be approximately equal to 0.13 percent of all U.S. greenhouse gas emissions in 2017, an enormous contribution to the U.S. greenhouse gas inventory from a single project.

54.     Despite the substantial emissions the Project will produce and the urgency and severity of climate change, the final EIS includes no discussion of the actual environmental effects of these emissions or their significance.

55.     Instead, the final EIS provides only volumetric totals of direct and indirect emissions, which it claims to assess "as a proxy for understanding the potential effects of the [Willow] Project on climate change."

56.     This estimate of volume fails to account for the actual effects of the emissions, including among many other things, the contribution to sea-level rise, species loss, property damage, and human health impacts.  A volume estimate alone also cannot account for the incremental increase in harm caused by emissions over time as greenhouse gases continue to accumulate in the atmosphere and climate stress on the physical environment and economy increases.

57.     In providing only estimated volumes of emissions, BLM ignored well-established methods for quantifying and assessing the potential effects of those emissions, including the social cost of greenhouse gases metric, a tool developed by a federal Interagency Working Group to evaluate the significance of a project's greenhouse emissions by monetizing the damages caused by the emissions.  BLM acknowledges this metric is capable of assessing the economic cost of a project's greenhouse gas emissions.

58.     In addition to its failure to use available science to quantify the effects of the Willow Project's emissions, BLM failed to use other available information and methods to assess the significance of emissions, including a carbon budget analysis,

which would assess the emissions from the Willow Project in the context of remaining greenhouse gasses that may be emitted while maintaining warming below an acceptable threshold. Moreover, the final EIS fails even to include a qualitative assessment of the effects of direct and indirect emissions from the Project that acknowledges the significance of the threat of climate change and the cumulative nature of the problem.

### C. The Effects of the Willow Project on the Teshekpuk Caribou Herd

59. The Willow Project poses a particularly significant threat to the Teshekpuk Caribou Herd and the communities that rely on it as a subsistence and cultural resource.

60. Roads, vehicle traffic, pipelines, and air traffic all can disturb and displace caribou.

61. The Willow Project falls within the highest-use portion of the Teshekpuk Caribou Herd's range.

62. The Teshekpuk Caribou Herd is the only Alaska caribou herd in which the majority of individuals regularly overwinter on the coastal plain. The Teshekpuk Caribou Herd uses areas within and near the Project area year round, including for overwintering, migration, calving, postcalving, and insect relief.

63. Winter is a critical time for caribou, and disturbance during this time can have very significant consequences. Foraging opportunities are limited during the winter and caribou rely on body stores of energy for survival and gestation. Disturbances can lead to flight responses in caribou, causing them to expend additional energy. This

additional energetic cost may lead to loss of body mass and depletion of vital energy reserves.  These effects can be greater in high-snowpack years, when energetic costs of movement are higher and foraging opportunities are reduced.  High-snowpack years are expected to become more frequent over the life of the project.

64.     Any extra expenditure of energy that caribou undertake as a result of interaction with oil and gas activity or development is of concern as reproductive success in caribou is strongly correlated with nutritional stress.  Late winter body mass of female caribou has been strongly linked to calf production and survival, potentially influencing population growth rates.

65.     The Willow Project would be the first development project within the year-round range of any Alaska caribou herd, creating unprecedented potential contact with oil and gas development and activity throughout the year.

66.     The final EIS briefly acknowledges that the Project will disturb caribou during winter, but it fails to analyze the significance of those effects or acknowledge the novelty of the extent to which the Teshekpuk Caribou Herd will be exposed to oil and gas development during winter as a result of the project.  Nor does the final EIS acknowledge or analyze the significance of the unprecedented year-round exposure to oil and gas infrastructure and activity the Willow Project will cause.

**D.** **The Fish and Wildlife Service's Biological Opinion and Potential Harm to Polar Bears**

67.     Polar bears are listed as threatened species under the ESA and are also protected under the MMPA.  50 C.F.R § 17.40(q); 73 Fed. Reg. 28,212 (May 15, 2008).

68.     The Southern Beaufort Sea (SBS) polar bear population in the Willow Project area has already declined significantly, and the remaining bears are under enormous stress because climate change is destroying their habitat, making it more difficult for them to find food, and increasing their energy expenditure.

69.     As sea-ice extent and duration decreases, SBS population polar bears are spending more time onshore, including increasingly denning on land.  This trend is expected to continue, with inland areas of the Reserve, including the Willow Project area, becoming more critical to the SBS population.

