Eric B. Fjelstad
EFjelstad@perkinscoie.com
PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, AK 99501-1981
Telephone: 907.263.6973
Facsimile: 907.263.6473

Stacey Bosshardt (*pro hac vice* pending)
SBosshardt@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN INUPIAT FOR A LIVING ARCTIC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> BUREAU OF LAND MANAGEMENT, et al., <br><br> Defendants. | **Case No. 3:20-cv-00290-SLG** |

**AMICUS CURIAE BRIEF OF ARCTIC SLOPE REGIONAL CORPORATION SUPPORTING DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

                                                               **Page**

INTRODUCTION ............................................................................................. 1

BACKGROUND ............................................................................................... 3

ARGUMENT ..................................................................................................... 5

CONCLUSION ................................................................................................ 10

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
Page **1** of **1**

Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 2 of 14

## INTRODUCTION

A preliminary injunction "is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief."[1] A party seeking injunctive relief must show all of the following things: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."[2] As demonstrated in Federal Defendants' and Intervenor-defendants' briefs, Plaintiffs have failed to make the required showing on any of the four prerequisites.

Arctic Slope Regional Corporation (ASRC), an Alaska Native Corporation located on the North Slope of Alaska in the vicinity of the Willow Master Development Plan Project (Project), is uniquely aware of the reasons that an injunction would not be in the public interest. ASRC's shareholders have called the North Slope home for over 10,000 years. Nearly half of ASRC's 13,000 Iñupiat shareholders currently reside in the challenging conditions of the North Slope, and all of them are dependent on the dividends issued by ASRC. Those dividends are possible due to development and the attendant infrastructure on the North Slope. As stated in the Environmental Impact Statement (EIS) and Record of Decision (ROD) for the Project, drilling would have a peak production of up to 130,000 barrels of oil per day over the Project's 30-year life

---

[1] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24 (2008).

[2] *Id.* at 20.

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **1** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 3 of 14

(producing approximately 590 million barrels of oil), which would help offset declines in production from the North Slope oil fields and contribute to the local, state, and national economies.[3] The Bureau of Land Management found that "[i]ncreased revenue from [oil and gas] development for the NSB and ASRC has . . . beneficially impacted Nuiqsut residents through health and social programs funded by these organizations, more job opportunities associated with programs run by these organizations, and increased dividends for ASRC shareholders."[4] Enjoining the development of the Project, as Plaintiffs seek here, would be inconsistent with the public interest and detrimental to the Alaska Native population.

Since the Covid-19 pandemic began, Alaska Natives have suffered from unprecedented job losses, plummeting government tax bases, and urgent public health needs. The combination of restricted access to hospitals coupled with isolated populations has the potential to decimate entire Alaska Native communities, as evidenced by the horrific impact on these communities by the Spanish Flu. The Project would help ameliorate these conditions for North Slope residents, including ASRC's shareholders, by providing dividends that augment household incomes, job opportunities, and access to critical social services and programs that depend on government revenues. The Ninth

---

[3] "North Slope oil production peaked in 1988 and then entered a steady decline through 2015 (USEIA 2016)." *Willow Master Development Plan*, Environmental Impact Statement ("EIS") (available at https://eplanning.blm.gov/eplanning-ui/project/109410/570), p. 223.

4 EIS, p. 296.

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **2** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 4 of 14

Circuit has recognized that private projects on federal lands like Willow, which improve the economic health of local communities by stemming job losses, serve the public interest.[5] The effects of lost economic opportunities on the North Slope of Alaska would be felt more keenly now than ever. An injunction would be contrary to the public interest.

## BACKGROUND

ASRC is one of twelve land-owning Alaska Native regional corporations established pursuant to the Alaska Native Claims Settlement Act of 1971 (ANCSA).[6] ASRC's region is the North Slope of Alaska and encompasses 55 million acres. The North Slope region includes the villages of Point Hope, Point Lay, Wainwright, Atqasuk, Utqiaġvik (formerly Barrow), Nuiqsut, Kaktovik, and Anaktuvuk Pass. The residents of these villages are also residents of the North Slope Borough. The Borough's residents

---

[5] *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) (acknowledgment by en banc panel that a national forest project benefitted the public's interest in a variety of ways, including by "aiding the struggling local economy and preventing job loss"), *overruled on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008); *Earth Island Inst. v. Nash,* No. 119CV01420DADSAB, 2020 WL 1936701, at *20 (E.D. Cal. Apr. 21, 2020) (denying preliminary injunction against project that would "serve the public interest by promptly reducing the fuel load and the risk of another severe wildfire striking the area; protecting and restoring wildlife and the environment; and providing socioeconomic benefits to local communities impacted by the fire, such as employing contractors and industrial forest landowners."); *see also Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 949 (9th Cir. 2008) (statutory public interest determination properly considered economic benefits in balancing public interest factors; "[g]iven the relatively poor condition of the local economy in relation to the state overall, we agree that these benefits are weighty in this case").

