Jeremy C. Lieb
Ian S. Dooley
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: idooley@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*,   ) | |
|       *Plaintiffs*,   ) | |
|       v.   ) | Case No. 3:20-cv-00308-SLG |
| BUREAU OF LAND MANAGEMENT *et al.*,   ) | |
|       *Defendants*,   ) | |
| CONOCOPHILLIPS ALASKA, INC.,   ) | |
|       *Intervenor-Defendant.*   ) | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
## FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

ARGUMENT..................................................................................................... 1

I.    Plaintiffs are likely to succeed on the merits.............................................. 1

    A.    Defendants failed to adequately disclose and analyze greenhouse gas emissions. ............................................................................. 1

    B.    The FEIS failed to consider reasonable alternatives. .................... 4

    C.    The Reserves Act's statute of limitations does not apply to this case. ......... 7

II.    Plaintiffs are likely to suffer irreparable harm without an injunction. .................... 9

    A.    The deflection of caribou will irreparably harm subsistence. ....................... 9

    B.    Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests............................................... 14

    C.    The permanent road will commit the agency to future development, making it more difficult for the agency to reach a different decision that reduces impacts to species and habitat. ................................................. 18

III.    The balance of equities and public interest favor a preliminary injunction here. .................................................................................................. 19

CONCLUSION ................................................................................................ 21

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................................... 22

# INTRODUCTION

Plaintiffs have demonstrated that they are likely to succeed on claims that Defendants' approval of the Willow Project violated NEPA. Defendants and ConocoPhillips intend to begin on-the-ground activity pursuant to this unlawful approval before this Court can issue a decision on the merits. Preliminary relief is necessary to prevent imminent and irreparable harm to Plaintiffs and the Reserve.

# ARGUMENT

## I. Plaintiffs are likely to succeed on the merits.

### A. Defendants failed to adequately disclose and analyze greenhouse gas emissions.

Defendants violated NEPA by failing to adequately disclose and analyze greenhouse gas emissions associated with the Willow Project. *Center for Biological Diversity v. Bernhardt* (*CBD*), 982 F.3d 723 (9th Cir. 2020) sets out Defendants' obligations to (1) quantify greenhouse gas emissions, globally, or (2) explain specifically why they could not *and* (3) discuss the emissions' potential magnitude and nature. *Id.* at 740. Despite acknowledging that the Willow Project "would affect both domestic and foreign energy consumption," Doc. 9-7 at 106, BLM made no attempt to quantify foreign emissions, did not successfully explain why it could not, and declined to examine the potential magnitude or the nature of these emissions. Nothing in Defendants' or ConocoPhillips' opposition briefs distinguishes *CBD* or justifies these failures.

Defendants and ConocoPhillips do not dispute that BLM failed to quantify

emissions from foreign oil consumption, and they do not argue that, in the absence of such quantification, BLM met the basic requirement to "estimate the magnitude of such emissions" and provide a "thorough discussion of how foreign oil consumption might change the carbon dioxide equivalents analysis." *CBD*, 982 F.3d at 740. The Court, therefore, need look no further to conclude that Plaintiffs have demonstrated a likelihood of success on the merits.

BLM also did not explain adequately why it could not quantify these emissions. First, Defendants and ConocoPhillips fail to counter the controlling conclusion of *CBD* that the same information in the record here obligated BOEM, and therefore BLM in this case, to estimate global emissions. 982 F.3d at 738; *see* Doc. 9 at 8-9. As in *CBD*, the record here belies BLM's "contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence." 982 F.3d at 738.

Second, Defendants and ConocoPhillips assert that the FEIS here contains more extensive explanations for its greenhouse gas estimates than did the BOEM EIS in *CBD*. Doc. 30 at 37-38; Doc. 31 at 43-44. But across those discussions, the FEIS relies solely on the same unsupported assertions about emissions from foreign consumption that the court in *CBD* rejected: that the agency lacked reliable data or methods. The statements cited by Defendants are: Ex. 23 at 18 (AR182957) ("The issue is the uncertainty and lack of reliable data as to the likely distribution of demand changes among countries."); *id.* at 19 (AR182963) ("[I]nformation on which countries would consume less oil was not available."); Doc. 9-7 at 106 (AR183508) ("This estimation would require detailed data

on proportional consumption changes and the most likely energy substitution . . . for all countries worldwide."). *See* Doc. 30 at 37-38. *CBD* rejected BOEM's functionally indistinguishable versions of each. *See* 982 F.3d at 737 (rejecting BOEM's assertion that it "did not have sufficiently 'reliable information on foreign emissions factors and consumption patterns'"); *id.* at 738 (rejecting BOEM's undocumented assertion that "'[e]xcluding the foreign oil and gas markets is reasonable' because '[o]il consumption in each country is different, and BOEM does not have information related to which countries would consume less oil'").