70.     BLM and the Fish and Wildlife Service acknowledge that the Willow Project may disturb both denning and non-denning bears.  Disturbance of denning bears is particularly problematic because it can cause premature den or den site abandonment after cubs are born, leading to death of cubs.

71.     Given the precarious status of the SBS population of polar bears and the foreseeable significant cumulative effects from Arctic National Wildlife Refuge oil exploration and development, disturbance of even one denning bear could have significant consequences for the population.

72.     The Service issued a biological opinion concluding that the Willow Project

is not likely to jeopardize the continued existence of polar bears or adversely affect their critical habitat.  These conclusions rely in part on future compliance with mitigation measures and take authorizations issued under the MMPA.  Because these measures are unspecified, however, the Service has no basis on which to conclude that compliance with any such measures will prevent jeopardy or adverse effects to critical habitat. Moreover, incidental take authorizations under the MMPA are geared toward ensuring an activity will have a negligible impact on the species over the five-year period covered by the regulations, and without considering the cumulative impacts from other activities. 16 U.S.C. § 1371(a)(5)(A); 50 C.F.R. § 18.27.  Compliance with these short-term measures does not necessarily establish that a species will not be jeopardized over the life of a much longer-term project.

73.     The Service also estimates that the Willow Project will result in incidental take of up to two bears from direct injury as a result of hazing over the life of the project. This estimate fails to account for take resulting from disturbance and harassment that does not cause direct injury or mortality, even though the biological opinion contemplated disturbance rising to the level of take.  It also fails to account for any take resulting from mortality caused by den disturbance—the Service estimates a mean of 2.2 cubs could be killed by den disturbance over the life of the project.

74.     Despite concluding that the Willow Project will result in take of polar bears, the biological opinion does not include an incidental take statement as required by the ESA.  Instead, the Service defers to future take authorization under the MMPA.

These authorizations, which are uncertain and do not yet exist, fail to establish the permissible level of take over the life of this project.

## CLAIMS FOR RELIEF

### I.  First Claim for Relief (NEPA)

75.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 74.

76.     NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

77.     An agency must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E); 40 C.F.R. § 1502.14.[1]

78.     The range of alternatives must include reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment.  40 C.F.R. § 1500.2(e).

79.     An agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear

---

[1] All citations to Chapter V, Subchapter A of Title 40 of the Code of Federal Regulations, 40 C.F.R. § 1500 *et seq*., are to the regulations in effect prior to September 14, 2020, which are applicable to this action.  *See* 40 C.F.R. § 1506.13 (Sept. 14, 2020).

Case 3:20-cv-00308-HRH   Document 1   Filed 12/21/20   Page 24 of 33

basis for choice among options by the decision maker and the public." 40 C.F.R. § 1502.14.

80.     The action alternatives considered in the final EIS are not meaningfully different and would not have meaningfully different environmental impacts.  Each action alternative includes the same core infrastructure and layout, including the same number of wells, the same pad size and placement, and the same road and/or pipeline alignment.

81.     The final EIS fails to consider appropriate, environmentally protective alternatives, including any alternative that would reduce the size of the development, eliminate infrastructure in designated special areas, or limit drilling only to the winter season and eliminate gravel road construction.

82.     BLM asserts that it may not consider meaningfully different alternatives because it lacks authority to limit ConocoPhillips' development of its leases and that it must allow ConocoPhillips to extract all of the oil and gas possible within leased areas. This assertion is contrary to its obligations and authority under the Reserves Act to restrict activity as it determines necessary to protect surface resources and is an unlawful basis on which to justify failure to consider reasonable alternatives which would reduce environmental impacts.

83.     Defendants' decision to permit the Willow Project without considering reasonable alternatives that would reduce adverse impacts and without describing the comparative environmental impacts of those alternatives was arbitrary, capricious, and not in accordance with law in violation of NEPA, 42 U.S.C. § 4332(2)(C), its

implementing regulations, 40 C.F.R. §§ 1500.2, 1502.14, and the Administrative

Procedure Act (APA), 5 U.S.C. §§ 702, 706.

## II.     Second Claim for Relief (NEPA)

84.     Plaintiffs incorporate by reference each of the allegations in paragraphs 1

through 83.