[6] 43 U.S.C. § 1601 *et seq.*

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **3** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 5 of 14

are predominantly Iñupiat people, and they comprise many of the approximately 13,000 Alaska Native owners of ASRC.

Within the North Slope region, ASRC also holds title to approximately five million acres of land conveyed to it under ANCSA, much of it with energy, mineral and other resource potential. Among many other efforts, ASRC pursues and benefits from natural resource development on and near its lands. Its shareholders also depend on subsistence resources from the land as well as the rivers and ocean, as they have for millennia. ASRC also represents the business interests of the Iñupiat of the Arctic Slope and is the largest Alaskan-owned and operated company, spanning six major business segments.

Under ANCSA, Congress created Native corporations, including ASRC, "to provide benefits to its shareholders who are Natives or descendants of Natives or to its shareholders' immediate family members who are Natives or descendants of Natives to promote the health, education or welfare of such shareholders or family members."[7] Consistent with this unique Congressional mandate, ASRC is committed both to providing sound financial returns to its shareholders in the form of jobs and dividends, and to preserving the Iñupiat way of life, culture and traditions, including the ability to hunt for food to provide for its communities. A portion of ASRC's revenues are invested in initiatives that promote and support an educated shareholder base, healthy communities, and sustainable local economies.

---

[7] 43 U.S.C. § 1606(r).

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **4** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 6 of 14

ASRC's perspective is based on the dual realities that its Iñupiat culture and communities depend upon a healthy ecosystem and subsistence resources as well as natural resource development as the foundation of a sustained North Slope economy. The Willow Master Development Plan Project (Project) challenged in this case represents the type of oil and gas development that balances these interests, and ASRC therefore has an interest in its prompt and successful implementation.

## ARGUMENT

Plaintiffs cannot show that the extraordinary relief they seek is in the public interest. To the contrary, an injunction would frustrate the public interest. First, ASRC and its shareholders would benefit directly from opportunities for the Corporation's subsidiaries, including ASRC Energy Services, LLC, to contract with the project proponent, ConocoPhillips. These opportunities, if realized, would result in increased dividends provided directly to ASRC shareholders.[8] Given the limited job opportunities available in the Project area, compounded by the inherent difficulty of living in a remote area, the financial assistance ASRC provides is crucial even under ordinary circumstances.[9] Dividends such as the ones provided by ASRC necessarily help

---

[8] EIS, p. 225 ("If local oil industry support companies, such as those owned by Kuukpik or ASRC, earn revenues on the Project, this would indirectly affect local incomes through increased dividends."); *id.,* p. 226.

[9] EIS, p. 228 ("corporation dividends now make up a substantial portion of household income in the NSB."); *id.* (61% of household heads in Nuiqsut reported owning village corporation shares); *id.*, p. 222 ("Nuiqsut households receive approximately half of their income from wages and half from corporation and state permanent fund dividends (NSB 2016)").

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **5** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 7 of 14

shareholders to pay rent and defray the high cost of utilities. The assistance provided by Alaska Native Corporations such as ASRC, as well as the village corporations, is all the more critical given the dire economic circumstances wrought by Covid-19. Supplementing household incomes, which have seen marked declines over the past year, would advance the public interest. Enjoining the project would postpone or eliminate a needed spur to the economy and disserve the public interest.

ASRC and its subsidiaries, the North Slope Borough municipal government, and the village corporations employ many North Slope residents, so any work they perform to support Project operations will increase employment rates in these communities.[10] In addition, ASRC shareholders would certainly benefit from increased opportunities for direct employment with ConocoPhillips. During the time it would take to build the Project facilities, the EIS projects that the company will employ as many as 1,650 seasonal workers (peak) and an average of 373 annual workers.[11] Once operational, the Project would directly employ approximately 406 full-time employees.[12] Although the EIS forecasts that most construction jobs will not go to local residents, "some construction jobs and supporting service jobs would likely be filled by NSB residents,

---

[10] *See* EIS, p. 228 ("ANCSA corporations and municipal governments (both borough and city) on the North Slope created new employment opportunities in communities and remain the primary employers in most communities.").