ConocoPhillips, but not Defendants, argues that this case is distinguishable from *CBD* because BLM asserted that it was reasonable to exclude an assessment of foreign oil consumption on the basis that Willow oil will be consumed domestically. Doc. 31 at 43 (citing AR182963 (Ex. 23 at 19)). But BOEM made the same assumption in *CBD*. 982 F.3d at 739. Moreover, BLM itself recognizes that the market for oil is global, explaining that "the lower prices for oil and other energy sources associated with increased U.S. production as a result of the Willow [Project] would affect both domestic and foreign energy consumption." Doc. 9-7 at 106.

Defendants and ConocoPhillips also wrongly assert that the *CBD* decision hinged on BOEM's conclusion that building the Liberty project would reduce greenhouse gas emissions. Doc. 30 at 36; Doc. 31 at 42-43. The Ninth Circuit found that "counterintuitive" prediction "demonstrate[d] the need for further explanation," but not that it established or changed the obligations the court set out, and which are controlling

here.  *CBD*, 982 F.3d at 737; *supra* p. 1.  It was not the "lynchpin" of the court's holding as ConocoPhillips argues; Doc. 31 at 42-43, rather, the foundation of the court's holding is that "[e]missions resulting from the foreign consumption of oil are surely a 'reasonably foreseeable' indirect effect of drilling," and BOEM's omission of these effects from its analysis violated NEPA.  *CBD*, 982 F.3d at 737-38.  BLM's omission here did the same.

## B.    The FEIS failed to consider reasonable alternatives.

Defendants violated NEPA by failing to consider reasonable alternatives proposed by Plaintiffs that would change the layout and footprint of the Project by eliminating infrastructure in special areas or eliminating permanent roads.  Defendants and ConocoPhillips' arguments do not demonstrate that these two alternatives are infeasible or unreasonable or that BLM's FEIS considered a reasonable range of alternatives in their absence.[1]

Notably, Defendants do not defend BLM's repeated assertion that ConocoPhillips' rights under its leases precluded BLM from considering alternatives that require different configurations of drill sites or otherwise limit ConocoPhillips' plans.  *See* Doc. 9 at 13-14.  Alone, this concession about the inadequacy of BLM's justification supports a

---

[1] Contrary to ConocoPhillips' argument, Doc. 31 at 47-48, the FEIS's brief consideration and rejection of various alternative components in the alternatives development process does not satisfy the agency's obligation to give full and meaningful consideration to reasonable alternatives.  *See W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1052 (9th Cir. 2013) (rejecting an EA that briefly discussed reasonable alternatives but excluded them from detailed analysis).

conclusion that it was arbitrary, but, in any event, none of their other defenses are successful.

Defendants argue that an alternative without infrastructure in the Teshekpuk Lake Special Area could not meet the purpose and need of the Project "because two of the drill sites (Bear Tooth 2 and 4) are within that Special Area in an area available to oil and gas leasing." Doc. 30 at 34-35. This assertion is based upon a false premise; the purpose of the Project is not to construct the specific wells in the specific locations that ConocoPhillips has proposed, it is "to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources," Doc. 9-7 at 25. Nothing in this purpose and need statement is inconsistent with BLM considering an alternative that would prohibit infrastructure, including drill sites, within a special area. Nor does the fact that an area is open to leasing obligate BLM to approve any specific project or configuration of infrastructure proposed within that area. *See* Doc. 9 at 13-15.