85.     NEPA requires that federal agencies prepare a "detailed statement"

regarding all "major Federal actions significantly affecting the quality of the human

environment."  42 U.S.C. § 4332(2)(C).  The agency must take a hard look at the

environmental consequences of a proposed action, including by disclosing and analyzing

the significance of all direct, indirect, and cumulative environmental impacts of each

alternative.  40 C.F.R. §§ 1502.14, 1502.16.  The agency's analysis must include accurate

scientific analysis, expert agency comments, and public scrutiny.  40 C.F.R. § 1500.1(b).

86.     When an agency considers a decision that will result in greenhouse gas

emissions, NEPA requires the agency to analyze and disclose the effects of these

emissions, including emissions from fossil fuels that will be burned because they will be

produced or delivered to market as a result of the agency's decision.

87.     The final EIS fails to fully consider and accurately describe the magnitude

and significance of greenhouse gas emissions from the Willow Project.

88.     BLM improperly excluded foreign oil consumption from the market

simulation model it used to estimate the project's net greenhouse gas emissions.  The

final EIS's conclusion that the Willow Project will have only negligible net greenhouse gas emissions because nearly all the oil produced by the Project would replace other energy sources is therefore unsupported and arbitrary. The conclusion is also arbitrary because the final EIS fails to disclose the full analysis, key assumptions, and data used in runs of the market simulation tool, and it relies on the unsupported assumption of near constant demand.

89.     The final EIS fails to disclose and analyze the environmental effects of the Project's direct and indirect greenhouse gas emissions or the significance of those emissions. In doing so, BLM ignored available science and well-established methods for assessing the effects of the Project's greenhouse gas emissions.

90.     The final EIS misleadingly compares estimated emissions from the Willow Project with total U.S. emissions in 2017. This misrepresents the significance of the Project's emissions, and the comparison wrongly assumes constant domestic greenhouse gas emissions over the 30-year life of the Project, failing to account for the likelihood that U.S. emissions will fall significantly over that time.

91.     Defendants' failure to accurately disclose and adequately analyze greenhouse gas emissions from the Willow Project is arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.9(c), 1502.14, and the APA, 5 U.S.C. §§ 702, 706.

## III.    Third Claim for Relief (NEPA)

92.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 91.

93.    NEPA requires that federal agencies prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). NEPA requires an agency to take a hard look at the environmental consequences of a proposed action, including by disclosing and analyzing the significance of all direct, indirect, and cumulative environmental impacts of each alternative. 40 C.F.R. §§ 1502.14, 1502.16. The agency's analysis must include accurate scientific analysis, expert agency comments, and public scrutiny. 40 C.F.R. § 1500.1(b).

94.    BLM did not provide objective data, and other scientific information relevant to its decision, concerning the Willow Project's potential impacts on caribou.

95.    The final EIS fails to adequately discuss the magnitude and nature of potential direct, indirect, and cumulative impacts to caribou from year-round exposure to oil and gas infrastructure and activity caused by the Willow Project.

96.    Defendants' failure to accurately disclose and adequately analyze impacts from the Willow Project is arbitrary, capricious, and not in accordance with law, in violation of NEPA, 42 U.S.C. § 4332(2)(C), its implementing regulations, 40 C.F.R. §§ 1502.9(c), 1502.14, and the APA, 5 U.S.C. §§ 702, 706.

## IV.    Fourth Claim for Relief (ESA)

97.    Plaintiffs incorporate by reference each of the allegations in paragraphs 1 through 96.

98.    Polar bears are protected under both the ESA and the MMPA.  While the ESA and MMPA both generally prohibit take of protected species, they establish distinct processes and standards to exempt an activity from those general prohibitions.

99.    Under Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), federal agencies considering any action that may affect threatened or endangered species or their critical habitat are required to engage in consultation with the Secretary of the Interior and/or Commerce—depending on the species involved—to ensure that the action is not likely to jeopardize the continued existence of the species or adversely modify its critical habitat.

100.    After consultation and before initiation of the agency action, the Secretary must, pursuant to 16 U.S.C. § 1536(b)(3)(A), issue a biological opinion detailing how the action affects the listed species and critical habitat, and determining whether the action is likely to jeopardize the continued existence of the species or adversely modify its critical habitat.  To accomplish this, the agency and the Secretary must use the best scientific and commercial information available.  16 U.S.C. § 1536(a)(2).  Mitigation measures supporting a no jeopardy or no adverse modification conclusion must be reasonably specific, certain to occur, and capable of implementation.