[11] *Willow Master Development Plan*, Record of Decision (Oct. 2020) (available at https://eplanning.blm.gov/eplanning-ui/project/109410/570), p. 9; *see generally* EIS § 3.15 ("Economics").

[12] ROD, p. 9.

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **6** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 8 of 14

positively impacting the local and regional economy."[13] All told, "throughout the Alaska economy, indirect and induced wages would total $131.1 million per year."[14]

Second, ASRC and its shareholders would benefit from increased revenues to the State and the North Slope Borough (NSB). The EIS projects revenues for the State of Alaska and NSB—from federal royalties and state and local taxes—of approximately $6 billion, as well as increased federal revenues totaling $5 billion.[15] Under the Naval Petroleum Reserves Production Act (NPRPA), the State of Alaska receives 50% of royalties from the production of oil and gas on federal lands.[16] Local residents and communities will benefit most from these revenues; the statute requires the State to prioritize use of the funds by those communities most impacted by such development, which it does through its NPR-A Impact Grant Program.[17] These increased revenues thus translate into much needed social services that benefit the communities closest to the Project, like the City of Nuiqsut. In this case, Nuiqsut residents would experience these improvements. As the EIS explains:

---

[13] EIS App'x. B.3., 27; *see also* p. 225 ("any industry employment would impact the local and regional economy given the limited nongovernment job opportunities").

[14] EIS p. 225. This assumes an average salary of $57,000 per year. *Id.*

[15] *See* EIS Table 3.15.4 ("Summary of State, Federal, and Borough Revenues from the Project").

[16] EIS, p. 222.

[17] EIS, p. 223; *id.* at App'x. B.3, p. 44 ("regional benefits from the NPR-A Impact Fund which can provide funds to the municipal governments of the NPR-A communities should be fully considered in BLM's analysis. The NPR-A Impact Fund has provided benefits to the local communities as a direct result of development within NPR-A.").

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **7** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 9 of 14

> The NPR-A Impact Fund has provided benefits to the local communities as a direct result of development within NPR-A. Examples of positive impacts of the NPR-A Impact Fund can be seen in Nuiqsut, through funding of natural gas piping and building conversions, funding of local government operations, renovation of City Hall, as well as funds dedicated to the Youth and Community Center.[18]

Similarly, the vast majority of the NSB's operating budget is generated from the taxation of oil and gas infrastructure.[19] As ASRC stated in its comments:

> The NSB … provides funding for essential services to the local communities, these services include: K-12 education, health clinics, sewage, refuse, fire department, wildlife protection, research, police services, search and rescue, emergency response services, and other community necessities…[20]

The Project would generate further funding for the NSB by supporting Trans-Alaska Pipeline System (TAPS) operations, which increase "long-term property taxation opportunities for the NSB."[21] This in turn allows the NSB to provide services essential for "residents' quality of life through social welfare support and continued capital improvements."[22]

Finally, the public interest is served by upholding projects, like the Willow Master Development Plan, that result from a collaborative and responsive public process. ASRC provided comments on the draft EIS and the supplemental draft EIS.[23] Despite the

---

[18] *Id.*

[19] EIS, p. 223; *id.* at App'x. B.3, p. 44.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] ASRC May 4, 2020 letter from Richard Glenn to Rachael Jones; October 29, 2019 letter from Teresa Imm to Rachael Jones (both available at https://eplanning.blm.gov/eplanning-ui/project/109410/570).

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **8** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 10 of 14

logistical obstacles caused by the pandemic, ASRC also engaged in consultation with BLM.[24] Through its robust participation, ASRC sought to ensure that the Project also protected the Iñupiat way of life, including subsistence harvesting, to the maximum extent possible. Those efforts led to changes by BLM and ConocoPhillips that protect resources, including a reduction in the Project's footprint.[25] ASRC's comments on the draft EIS caused the company to modify the project to include a new module transfer option (Module Transfer Option 3) that avoids the need to construct an offshore gravel island.[26] The applicant also made changes to subsistence ramps.[27] Finally, as a result of ASRC's comments, ConocoPhillips committed to seek and incorporate input from Nuiqsut residents when siting boat ramps in order to protect and promote subsistence activities.[28]

Courts in this Circuit have recognized that it is not in the public interest to enjoin projects that could provide an economic lifeline to at-risk local economies.[29] The Ninth

---

[24] EIS, §1.10.4; *id.* at App'x. B.3, 40 ("BLM reached out to ASRC for ANCSA consultation in December 2019.").