Defendants argue that BLM has adequately explained that a winter-only drilling alternative would be economically infeasible, pointing only to a single comment response where BLM asserts that the winter drilling season would be too short. Doc. 30 at 35 (citing AR183012 (Doc. 9-7 at 90)). BLM provided no support for this assertion. Doc. 9 at 15. ConocoPhillips points only to the same comment response, which merely notes that CD3, which is operated without permanent roads, "has its own airstrip and also river access." Doc. 31 at 47-48 (citing AR183012 (Doc. 9-7 at 90)). Defendants' additional argument that this alternative would be infeasible because the short duration of the

*CBD et al. v. BLM et al.,*
Case No. 3:20-cv-00308-SLG                                                        5

drilling season could extend the life of the Project beyond ConocoPhillips' ten-year lease term, Doc. 30 at 35, makes little sense given that the Project is already scheduled to last much longer than ten years, Doc. 9-7 at 28, and that producing leases may be renewed, 43 C.F.R. § 3135.1-5.

Defendants and ConocoPhillips suggest that the three action alternatives BLM considered represent a reasonable range of alternatives, but they identify only minor differences in Alternatives C and D. Doc. 30 at 33-34; Doc. 31 at 45-46. They do not dispute the fundamental point that the action alternatives each call for construction of the same number of wells in the same locations. *See* Doc. 9-7 at 22, 30-32; Doc. 9 at 12. Neither Alternative C nor D fundamentally changes the layout or scale of the proposed Project. Doc. 9-7 at 22. By contrast, the two alternatives proposed by Plaintiffs would substantially change the Project layout or footprint by excluding infrastructure in areas recognized as especially ecologically and culturally important and reducing the need for gravel and the year-round barrier created by roads, minimizing harm to the environment, and providing a basis for informed decisionmaking. Doc. 9 at 13-14.

This case is not distinguishable from *Friends of Yosemite Valley*, as ConocoPhillips argues. Doc. 31 at 46-47 n.178. In that case, the court rejected an EIS because each action alternative relied on the same user capacity framework, even though there were some differences among them. *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1037, 1039 (9th Cir. 2008). The FEIS here is analogous: alternatives vary in minor respects but include the same core infrastructure and layout.

**C.     The Reserves Act's statute of limitations does not apply to this case.**

Defendants and ConocoPhillips assert that the Reserves Act's statute of limitations

required Plaintiffs to bring this case within 60 days after the Notice of Availability of the

FEIS.  Doc. 30; Doc. 31 at 37 n.135.  It did not.  The text, structure, and context of the

Reserves Act confirm that this provision does not apply to an EIS for an oil and gas

development project.  *See Padash v. INS*, 358 F.3d 1161, 1170 (9th Cir. 2004).

The provision's text is clear:  it applies to EISs "concerning oil and gas *leasing* in

the [Reserve]."  42 U.S.C. § 6506a(n)(1) (emphasis added).  "Leasing" is the gerund form

of the verb "to lease."  *Gerund*, Macmillan Dictionary,

https://www.macmillandictionary.com/us/dictionary/american/gerund (last visited Jan.

21, 2021) (defining "gerund" as a noun formed by adding "-ing" to a verb, that describes

an action, such as "running" or "believing").  It describes a type of action.  Thus, the text

provides that EISs concerning this type of action—not, as Defendants would have it, all

actions on "leases"—are subject to the limitation.  *See Nielsen v. Preap*, 139 S. Ct. 954,

965 (2019) (stating that in interpreting a statute, "[w]ords are to be given the meaning

that proper grammar and usage would assign them") (citing A. Scalia & B. Garner,

Reading Law: The Interpretation of Legal Texts 140 (2012)).  Consistent with this

ordinary meaning, "leasing" as used in the Reserves Act refers to a specific stage of

decision making where parcels are offered for lease and leases are issued.  The Act

distinguishes "leasing," 42 U.S.C. §§ 6506a(a), (i), (n), from other oil and gas activities

that may occur within the Reserve, including "exploration," "development," and

"production," 42 U.S.C. §§ 6504, 6505, 6506a(i)(3)(A), (j)(3), (k), (m); *see N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 974, 977 (9th Cir. 2006) (describing different stages of decision-making under the Reserves Act). As do BLM's implementing regulations. *See* 43 C.F.R. §§ 3130.0-1 to 3132.5-2 (governing oil and gas leasing in the Reserve); *id.* §§ 3152.1 to 3152.7 (governing oil and gas exploration), *id.* §§ 3160.0-1 to 3165.4 (governing oil and gas exploration, development, and production).