101.    The Fish and Wildlife Service issued a biological opinion concluding that the Willow Project was likely to adversely affect, but not jeopardize the continued

existence of polar bears. The Service's biological opinion also concluded that the Willow Project would not adversely affect polar bear critical habitat.

102. The Service's no jeopardy and no adverse effects to polar bear critical habitat determinations rely on compliance with take authorization and terms and conditions issued under the MMPA. These authorizations do not yet exist and therefore do not constitute specific and binding plans necessary to support a no jeopardy finding. The Service cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under Section 7 of the ESA. Moreover, MMPA take authorizations and mitigation measures are geared toward ensuring an activity will have a negligible impact on the species over the five-year period covered by the regulations, and do not consider the cumulative impacts from other activities. 16 U.S.C. § 1371(a)(5)(A); 50 C.F.R. § 18.27. Compliance with these short-term measures does not necessarily establish that a species will not be jeopardized over the life of a much longer-term project as required under Section 7 of the ESA.

103. A federal agency and any permittee may take listed species only in accordance with an incidental take statement issued with a biological opinion. "Take" is defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. 16 U.S.C. § 1532(19). The Secretary is required under Section 7(b)(4) of the ESA to issue an incidental take statement with a biological opinion that specifies the amount and extent of incidental take authorized to

the action agency.  16 U.S.C. §§ 1536(b)(4), 1536(o).

104.    The Service has not issued an incidental take statement for polar bears, despite acknowledging that the Willow Project is likely to result in take of up to two bears.  Instead, the Service asserts that it cannot authorize take because take has not been authorized yet under the MMPA, and that the future MMPA authorization will substitute for authorization of take in the biological opinion.  While the ESA and MMPA both generally prohibit take of protected species, they establish distinct processes and standards to exempt an activity from those general prohibitions.  For this reason, compliance with the MMPA does not fulfill the Service's consultation obligations under Section 7 of the ESA.  The Service has failed to meet the separate requirements of Section 7, including issuing an incidental take statement with its biological opinion that specifies the extent of incidental take permitted over the life of the project.  16 U.S.C. § 1536(b)(4).

105.    Additionally, the Service's estimate that the Willow Project could result in take of up to two bears over the life of the project improperly excludes take other than from direct wounding bears from hazing, thereby failing to account for take from disturbance and harassment that does not cause direct injury.  Moreover, the Service improperly concluded that death or serious injury of polar bears from den disturbance is not reasonably certain to occur, and otherwise underestimated the extent of den disturbance.  The Service's conclusions are not based on the best available science and fail to consider relevant factors, including scientific studies indicating that more than 60

Case 3:20-cv-00308-HRH   Document 1   Filed 12/21/20   Page 31 of 33

percent of polar bears now den on land and that this proportion will likely increase over the life of the Willow Project as sea ice continues to diminish. The Service also underestimated the extent of den disturbance by overestimating the effectiveness of den detection methods, including by assuming a much higher den detection rate using Forward-Looking Infrared Imagery than field data indicate.

106. Defendant Fish and Wildlife Service's reliance on uncertain, future MMPA authorizations and conditions to support its no jeopardy and not likely to adversely affect critical habitat determinations, its failure to properly consider and analyze the extent of den disturbance, and its failure to issue an incidental take statement for polar bears is arbitrary, capricious, and not in accordance with law, in violation of the ESA, its implementing regulations, and the APA. 5 U.S.C. §§ 702, 706; 16 U.S.C. § 1536(a)(2), (b)(3)(A), (b)(4).

## PRAYER FOR RELIEF

Plaintiffs respectfully request that the Court:

1. Enter declaratory judgment that Defendants' decision to approve ConocoPhillips' Willow Project and Defendant Fish and Wildlife Service's biological opinion for the Project was arbitrary, capricious, and/or not in accordance with the law;

2. Vacate Defendants' Record of Decision approving the Willow Project;

3. Vacate Defendants' biological opinion for the Willow Project;

4. Enter appropriate injunctive relief to ensure that Defendants comply with

Case 3:20-cv-00308-HRH   Document 1   Filed 12/21/20   Page 32 of 33

the NEPA and the ESA and to prevent irreparable harm to Plaintiffs and to the

environment until such compliance occurs;

5.      Award Plaintiffs the costs of this action, including reasonable attorney's

fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412; and

6.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 21st day of December, 2020.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org


*s/ Eric Jorgensen*
Eric P. Jorgensen (Alaska Bar No. 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological*
*Diversity, Friends of the Earth, and*
*Greenpeace, Inc.*