[25] EIS App'x. B.2, p. 113.

[26] EIS App'x. B.2, 113. *See also* ASRC May 4, 2020 letter from Richard Glenn to Rachael Jones (available at https://eplanning.blm.gov/eplanning-ui/project/109410/570), p. 5 ("ASRC believes that BLM should adopt Alternative B and Module Transfer Option 3 in the final EIS as it provides for responsible North Slope development, increased employment opportunities, regional funding sources, while addressing the needs of the regional subsistence users.").

[27] EIS App'x. B.2, p. 33.

[28] EIS App'x. B.3, pp. 59 & 71.

[29] *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (upholding denial of preliminary injunction where "district court considered the government's interest in . . .

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **9** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 11 of 14

Circuit has also recognized the public's interest in developing energy resources.[30] ANCSA envisioned that ANCs would play an important role helping to channel some of the benefits of oil and gas resources to Alaska Natives.[31] Under current circumstances, the Project and others like it also represent an opportunity for local communities to rebound from pandemic-induced economic hardship. An injunction would not be in the public interest.

## CONCLUSION

For the reasons set forth above, Plaintiffs have not met their burden of demonstrating that an injunction would serve rather than frustrate the public interest.

---

.providing a boost to the local economy by creating jobs in the local logging industry"); *Earth Island Inst. v. Gould*, No. 1:14-CV-01140-KJM-SKO, 2014 WL 4082021, at *8 (E.D. Cal. Aug. 19, 2014) (denying preliminary injunction where "[t]he potential economic losses include the potential loss of jobs in the locality."); *Protect Our Communities Found. v. U.S. Dep't of Agric.,* No. 11-CV-00093-BEN (BGS), 2011 WL 13356151, at *12 (S.D. Cal. Sept. 15, 2011) ("Maintaining jobs is in the public interest").

[30] *W. Watersheds Project v. Salazar*, 692 F.3d 921 (9th Cir. 2012) (district court "properly weighed the environmental harm posed by the [solar power generation] project against the possible damage to project funding, jobs, and the state and national renewable energy goals that would result from an injunction halting project construction, and concluded that the balance favored [the government]."); *see also Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 127 (D.D.C. 2007) ("The development of domestic energy resources is of paramount public interest and will be harmed (at least to some extent) if that development is delayed.").

[31] EIS, p. 228 ("The desire to develop oil and gas resources on the North Slope was a major factor in passage of the ANCSA and creation of ANCSA Native corporations, including regional corporations (e.g., ASRC) and village corporations (e.g., Kuukpik) in each community as well as the creation of local municipalities. These corporations control money and land from the settlement agreement and were established with the intent to provide Alaska Natives with opportunities for self-control and self-determination.").

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **10** OF **12**

Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 12 of 14

Their motion should be denied.

Dated: January 16, 2021  Respectfully submitted,

/s/ Eric B. Fjelstad
Eric B. Fjelstad, Alaska Bar No. 9505020
EFjelstad@perkinscoie.com
PERKINS COIE LLP
1029 West Third Avenue, Suite 300
Anchorage, AK 99501-1981
Telephone: 907.263.6973

Stacey Bosshardt (*pro hac vice* pending)
SBosshardt@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

*Counsel for Amicus Curiae Arctic Slope Regional Corporation*

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **11** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 13 of 14

## RULE 7.4(a)(4) CERTIFICATION

I hereby certify under Local Civil Rule 7.4(a) that this brief contains 2,731 words, and complies with the word limits for an amicus brief.

/s/ Eric B. Fjelstad
Eric B. Fjelstad

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which in turn automatically generated a Notice of Electronic Filing ("NEF") to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identities recipients of electronic notice. I further certify that there appear to be no non-CM/ECF participants not represented by counsel in this case who require service by mail.

/s/ Eric B. Fjelstad
Eric B. Fjelstad, Alaska Bar No. 9505020

*Sovereign Iñupiat for a Living Arctic, et al. v. Bureau of Land Management, et al.*
Case No. 3:20-cv-00290-SLG
PAGE **12** OF **12**
Case 3:20-cv-00308-SLG   Document 32-1   Filed 01/16/21   Page 14 of 14