The provision's context further underscores that "leasing" does not encompass later-stage decisions like exploration and development. Congress enacted Section 6506a(n)(1) in 1980, when it authorized an "expeditious program of competitive *leasing* of oil and gas" in the Reserve. Pub. L. No. 96-514, 94 Stat. at 2964 (Dec. 12, 1980) (emphasis added). It envisioned that these "leasing" decisions would be accompanied by EISs, and, consistent with its intent to speed leasing, it subjected EISs *for those decisions* to expedited filing and judicial review provisions. *Id.* at 2964-65; 42 U.S.C. § 6506a(n)(1).

As the Ninth Circuit has recognized, NEPA compliance requirements for each stage are distinct. *N. Alaska Envtl. Ctr.*, 457 F.3d at 977. BLM prepared the FEIS at issue here for the development-stage decision about whether and how to authorize the Willow Project. The FEIS for this decision is not an EIS for the separate, antecedent "leasing" decision to offer the leases which ConocoPhillips here proposes to develop. The FEIS is therefore not subject to the Reserves Act's judicial review provision.

## II.    Plaintiffs are likely to suffer irreparable harm without an injunction.

Defendants and ConocoPhillips argue that the harm caused by this winter's planned activities is speculative and not sufficiently severe nor irreparable, and that Plaintiffs have not demonstrated that they themselves will be harmed.  Doc. 30 at 38-49; Doc. 31 at 12-36.  Each of these arguments fail.  Plaintiffs have demonstrated a number of ways in which they will be irreparably harmed, immediately and over time, by permanent road construction and mining activities planned this winter, any one of which is sufficient to support a preliminary injunction.[2]

### A.    The deflection of caribou will irreparably harm subsistence.

As an element of their argument that the road construction will affect their members' subsistence activities, Plaintiffs have shown, based on the agency's own EISs' analysis, that traffic, noise, and construction deflect caribou.  Doc. 9 at 16-19. Defendants do not dispute this, nor do they argue that activities which have caused deflection in the past are meaningfully different from the activities scheduled for this winter.  Rather, Defendants argue that the FEIS's conclusions on which Plaintiffs rely

---

[2] ConocoPhillips is wrong that the fact that some declarants are members of multiple plaintiff organizations raises standing or claim-splitting concerns.  Doc. 31 at 18 n.43. Overlapping membership does not undercut the organizations' representational standing; the necessary actual controversy between each organizational plaintiff's interest and the challenged action remains.  *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (inquiry is "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III").  Moreover, claim splitting is not a jurisdictional issue, *Smith v. District of Columbia*, 387 F. Supp. 3d 8, 19 (D.D.C. 2019), and it does not apply here regardless because the inquiry focuses on plaintiffs, *id.*, and, though they share some members, the plaintiff organizations in each case are different.

refer to caribou disturbance resulting from the entire Willow Project, as opposed to impacts from the road and associated construction activities at issue here. Doc. 30 at 42-43. To the contrary, caribou impacts described in the EISs are mostly from activities like those being conducted this winter, *see* Doc. 9-4 at 20-21, Doc. 9-7 at 56-57, 72-74, and the FEIS certainly does not state that only the Project in its entirety will cause deflection. Defendants also do not dispute that this winter's activities will take place in an area where caribou hunting occurs. Ex. 23 at 14, 39; Doc. 9-13 ¶¶10, 11, 36. The fact that winter harvests of caribou are lower than at other times of the year does not make disturbance to these hunts "negligible." Doc. 31-5 ¶¶13, 14. In fact, many other subsistence resources become unavailable in the winter. Ex. 23 at 41 (showing fewer resources in winter); *id.* at 43 (showing caribou as second highest-use resource during winter). Thus, caribou is particularly important precisely because it is still available during this period. Furthermore, ConocoPhillips incorrectly asserts that this winter's work is unlikely to adversely affect caribou because it will occur in an area that is not a high population area for caribou, especially in the winter. Doc. 31 at 30. The FEIS shows the opposite: The gravel mining, traffic, and road construction will all take place within high-density caribou winter habitat. Doc. 9-6 at 6, Map 3-22.

ConocoPhillips argues that Plaintiffs have not shown harm is likely because Ms. Ahtuangaruak has not attested to a specific plan to hunt near the gravel mine this winter. Doc. 31 at 26. Because hunting can only take place wherever the caribou are present, Ms. Ahtuangaruak cannot identify now, with certainty, the precise locations where such

hunting will occur.  It is irreparable harm, however, to remove this affected area from otherwise available nearby hunting opportunities.  In addition, this argument fails to acknowledge that the noise and disturbance from the mine, traffic, and construction will extend across a large area, and that disturbance to caribou anywhere in this area can deflect the migration route of caribou and therefore affect a hunt that takes place anywhere "downstream" of this deflection.  *See, e.g.*, Ex. 21 at 61 (noting that development near Teshekpuk Lake could deflect or divert caribou hunted in and near Nuiqsut).

ConocoPhillips also argues that because Ms. Ahtuangaruak attests to the harm that this winter's planned activities will cause to her family and community, she has failed to show harm to herself.  Doc. 31 at 26.  Yet Ms. Ahtuangaruak explicitly states that she herself participates in family and community hunting.  Doc. 9-13 ¶¶10, 51.  More fundamentally, however, the focus on Ms. Ahtuangaruak's use of the word "we" demonstrates, at best, an utter lack of cultural awareness and at worst, an attempt to undermine her credibility based on her cultural differences.  Iñupiat culture "is based on interdependent family groups and a tradition of sharing harvested resources."  Ex. 21 at 27.  "Cooperation in hunting and fishing activities also remains an integral part of Iñupiat life, and a major component of significant kin ties is the identity of those with whom one cooperates."  *Id.*  Iñupiat peoples hunt, gather, and process foods in "[t]ask groups" and the "sharing of subsistence foods is essential to the maintenance of family ties, kinship networks, and community well-being."  *Id.*; *see also* Doc. 9-13 ¶¶7, 8.  ConocoPhillips

also suggests that Plaintiffs must provide expert testimony to "back up" Ms. Ahtuangaruak's assertion that her subsistence activities will be harmed. Doc. 31 at 29. Ms. Ahtuangaruak is more qualified than any expert to testify to her and her family's subsistence activities in the area, and the record, without the need for expert testimony, amply demonstrates the likely harm this winter's road construction will cause to such activities by disturbing caribou, this year and in the future. *Supra* pp. 9-11. Despite Defendants' and ConocoPhillips' assertions to the contrary, Doc. 30 at 44; Doc. 31 at 28, the fact that Plaintiffs' members are also "concerned" about these harms only emphasizes how significant the resulting harm would be to them and does not undercut the record evidence showing it is likely. This case can therefore be distinguished from *Manzanita Band of the Kumeyaay Nation v. Wolf*, where Plaintiffs failed to provide any evidence that injuries were likely to occur. No. 1:20-cv-02712 (TNM), 2020 WL 6118182, at *7 (D.D.C. Oct. 16, 2020). In any event, Plaintiffs do not argue that Ms. Ahtuangaruak's concern is the irreparable harm; it is the likely impact to subsistence that is irreparable.

Furthermore, ConocoPhillips asserts that because the displacement of caribou is "temporary," impacts to subsistence are not irreparable. Doc. 31 at 21. This displacement, however, is likely to cause irreparable harm. "Caribou is the most important overall subsistence resource." Ex. 21 at 6. Thus, "[e]ven a temporary disruption of . . . harvest patterns would have negative effects for subsistence users." Doc. 9-4 at 41; Doc. 9 at 17. Any disruption in subsistence food sources is an irreparable harm. *See D.C. v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 43 (D.D.C. 2020) ("Going

without food is an irreparable harm"); Ex. 21 at 43, Tbl. 3-49 (noting 25% of Nuiqsut household members "at times did not have enough to eat"); *id.* at 51, Tbl. 3-55 (53% of Nuiqsut residents who reported difficulty in getting the foods necessary to eat healthy meals attributed the deficiency to not being "able to get enough subsistence foods."). Defendants' reliance on *Fund for Animals v. Frizzell* is misplaced because that case addressed temporary population reductions, not the irreparable impacts that disturbance to animals would cause to subsistence.  530 F.2d 982, 986 (D.C. Cir. 1975), *as amended* Jan. 9, 1976.

Defendants and ConocoPhillips also question whether noise from the mine will cause irreparable harm to Plaintiffs' members.  Doc. 30 at 47, Doc. 31 at 28, 33-34. ConocoPhillips does not dispute that past mining activity caused property damage in Nuiqsut and post-traumatic stress disorder.  Instead it attempts to distinguish the planned mine from previous mining.  Doc. 31 at 34.  ConocoPhillips does not demonstrate, though, that any of the differences it claims make irreparable harm unlikely in this case. Gravel mine blasting will reach 59 decibels in Nuiqsut, or 24 decibels higher than the ambient sound level in the area.  Ex. 23 at 8-9.  Courts have that found lesser increases in noise will establish irreparable harm.  *See, e.g.*, *Davis v. Mineta*, 302 F.3d 1104, 1115-16 (10th Cir. 2002) (finding noise level increases of 10-20 decibels demonstrated irreparable harm), *abrogated on other grounds by Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276 (10th Cir. 2016).

ConocoPhillips' reliance on *National Parks Conservation Association v. Semonite*, 282 F. Supp. 3d 284, 289-90 (D.D.C. 2017), is misguided. Doc. 31 at 26 n.122. Unlike the jogger who could go elsewhere during the construction project in that case, here Ms. Ahtuangaruak does not have such a choice; the mine is being constructed and developed within earshot of her home.

### B. Gravel mining and road construction will cause irreparable harm to recreational, research, and aesthetic interests.

ConocoPhillips argues that though Plaintiffs may have asserted general harm to the environment, they have failed to show the required irreparable harm to Plaintiffs and their members. Doc. 31 at 20. However, Plaintiffs have plainly demonstrated that harm to the environment and permanent alterations of its natural condition from this winter's activities will harm their members' ability to enjoy the undisturbed character of the Reserve in the area. Doc. 9-13 ¶¶11-12, 29, 31-32, 58, 60; Doc. 9-14 ¶¶10, 20, 22-24; Doc. 9-15 ¶¶15-16, 27-28; Doc. 9-16 ¶¶19-20; Doc. 9-17 ¶14; Doc. 9-18 ¶10; Doc. 9-19 ¶¶15-16; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (finding that declarant described the connection between healthy salmon populations and his use and enjoyment of the river); *Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1197 (D. Or. 2012) (Plaintiff and its members' aesthetic, recreational, and educational interest in area would be harmed by degraded water quality and harm to fish); *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*, 657 F. Supp. 2d 1233 (D. Colo. 2009). ConocoPhillips itself recognizes "the fact that construction this winter

will cause permanent changes to the environment," Doc. 31 at 20, and it is precisely these changes to the natural environment, which Plaintiffs' members seek to enjoy and study, that will harm their interests. Doc. 19-13 ¶29; Doc. 9-14 ¶¶20, 24; Doc. 9-15 ¶28; Doc. 9-17 ¶14; Doc. 9-19 ¶15. To the extent that Defendants seek to establish that such harm must be "certain," Doc. 30 at 46, this standard is incorrect. Rather, Plaintiffs must, and have, shown that such harm is likely. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

ConocoPhillips suggests that the harm this winter will not be sufficiently great to merit a preliminary injunction. Doc. 31 at 21-23. To the contrary, Plaintiffs have shown that the harm to subsistence uses in the area and to the wild character of the Reserve will be substantial. Doc. 9 at 16-19. The cases ConocoPhillips relies on turned, irrelevantly, on insufficient evidence that *any* harm would occur. *Earth Island Inst. v. Elliot*, 290 F. Supp. 3d 1102, 1124-5 (E.D. Cal. 2017) (finding that there were no reported instances of the species at issue in the project area and that the species' territory had "minimal overlap" with the planned area); *Nat'l Parks Conservation Ass'n v. United States Forest Serv.*, No. 15-CV-01582 (APM), 2016 WL 420470, at *5 (D.D.C. Jan. 22, 2016) (finding that Plaintiffs failed to demonstrate that their members would experience adverse effects from mining operations). Furthermore, Defendants and ConocoPhillips fail to address the ongoing harm that will be caused by opening a gravel mine and building a road— harm that will be caused this winter, but which will result in effects that last long into the future. Doc. 9 at 16-17.

To assert harm from the gravel mine is minimal, Defendants also point to the reclamation plan, which will allow the mine site to fill with water, with the hope of creating a lake.  Doc. 30 at 44.  Yet the time it will take for the pit to fill with water is "unknown" and could be "a decade or more."  Ex. 23 at 33.  Final site reclamation would not even commence for at least seven years, when construction has been completed, *id.* at 35, and in the end, the goal of the reclamation plan is not to restore the area to its prior condition, but to create a new landscape.  *Id.* at 31.  Thus, the reclamation plan fails to provide any assurance that harm to the environment from the mine will not be irreparable.  The cases Defendants rely on are distinguishable because reclamation would be achieved over a short time-frame, *Nat'l Parks Conservation Ass'n*, 2016 WL 420470, at *5, or because mitigation would prevent impacts in the first place, *Sierra Club v. United States Army Corps of Eng'rs,* 990 F.Supp.2d 9, 39 n.17 (D.D.C. 2013) (identifying strict time limits for instream excavation activities and the use of horizontal directional drills to avoid impact to water bodies).

Citing *Natural Resources Defense Council v. Kempthorne*, ConocoPhillips also claims that encroachment into undeveloped areas of the Reserve by this winter's planned activities does not cause irreparable harm to the wild character of the Reserve because adjacent areas have been developed.  Doc. 31 at 23.  Yet in that case, drilling in the area of the proposed wells had also already been occurring for some time, *Nat. Res. Def. Council v. Kempthorne*, 525 F. Supp. 2d 115, 125 (D.D.C. 2007); *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755,

764-65 (9th Cir. 2014) (finding irreparable harm even though area had previously been logged). Here, the proposed activities will extend from previously developed areas into wholly undeveloped areas. Doc. 9-7 at 21; Doc. 9-9 at 4.

Defendants and ConocoPhillips do not dispute that, absent an injunction, the planned activities are likely to occur. Thus, this case is unlike cases, including several Defendants rely on, where plaintiffs failed to establish such likelihood. *See Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) (possibility that candidate might be removed from office in the future was based on speculation); *Gwich'in Steering Comm. v. Bernhardt.*, Nos. 3:20-cv-00204-SLG, 3:20-cv-00204, 2021 WL 46703 at *8 (D. Alaska Jan. 9, 2021) (other than not-yet-approved seismic activity, no likelihood of ground-disturbing activities before the Court could issue a ruling on the merits); *Ness v. Law Enf't Support Agency*, No. C10-5111 KLS, 2012 WL 13176243, at *4 (W.D. Wash. Aug. 9, 2012) (concern that plaintiff would have to work different shifts was not supported by any likelihood that this would actually occur). *Mazurek v. Armstron*, cited by Defendants, is entirely inapposite, as that case addressed only the likelihood of success on the merits and whether plaintiff had reached a heightened burden in showing improper legislative intent. 520 U.S. 968, 972 (1997).

**C.** **The permanent road will commit the agency to future development, making it more difficult for the agency to reach a different decision that reduces impacts to species and habitat.**

Finally, Defendants seek to avoid the harm caused by bureaucratic momentum, arguing that it alone cannot satisfy Plaintiffs' burden of demonstrating irreparable harm. Doc. 30 at 47-49. Plaintiffs do not rely on bureaucratic momentum alone to establish harm. Plaintiffs have anchored their argument about harm in the demonstrated likely impacts to subsistence hunting of caribou and the harm to recreational, research, and aesthetic interests of their members in the region of the Reserve affected by the activities. *Supra* pp. 9-17. The bureaucratic steamroller effects an already constructed road could have on agency's choices after remand are significant, and additive to the on-the-ground impacts. The direct harms from road construction alone justify an injunction; together, these two types of harm make the need for an injunction even more compelling. *See* Doc. 9 at 20-22.

Moreover, that decisions granting injunctions based at least in part on steamroller harm have generally arisen in connection with leasing or contract decisions, Doc. 30 at 47-48, does not undermine its significance in the case at hand. Indeed, it is all the more relevant here, where the steamroller effects result not from only a contract, but an actual, permanent alteration of the environment. ConocoPhillips' reliance on *Semonite* on this point is misplaced because, as discussed above, in that case the court found that it was unlikely there would be any on-the-ground, irreparable harm before the merits of the case could be reached. *Semonite*, 282 F. Supp. 3d at 289-90.

**III.    The balance of equities and public interest favor a preliminary injunction here.**

Irreparable environmental harm is "sufficiently likely" to occur and thus "the balance of harms . . . favor[s] the issuance of an injunction to protect the environment." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987); *see* Doc. 9 at 15-22. Because Plaintiffs have demonstrated a strong likelihood of success on the merits this court need not apply the "sliding scale" test, *see All. for the Wild Rockies v*, 632 F.3d at 1135.  Nevertheless, a preliminary injunction is also warranted under that standard because the balance of harms tip sharply in Plaintiffs' favor here.  *See id.*

Defendants fail to justify any claims of harm from a temporary injunction. ConocoPhillips states that it has spent an estimated $1.9 million in preparation for this winter's construction work, but it admits that some of these expenditures could be applied to future work, and fails to provide any estimate at all of how much will be lost.  Doc. 31-4 ¶19.

ConocoPhillips also claims that a project delay would harm its economic interest, Doc. 31 at 50-51, but fails to offer specific evidence supporting this assertion or quantifying the loss.  In any case, financial harm is not irreparable harm.  *N. Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986); *cf. Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1093 (9th Cir. 2014) (explaining companies that presume permitting outcomes assume the risk of doing so).

All of the other harms cited by ConocoPhillips and Amici focus on future revenues and jobs that may be generated by development and production beyond this winter's activities. *See* Doc. 31 at 50-51; Doc. 31-3 ¶¶22-24; Doc. 33-1 at 3-4, 8-10; Doc. 25-3 at 6-9. But only harm during the period of the injunction is relevant. *S.E. Alaska Conservation Council v. U.S. Forest Serv.*, 413 F. Supp. 3d 973, 985 (D. Alaska 2019) (determining the court "must consider 'only the portion of the harm that would occur while the preliminary injunction is in place'") (quoting *League of Wilderness Defs.*, 752 at 765). A "temporary delay of the economic benefit" in developing Willow does not outweigh the likely harms to be incurred by Plaintiffs. *See League of Wilderness Defs.*, 752 F.3d at 766-67.

A preliminary injunction also advances the public interest. Defendants argue that even if they have violated the law, "the requested injunction would not further the public interest because it would undermine the Congressionally-sanctioned process for oil and gas leasing in the NPR-A." Doc. 30 at 49. To the contrary, there is no public interest in allowing construction to go forward for a few months in the face of an illegal decision. *See All. for Wild Rockies*, 632 F.3d at 1138 (suspending a project until proper consideration of environmental impacts has occurred "comports with the public interest").

# CONCLUSION

For the foregoing reasons, and the reasons described in their opening brief, Doc. 9, Plaintiffs request that this Court enter a preliminary injunction effective until this Court has issued a final decision on Plaintiffs' claims, enjoining implementation of Defendants' approval of ConocoPhillips' Willow Project in the Reserve, including authorization of construction activities planned for this winter.

Respectfully submitted this 21st day of January, 2021.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
Eric P. Jorgensen (Alaska Bar No. 8904010)
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological*
*Diversity, Friends of the Earth, and Greenpeace, Inc.*

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITS**

I certify that this document contains 5,392 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits requested in Plaintiffs' Unopposed Motion to File Overlength Reply (Doc. 40).

Respectfully submitted this 21st day of January, 2021.

*s/ Jeremy Lieb*
Jeremy Lieb

## TABLE OF EXHIBITS

| Exhibit No. | AR File No. | Description |
|---|---|---|
| 21 | 2824 | Bureau of Land Management (BLM), National Petroleum Reserve-Alaska, Final Integrated Activity Plan/ Environmental Impact Statement (Nov. 2012) (excerpts) |
| 22 | 2829 | BLM, Alpine Satellite Development Plan for the Proposed Greater Mooses Tooth 2 Development Project, Final Supplemental Environmental Impact Statement (Aug. 2018) (excerpts) |
| 23 | 2813 | BLM, Willow Master Development Plan, Final Environmental Impact Statement (Aug. 2020) (excerpts) |