**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | Case No. 3:20-cv-00290-SLG |
| Defendants. | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendant. | |

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, | |
| Plaintiffs, | |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | Case No. 3:20-cv-00308-SLG |
| Defendants, | |
| and | |
| CONOCOPHILLIPS ALASKA, INC., *et al.*, | |
| Intervenor-Defendant. | |

## ORDER DENYING MOTIONS FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

Before the Court are two motions filed in related cases challenging the Bureau of Land Management's ("BLM") review and approval of ConocoPhillips Alaska, Inc.'s ("ConocoPhillips") Willow Master Development Plan ("Willow Project" or "Project") in the National Petroleum Reserve in Alaska ("NPR-A"). At issue are Center for Biological Diversity Plaintiffs' ("CBD Plaintiffs")[1] Motion for Preliminary Injunction (Docket 9) and Sovereign Iñupiat for a Living Arctic Plaintiffs' ("SILA Plaintiffs")[2] Motion for Temporary Restraining Order and Preliminary Injunction (Docket 17). Both motions seek to enjoin ConocoPhillips from undertaking Willow Project construction activities this winter, pending the Court's final judgment on the merits of Plaintiffs' claims against Federal Defendants.[3] For the reasons set forth below, Plaintiffs' motions will be denied.

---

[1] Case No. 3:20-cv-00308-SLG. Center for Biological Diversity Plaintiffs are Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc.

[2] Case No. 3:20-cv-00290-SLG. Sovereign Iñupiat for a Living Arctic Plaintiffs are Sovereign Iñupiat for a Living Arctic, Alaska Wilderness League, Defenders of Wildlife, Northern Alaska Environmental Center, Sierra Club, and The Wilderness Society.

[3] In both cases, Federal Defendants are the United States Bureau of Land Management; United States Fish and Wildlife Service; United States Department of the Interior ("Interior Department"); Scott de la Vega, in his official capacity as acting Secretary of the Interior; and Chad B. Padgett, in his official capacity as Alaska State Director of Bureau of Land Management. *See* Fed. R. Civ. P. 25(d). ConocoPhillips Alaska, Inc. was admitted as intervenor-defendant in both cases. *See* Docket 17 (Case No. 3:20-cv-00308-SLG); Docket 13 (Case No. 3:20-cv-00290-SLG). Additionally, after filing its motion, SILA Plaintiffs amended their complaint and added the United States Army Corps of Engineers and David Hobbie, in his

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 2 of 28

# INTRODUCTION

## I.    Background

The National Petroleum Reserve in Alaska ("NPR-A"), on Alaska's North Slope, consists of 23.6 million acres and is the nation's largest single unit of public land.[4]   Established as the Naval Petroleum Reserve in 1923, the NPR-A was renamed and its management authority was transferred to the Secretary of the Interior in 1976 by the Naval Petroleum Reserves Production Act ("NPRPA"), 42 U.S.C. § 6501 *et seq.*[5]   In 1980, the NPRPA was amended by an appropriations rider that directed the Secretary of the Interior to conduct "an expeditious program of competitive leasing of oil and gas in the" NPR-A.[6]   Over the years, Intervenor-Defendant ConocoPhillips has acquired and developed significant lease holdings in the northeast portion of the NPR-A.[7]

Pursuant to certain lease rights, on May 10, 2018, ConocoPhillips requested that BLM prepare an Environmental Impact Statement ("EIS") for the Willow

---

official capacity as Regional Regulatory Chief of the Army Corps of Engineers-Alaska District, as defendants.  *See* Docket 36 (Case No. 3:20-cv-00290-SLG) (Am. Compl.).

[4] *N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006).

[5] Administrative Record ("AR") 182389.  Unless otherwise noted, all Administrative Record citations refer to the record filed at Docket 24 in Case No. 3:20-cv-00308-SLG.

[6] Pub. L. No. 96-514, 94 Stat. 2964 (1980) (codified at 42 U.S.C. § 6506a).

[7] Docket 31 at 10 (Case No. 3:20-cv-00308-SLG) (ConocoPhillips Opp.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 3 of 28

Project, as required by the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. § 4321 *et seq.*[8] The following year, BLM made available for public comment a Draft EIS for the Project.[9] Then, on March 26, 2020, BLM released a Supplemental Draft EIS that evaluated additional Project components.[10] BLM published its notice regarding the availability of the Final EIS ("FEIS") on August 14, 2020.[11] On October 26, 2020, then-Secretary of the Interior David Bernhardt signed the Record of Decision ("ROD") approving the Willow Project.[12]

## II. The Willow Project and Winter 2021 Construction Activities

As approved by the ROD, the Willow Project will consist of "up to three drill sites and related support infrastructure, including a central processing facility, airstrip, operations center, freshwater reservoir, and all-season gravel road connecting the Willow development to [existing ConocoPhillips] facilities."[13] Construction for the entire Project is projected to occur over approximately nine

---

[8] AR 182389.

[9] 84 Fed. Reg. 45801 (Aug. 30, 2019).

[10] 85 Fed. Reg. 17094 (Mar. 26, 2020) ("This targeted Supplement to the Draft EIS only addresses additional analysis for three Project components added by the Project proponent: Module [D]elivery Option 3, a constructed freshwater reservoir, and up to three boat ramps for subsistence access.").

[11] 85 Fed. Reg. 49677 (Aug. 14, 2020).

[12] AR 186073.

[13] Docket 31 at 10 (Case No. 3:20-cv-00308-SLG) (ConocoPhillips Opp.); *see generally* AR 186046–186134 (Record of Decision).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 4 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 4 of 28

years.[14]    However, ConocoPhillips plans to undertake certain construction activities this winter from approximately February 2, 2021, to May 1, 2021 ("Winter 2021 Construction Activities").[15]   Both CBD Plaintiffs and SILA Plaintiffs seek to enjoin the Winter 2021 Construction Activities pending adjudication of the merits of their claims.[16]

The Winter 2021 Construction Activities are comprised of three components: (1) constructing ice roads, (2) opening a gravel mine site and testing a surface miner, and (3) constructing up to 2.8 miles of a gravel road.[17]  Prior to opening the gravel mine and commencing the gravel road construction, ConocoPhillips plans to construct ice roads from Greater Mooses Tooth-1 to the gravel mine site and from Greater Mooses Tooth-2 westward along the projected gravel road

---

[14] AR 186063.

[15] Docket 31-4 at 8, ¶ 12 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG); *see also* AR 186056–186057 (Record of Decision).

[16] This order only addresses equitable relief with respect to Winter 2021 Construction Activities. Parties have not fully briefed issues related to any future construction, but particularly with an expedited briefing schedule, the Court could, if necessary, reach a decision on the merits prior to other construction activities occurring after May 1, 2021.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22–23 (2008).

[17] *See generally* Docket 31-4 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG); Docket 9 at 15–16 (Case No. 3:20-cv-00308-SLG).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 5 of 28

extension.[18]  Gravel hauling and other construction traffic is scheduled to occur on the ice roads.[19]

ConocoPhillips plans to open one gravel mine site this winter, the Willow Mine Site Area 2, which is located about 7 miles west of the Nuiqsut community and will initially cover 9.0 acres of land.[20]  ConocoPhillips plans to use a combination of heavy equipment and blasting to remove the overburden (i.e., tundra and soil) and gravel.[21]  An approximate total of 18 blasts (on 18 separate days) are expected.[22]

ConocoPhillips also plans to lay approximately 2.0 to 2.8 miles of gravel road from GMT-2 westward this winter.[23]  The gravel road extension will create between 15.0 and 20.9 acres of surface disturbance, based on actual road mileage, bringing

---

[18] Greater Mooses Tooth-1 ("GMT-1") and Greater Mooses Tooth-2 ("GMT-2") are existing ConocoPhillips facilities.  Docket 31-4 at 3, ¶ 2 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG).

[19] Docket 9 at 17 (Case No. 3:20-cv-00308-SLG); Docket 31-4 at 8, ¶ 12 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG); Docket 31-3 at 35 (Decl. of Connor Dunn) (Case No. 3:20-cv-00308-SLG) (2020–2021 Willow Development Project Construction Map).

[20] Docket 31-4 at 5, ¶ 6 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG).

[21] Docket 31-4 at 6, ¶ 8 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG).

[22] Docket 31-4 at 6, ¶ 8 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG); Docket 9-4 at 10 (Case No. 3:20-cv-00308-SLG).

[23] Docket 31-4 at 7–8, ¶ 11 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 6 of 28

the total surface disturbance of the Winter 2021 Construction Activities at between 24.0 acres and 29.9 acres.[24]

The Southern Beaufort Sea ("SBS") polar bear stock is a protected species under the Endangered Species Act.[25]  The SBS stock's critical habitat is located on the North Slope and its coastal waters.[26] The Winter 2021 Construction Activities are planned to principally occur outside the critical habitat; however, some maritime and construction traffic is expected to pass through the critical habitat.[27]

### III.    Plaintiffs' Claims

SILA Plaintiffs filed their case on November 17, 2020, and their motion for preliminary injunctive relief on December 23, 2020.[28]  As relevant here, SILA Plaintiffs assert that Federal Defendants violated the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, by relying on uncertain Marine Mammal

---

[24] Docket 9 at 15–16 (Case No. 3:20-cv-00308-SLG); Docket 31-4 at 9, ¶ 13 (Decl. of James I. Brodie) (Case No. 3:20-cv-00308-SLG).

[25] 73 Fed. Reg. 28212 *et seq.* (May 15, 2008).

[26] 75 Fed. Reg. 76086 (Dec. 7, 2010).

[27] FWS AR 000726 (Figure 6.2); FWS AR 000758–000760 (Case No. 3:20-cv-00308-SLG). Unless otherwise noted, all FWS Administrative Record citations refer to the record filed at Docket 24 in Case No. 3:20-cv-00308-SLG.  *See also* AR 182399-182400 (Section 2.5.3 Access to the Project Area).

[28] *See* Docket 1 (Case No. 3:20-cv-00290-SLG) (Compl.); Docket 17 (Case No. 3:20-cv-00290-SLG) (Mot. TRO & Prelim. Inj.)

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 7 of 28

Protection Act, 16 U.S.C. § 1361 *et seq.*, mitigation measures.[29] SILA Plaintiffs also bring a claim pursuant to NEPA, arguing that Federal Defendants failed to take a "hard look" at the impacts of the Willow Project.[30]

CBD Plaintiffs initiated their case on December 21, 2020, and filed their motion for preliminary injunctive relief on December 24, 2020.[31] As relevant here, CBD Plaintiffs bring two NEPA claims: First, CBD Plaintiffs contend that Federal Defendants failed to meaningfully consider any reasonable alternative projects, including alternatives proposed by Plaintiffs, as required by NEPA.[32] Second, CBD Plaintiffs assert that Federal Defendants violated NEPA by failing to properly estimate global greenhouse gas emissions associated with the Willow Project.[33]

Both SILA Plaintiffs and CBD Plaintiffs seek an immediate order enjoining the Winter 2021 Construction Activities.[34]

---

[29] Docket 17-1 at 11–15 (Case No. 3:20-cv-00290-SLG); *see also* Docket 36 at 72–75, ¶¶ 235–243 (Case No. 3:20-cv-00290-SLG) (Am. Compl.).

[30] Docket 17-1 at 16–23 (Case No. 3:20-cv-00290-SLG); *see also* Docket 36 at 64–66, ¶¶ 201–209 (Case No. 3:20-cv-00290-SLG) (Am. Compl.).

[31] *See* Docket 1 (Case No. 3:20-cv-00308-SLG) (Compl.); Docket 9 (Case No. 3:20-cv-00308-SLG) (Mot. Prelim. Inj.).

[32] Docket 9 at 11–15 (Case No. 3:20-cv-00308-SLG); *see also* Docket 1 at 24–26, ¶¶ 75–83 (Case No. 3:20-cv-00308-SLG) (Compl.).

[33] Docket 9 at 8–11 (Case No. 3:20-cv-00308-SLG); *see also* Docket 1 at 26–27, ¶¶ 84–91 (Case No. 3:20-cv-00308-SLG) (Compl.).

[34] Docket 9 at 3 (Case No. 3:20-cv-00308-SLG) ("Plaintiffs request a decision on this motion by February 2, 2021, the date by which construction could move forward."); Docket 17-1 at 1 (Case No. 3:20-cv-00290-SLG) ("Expedited ruling requested by February 1, 2021").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 8 of 28

## JURISDICTION

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, which "confer[s] jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate."[35]

## LEGAL STANDARD

In *Winter v. Natural Resources Defense Council, Inc.*, the United States Supreme Court held that plaintiffs seeking preliminary injunctive relief must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest.[36]

The Supreme Court in *Winter* characterized "injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."[37] Thus, a plaintiff "must demonstrate that in the absence of a preliminary injunction, 'the [plaintiff] is likely to suffer irreparable harm before a decision on the merits can be rendered.'"[38] "Speculative injury does not constitute irreparable injury . . . a plaintiff must demonstrate immediate threatened

---

[35] *Califano v. Sanders*, 430 U.S. 99, 105 (1977).

[36] 555 U.S. 7, 20 (2008).

[37] 555 U.S. at 22 (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)).

[38] *Winter*, 555 U.S. at 22 (quoting 11A Wright & Miller, *Federal Practice and Procedure* § 2948.1, p. 139 (2d ed. rev. 1995)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 9 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 9 of 28

injury as a prerequisite to preliminary injunctive relief."[39]  Moreover, "[t]here must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined," such as a "showing that 'the requested injunction would forestall' the irreparable harm . . . ."[40]

Following *Winter*, the Ninth Circuit addressed the first element—the likelihood of success on the merits—and held that its "serious questions" approach to preliminary injunctions was still valid "when applied as a part of the four-element *Winter* test."[41]  Accordingly, if a plaintiff shows "that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits— then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor.'"[42]  "Serious questions are 'substantial, difficult, and doubtful,' as to make them a fair ground for litigation and thus for more deliberative investigation."[43]  They "need not promise a certainty of success, nor even present

[39] *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis omitted) (citing *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 472 (9th Cir. 1984) and *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1201 (9th Cir. 1980)).

[40] *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981–82 (9th Cir. 2011)).

[41] *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011).

[42] *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (emphasis in original) (quoting *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

[43] *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988)); *see also Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1273 (N.D. Cal. 2014) ("'Serious questions' refers to questions

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 10 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 10 of 28

a probability of success, but must involve a 'fair chance on the merits.'"[44]  All four

*Winter* elements must still be satisfied under this approach,[45] but analyses of the

last two elements—harm to the opposing party and consideration of the public

interest—merge when the government is the opposing party.[46]

Injunctive relief is an equitable remedy, and "[t]he essence of equity

jurisdiction is the power of the court to fashion a remedy depending upon the

necessities of the particular case."[47]

---

'which cannot be resolved one way or the other at the hearing on the injunction and as to which
the court perceives a need to preserve the status quo . . . .'" (quoting *Gilder*, 936 F.2d at 422)).

[44] *Gilder*, 936 F.2d at 422 (quoting *Marcos*, 862 F.2d at 1362).

[45] *All. for the Wild Rockies*, 632 F.3d at 1135 ("Of course, plaintiffs must also satisfy the other
*Winter* factors."); *see also, e.g.*, *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
729 F.3d 937, 944 (9th Cir. 2013) (describing standard for preliminary injunction).

[46] *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The merger of the last two elements does not
mean that these factors always weigh in the government's favor.  The Supreme Court
recognized in *Nken* that "there is a public interest in preventing" wrongful government action.
556 U.S. at 436.

[47] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009) (citing *United States v.
Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 11 of 28

**DISCUSSION**

Upon consideration of the parties' briefing and the record in this case, the Court finds as follows:

### I. NPRPA's Time Limitation for Seeking Judicial Review

Federal Defendants assert that Plaintiffs' NEPA claims are time-barred by the NPRPA's judicial review provision.[48]   That provision, which was enacted in 1980 as an appropriations rider amending the NPRPA of 1976, states:

> Any action seeking judicial review of the adequacy of any program or site-specific environmental impact statement under [NEPA] concerning oil and gas leasing in the National Petroleum Reserve-Alaska shall be barred unless brought … within 60 days after notice of the availability of such statement is published in the Federal Register.[49]

Defendants contend that Plaintiffs' NEPA claims fall within the ambit of the judicial review provision because those claims challenge the adequacy of the Willow EIS, which "concern[s] oil and gas leasing."[50]   According to Defendants,

> [t]he Willow EIS is a site-specific EIS, drafted solely for the purposes of analyzing an oil and gas development project proposed pursuant to Conoco's lease rights and to occur on oil and gas leases within the NPR-A.   The EIS's evaluation of these lease-based activities

---

[48] Docket 30 at 21 (Case No. 3:20-cv-00308-SLG) (Fed. Defs.' Opp.).  ConocoPhillips incorporates by reference Federal Defendants' statute of limitations arguments into its motion. Docket 31 at 37, n.135 (Case No. 3:20-cv-00308-SLG).

[49] 42 U.S.C. § 6506a(n)(1); *see also* Pub. L. No. 96-514, 94 Stat. 2964.

[50] Docket 30 at 30 (Case No. 3:20-cv-00308-SLG).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 12 of 28

constitutes implementation of the NPR-A leasing program and is within the ambit of [the judicial review provision].[51]

Defendants maintain that both sets of Plaintiffs' NEPA claims are time-barred because neither sought judicial review within 60 days of the publication of the notice of availability of the Willow Project EIS.[52]

Plaintiffs reply that the judicial review provision does not apply to their NEPA claims challenging the Willow EIS because that statute only applies to challenges to EISs that evaluate *leasing* decisions, not EISs evaluating oil and gas *production* projects like the Willow EIS.[53] Plaintiffs contend that the text, context, and legislative history of the judicial review provision demonstrate that Congress did not intend the 60-day provision to apply to challenges to EISs evaluating production projects, and therefore their NEPA claims are not time-barred.[54]

The Ninth Circuit has not addressed whether the NPRPA's judicial review provision applies solely to leasing EISs—or whether it extends to EISs evaluating

---

[51] Docket 30 at 30 (Case No. 3:20-cv-00308-SLG).

[52] Docket 30 at 30–31 (Case No. 3:20-cv-00308-SLG). The parties do not dispute the following: The Notice of Availability of the FEIS was published in the Federal Register on August 14, 2020. 85 Fed. Reg. 49677. CBD Plaintiffs filed their Complaint on December 21, 2020 and SILA Plaintiffs filed their Complaint on November 17, 2020. For purposes of the instant motion, the Court assumes that at least one CBD Plaintiff and one SILA Plaintiff have standing to bring their NEPA claims.

[53] Docket 41 at 9–10 (Case No. 3:20-cv-00308-SLG); Docket 40-1 at 8–9 (Case No. 3:20-cv-00290-SLG).

[54] Docket 41 at 9 (Case No. 3:20-cv-00308-SLG); Docket 40-1 at 9 (Case No. 3:20-cv-00290-SLG).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 13 of 28

exploration or production projects.[55]  In interpreting a statue, a court looks "to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress."[56]  A court "begin[s] with the understanding that Congress says in a statute what it means and means in a statute what it says there."[57]  Judicial "inquiry begins with the statutory text, and ends there as well if the text is unambiguous."[58]  However, where the text is ambiguous, a court looks to the language and context of the entire statute, as well

---

[55] This Court and others have previously addressed the NPRPA's judicial review provision with respect to claims challenging EISs that evaluated lease sales, but not the question in the instant case.  *See, e.g.*, *Nat. Res. Def. Council v. Zinke*, Case No. 3:18-cv-00031-SLG, 2018 WL 6424687, at *3–*5 (D. Alaska Dec. 6, 2018).

[56] *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999) (quoting *Northwest Forest Resource Council v. Glickman*, 82 F.3d 825, 830 (9th Cir. 1996)); *see also Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning . . . of the law itself."); *see also Muscarello v. United States*, 524 U.S. 125, 127 (1998) ("We begin with the statute's language."); *United States v. van den Berg*, 5 F.3d 439, 442 (9th Cir. 1993) ("In interpreting a statutory provision we must begin with its language") (citing *Pennsylvania Public Welfare Dept. v. Davenport*, 495 U.S. 552, 557 (1990)).

[57] *Hartford Underwriters Ins. Co. v. Union Planters Bank*, N.A., 530 U.S. 1, 6 (2000).

[58] *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). For "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Hartford Underwriters Ins. Co.*, 530 U.S. at 6 (quoting *United States v. Ron Pair Enterprises*, Inc., 489 U.S. 235, 241 (1989)) (quotation marks omitted); *see also United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is easily stated.  It is to construe the language so as to give effect to the intent of Congress.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 14 of 28

as to its "object and policy."[59]  "Then, [only] if the language of the statute is [still] unclear, we look to its legislative history."[60]

Accordingly, the Court turns to the plain language of the NPRPA's judicial review provision.   Plaintiffs emphasize the word "leasing" in that provision and maintain that its "ordinary meaning" can only apply to lease sales and not to exploration or production activities that may occur as a result of a lease sale.[61] Generally speaking, "[w]hen a term is not defined by a statute," as is the case here, "it is to be construed in accord with its ordinary or natural meaning."[62]   But read in the context of the entire judicial review provision, the term "leasing" is not "so clear

---

[59] *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015); *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 412 (2012) ("[W]e consider each question in the context of the entire statute."); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("The definition of words in isolation, however, is not necessarily controlling in statutory construction.  A word in a statute may or may not extend to the outer limits of its definitional possibilities.  Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *U.S. Nat. Bank of Oregon v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993) ("Over and over we have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law . . . .") (quotation marks omitted); *see also State of Nev. v. Herrington*, 827 F.2d 1394, 1396 (9th Cir. 1987) ("The issue we must decide is one of statutory interpretation, and it must be analyzed in the context of the entire statutory scheme enacted by Congress to cope with the pressing problem of nuclear waste disposal.").

[60] *Glickman*, 82 F.3d at 830–31 (quoting *Alarcon v. Keller Industries, Inc.*, 27 F.3d 386, 389 (9th Cir.1994)); *see also Food Mktg. Inst.*, 139 S. Ct. at 2364 (holding that legislative history should never "muddy the meaning of clear statutory language") (quotation marks omitted).

[61] Docket 41 at 9–10 (Case No. 3:20-cv-00308-SLG) (citing *Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019)).

[62] *van den Berg*, 5 F.3d at 443.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 15 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 15 of 28

[as] to avoid ambiguity."[63]  Notably, the phrase "oil and gas leasing" is preceded by the words "[a]ny action" and "concerning."[64]  "Concerning" is defined as "relating to" or "regarding."[65]  The use of these words indicates a broader scope than Plaintiffs' reading suggests.  Plaintiffs also note that oil and gas development generally proceeds in three separate stages—leasing, exploration, and production—and assert that the word "leasing" can only apply to the first stage of development.[66]  But other plain language within the judicial review provision runs counter to this assertion.  Congress applied the provision to both "program [and] site-specific" EISs.[67]  As is generally the case with "multi-stage projects such as oil and gas programs," programmatic EISs are typically prepared for lease sales, while site-specific EISs evaluate later stages of development, such as exploration and production.[68]  This distinction between programmatic and site-specific EISs

---

[63] *Id.* ("Because there is no plain meaning of 'temporary statute' that is dispositive of the disagreement between the parties, we move on to a consideration of the statute as a whole, its history, and its purposes.").

[64] 42 U.S.C. § 6506a(n)(1) ("concerning oil and gas leasing").

[65] Concerning, Merriam Webster Online Dictionary, available at www.merriam-webster.com/dictionary/concerning (last visited Feb. 1, 2021).

[66] Docket 41 at 9–10 (Case No. 3:20-cv-00308-SLG).

[67] 42 U.S.C. § 6506a(n)(1) ("[a]ny action seeking judicial review of the adequacy of any program or site-specific environmental impact statement").

[68] "In general, a 'programmatic' EIS analyzes alternatives to, and overall effects of, a broad agency program. A 'site-specific' or 'project-specific' EIS focuses on particular facilities." *Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1270 n.32 (D.C. Cir.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 16 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 16 of 28

was well established by 1980.[69]  In expressly applying the 60-day window to site-specific EISs, in addition to programmatic EISs, Congress may have intended to extend the 60-day time limitations statute beyond leasing actions.  The Court concludes that the statutory meaning of the judicial review provision is not without ambiguity.  Accordingly, the Court next looks to the broader statutory language of the 1980 rider to the NPRPA in an effort to ascertain the intent of Congress.

SILA Plaintiffs assert that the 1980 rider only allowed leasing, not production activities, and thus the judicial review provision is also limited solely to leasing.[70]  But the plain language of the 1980 rider indicates that Congress intended the expeditious leasing program to extend beyond the sale of leases.  Notably, the rider was titled "*Exploration* of National Petroleum Reserve in Alaska."[71]  "Although statutory titles are not part of the legislation, they may be instructive in putting the statute in context."[72]  Further, the 1980 rider contained multiple other provisions,

---

1979) (citing *Scientists' Inst. for Pub. Information v. AEC*, 481 F.2d 1079, 1086–88 (D.C. Cir. 1973) and *Kleppe v. Sierra Club*, 427 U.S. 390, 412–15 (1976)).

[69] *See id.* (discussing the difference between a programmatic and a site-specific EIS) (citing *Scientists' Inst. for Pub. Information*, 481 F.2d at 1086–88 and *Kleppe*, 427 U.S. at 412–15). NEPA was enacted on January 1, 1970, a decade before the judicial review provision.  *See* Pub. L. No. 91-190, 83 Stat. 852 (1970).

[70] Docket 40-1 at 8–9 (Case No. 3:20-cv-00290-SLG).

[71] Pub. L. No. 96-514, 94 Stat. 2964 (emphasis added).

[72] *United States v. Todd*, 627 F.3d 329, 335 (9th Cir. 2010) (M. Smith, J., concurring) (citation omitted).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 17 of 28

the plain language of which indicate that Congress intended the leasing program to include exploration and production projects. Subsection 8 provided that "each lease shall be issued for an initial period of up to ten years, and shall be extended for so long thereafter as oil or gas is *produced* from the lease in paying quantities . . . conducted thereon."[73] There is no reason to issue oil and gas leases without the expectation of exploration and production activities. Subsection 9 of the 1980 rider allocated "all receipts from sales, rentals, bonuses, and royalties on leases issued pursuant to this Act" to the U.S. Treasury.[74] While receipts from "sales" may fit within a narrow reading of the leasing program, the inclusion of "royalties" is indicative of congressional intent to authorize production activities, not just the sale of leases. The 1980 rider also explicitly required that "any *exploration or production* undertaken pursuant to [the first two oil and gas lease sales] shall be in accordance with [another section] of the Naval Petroleum Reserves Production Act of 1976."[75] In short, the plain language of the entire 1980 rider strongly suggests that Congress intended to expedite legal challenges to all aspects of oil and gas development, including not just leasing but exploration and production

---

[73] Pub. L. No. 96-514, 94 Stat. 2964 (emphasis added).

[74] *Id.*

[75] Pub. L. No. 96-514, 94 Stat. 2965 (emphasis added).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 18 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 18 of 28

projects as well, as part of its "expeditious program of competitive leasing of oil and gas[.]"[76]

The Court next looks to the "object and policy" of the 1980 rider. When Congress first enacted the NPRPA in 1976, only the federal government was permitted to explore for petroleum, and the "production of petroleum" was generally prohibited.[77] A few years later, the nation experienced its second energy crisis of that decade, the 1979 Oil Crisis, with "oil prices beg[inning] to rise rapidly in mid-1979, more than doubling between April 1979 and April 1980."[78] In late 1980, Congress debated the future of the government's inadequate exploration efforts and whether to open the NPR-A to private oil and gas leasing and development.[79] In December 1980, Congress added the rider to the Department of Interior appropriations bill for the fiscal year ending September 30, 1981, authorizing the "expeditious program of competitive [private] leasing of oil and gas in the National

---

[76] Pub. L. No. 96-514, 94 Stat. 2964.

[77] Pub. L. No. 94-258, § 104(c), 90 Stat. 303 (1976) (directing the Secretary of the Navy and the Secretary of the Interior, upon transfer of management authority, to "continue the ongoing petroleum exploration program"); *see also* § 104(a), (e) (prohibiting production except to provide gas to the Village of Barrow, other communities, and agencies of the federal government).

[78] Laurel Graefe, *Oil Shock of 1978–79*, Federal Reserve History, available at www.federalreservehistory.org/essays/oil-shock-of-1978-79 (last visited Jan 31, 2021).

[79] H.R. Rep. No. 96-1147, at 32–33 (1980). The debate was also between Congress and the Carter Administration. The Carter Administration proposed discontinuing government exploration prior to commencing a private leasing program. Some members of Congress, on the other hand, supported continue government drilling until a leasing program for private exploration was established. *See* H.R. Rep. No. 96-1147, at 32–33 (1980).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 19 of 28

Petroleum Reserve in Alaska[.]"[80]  Faced with a critical oil shortage and the federal government's limited exploratory program, Congress likely opened the NPR-A to private leasing *and* exploration and production in order to increase domestic oil supply as expeditiously as possible.  Thus, the 1980 rider's object and policy supports interpreting the judicial review provision to encompass challenges to EISs evaluating exploration and production projects.[81]

The legislative history also indicates that Congress appears to have intended the judicial review provision to apply to EISs addressing exploration and production in the NPR-A, as well as EISs addressing leasing.  For example, when discussing the 1980 rider, Senator Huddleston stated, "We are agreeing with House language that authorizes leasing the reserve for private oil and gas exploration and development with amendments to accelerate judicial review . . . ."[82]  Other members of Congress, including Senator Ted Stevens of Alaska, expressed similar views.[83]  And both the Senate and House reports accompanying

---

[80] Pub. L. No. 96-514, 94 Stat. 2964.

[81] CBD Plaintiffs point to a number of NPRPA provisions to assert that the statutory context demonstrates otherwise.  Docket 41 at 9–10 (Case No. 3:20-cv-00308-SLG).  However, most of these provisions were not enacted contemporaneously with the 1980 rider at issue here.

[82] 126 Cong. Rec. S29485 (1980).

[83] 126 Cong. Rec. S29489, S31196 (1980) (statements of Sen. Stevens)  ("The events of the last weeks in the Middle East should serve warning that we can no longer delay efforts which would increase the domestic supply of oil and gas and lessen our reliance on imports.") ("The conferees have agreed to include language to expedite private leasing and exploration of the entire National Petroleum Reserve in Alaska."); 126 Cong. Rec. H20533 (1980) (statement of

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 20 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 20 of 28

the 1980 rider indicate that Congress intended to expedite private exploration and production as well.[84]

In conclusion, the plain language of the judicial review provision and the 1980 rider, the object and policy of the statute, and the legislative history strongly suggest that Congress intended the judicial review provision to encompass NEPA challenges not only to lease sales but also to challenges to exploration and production projects in the NPR-A, like Plaintiffs' challenges to the Willow EIS here. The statute requires NEPA challenges to be filed within 60 days after the notice of the availability of an EIS is published in the Federal Register.[85] Since Plaintiffs' complaints were both filed more than 60 days after the notice of availability was

---

Rep. McDade) ("Twenty months, as I said, is the statutory goal in this bill. Within 20 months we want them in, we want them drilling, we want them developing, so that we do not have to put up that front-end money."); 126 Cong. Rec. S31190 (1980) (statement of Sen. Huddleston) ("The conferees also approved the $60.5 million increase for the national petroleum reserve in Alaska so that exploration can continue while the Interior Department prepares to lease the first 2 million acres of the reserve for private exploration and development under accelerated authority also provided in the bill.").

[84] S. Rep. No. 96-985, at 34 (1980) ("In an effort to assure minimum delays, the Committee has included language providing for accelerated judicial review . . . .") ("[T]he Committee believes the shift from Federal to private exploration and development of the reserve's strategic oil and gas potential can be accomplished quickly without neglecting essential environmental considerations, certainly well within the 20 months mandated in the bill."); H.R. Rep. No. 96-1147, at 32–33 (1980) ("The Congress has argued for, and supported, continued government drilling until a leasing program for private exploration is in place.") ("The Committee does agree, however, that extensive private exploration is more apt to discover commercial quantities of oil and gas[.]").

[85] 42 U.S.C. § 6506a(n)(1).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 21 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 21 of 28

published for the Willow EIS,[86] Plaintiffs' NEPA claims are quite likely time-barred. Based on the foregoing, the Court finds that Plaintiffs have not demonstrated "'serious questions going to the merits" with respect to their NEPA challenges.[87] As this *Winter* requirement has not been met, the Court does not consider the remaining three elements with respect to Plaintiffs' NEPA claims.[88]

## II. SILA Plaintiffs' Endangered Species Act Claim

The Court turns to SILA Plaintiffs' claim that Federal Defendants violated the Endangered Species Act.[89] SILA Plaintiffs assert that the Fish and Wildlife Service inappropriately relied on uncertain Marine Mammal Protection Act mitigation measures for its ESA Section 7 determinations concerning Southern Beaufort Sea

---

[86] The Notice of Availability of the FEIS was published in the Federal Register on August 14, 2020. 85 Fed. Reg. 49677. CBD Plaintiffs filed their Complaint on December 21, 2020, and SILA Plaintiffs filed their Complaint on November 17, 2020.

[87] *Shell Offshore, Inc.*, 709 F.3d at 1291; *see also Seven Arts Filmed Entm't Ltd. v. Content Media Corp.*, Case No. CV114603ABCFMOX, 2011 WL 13143545, at *6 (C.D. Cal. July 18, 2011) ("Because application . . . the statute of limitations will likely bar Plaintiff's claims, Plaintiff has failed to show a probability of success on the merits to justify a preliminary injunction.").

[88] *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014)).

[89] Docket 17-1 at 11–15 (Case No. 3:20-cv-00290-SLG); *see also* Docket 36 at 72–75, ¶¶ 235–243 (Case No. 3:20-cv-00290-SLG) (Am. Compl.).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 22 of 28

polar bears.[90]  The Court first considers whether SILA Plaintiffs have demonstrated "that irreparable injury is *likely* in the absence of an injunction."[91]

To establish irreparable injury under the Endangered Species Act, a plaintiff must demonstrate "a definitive threat of future harm to protected species, not mere speculation."[92]  "[A] threat of harm to a listed species that falls below an imminent extinction threat can justify an injunction."[93]  "[E]stablishing irreparable injury should not be an onerous task for plaintiffs";[94] however, "there is no presumption of irreparable injury where there has been a procedural violation in ESA cases."[95] There also "must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined . . . ."[96]  Ultimately, a plaintiff "must

---

[90] Docket 17-1 at 11–15 (Case No. 3:20-cv-00290-SLG).

[91] *Winter*, 555 U.S. at 22 (emphasis in original).  For purposes of the instant motion, the Court assumes that at least one SILA Plaintiff has standing to bring the ESA claim.

[92] *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (quoting *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)).

[93] *Nat'l Wildlife Fed'n*, 886 F.3d at 819.

[94] *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015) (citing 16 U.S.C. § 1531).

[95] *Id.*

[96] *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (quoting *Perfect 10, Inc.*, 653 F.3d at 981–82).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 23 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 23 of 28

demonstrate that irreparable injury 'is *likely* in the absence of an injunction.' A 'possibility' of irreparable harm cannot support an injunction."[97]

The FWS Biological Opinion ("BiOp") for the Willow Project estimates a very low probability of harm to polar bears over the entirety of the 30-year project.[98] For example, the BiOp estimates "up to 2 [adult] polar bears may be hazed resulting in non-lethal physical injuries during activities over the 30-year life of the" Project.[99] The BiOP also estimates a mean probability of 2.2 polar bear cubs experiencing death or serious injury over 30 years, with a median probability of 0 cubs experiencing death or serious injury, over the course of the entire Project.[100] Moreover, FWS estimates that there is an 84% probability that zero cub deaths or serious injury will occur over the life of the Project.[101] In sum, according to the BiOp, there is only a minimal possibility, not a likelihood, that polar bears will be harmed over the entire 30-year life of the Willow Project.

---

[97] *Id.* at 818 (quoting *Winter*, 555 U.S. at 22 (emphasis in original)).

[98] The Court accords the BiOp due deference. *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) ("[T]raditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise.") (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989)).

[99] FWS AR 000764.

[100] FWS AR 000748.

[101] FWS AR 000797.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 24 of 28

SILA Plaintiffs assert, however, that the FWS reached its conclusion based on flawed underlying assumptions.[102] But SILA Plaintiffs do not explain to what extent the "BiOP underestimates the potential for disturbance or death of polar bears."[103] SILA Plaintiffs point to one study to assert that current den detection technology only detects 45% of dens.[104] However, it appears that the BiOp model accounted for this fact.[105] SILA Plaintiffs also assert that the BiOp model utilized outdated SBS stock population estimates but do not provide any updated estimates.[106] Based on the record before the Court, SILA Plaintiffs have not demonstrated that it is likely that SBS polar bears will be irreparably injured before the Court rules on the merits.

SILA Plaintiffs also have not shown how any harm to polar bears would result specifically from the construction of the proposed Winter 2021 Construction

---

[102] Docket 40-1 at 19 (Case No. 3:20-cv-00290-SLG).

[103] Docket 40-1 at 18 (Case No. 3:20-cv-00290-SLG).

[104] Docket 40-1 at 18 (Case No. 3:20-cv-00290-SLG).

[105] FWS AR 00748 ("[T]he surveys do not detect 100% of the dens present. Therefore, we evaluated the probability that a den (or family group newly emerged from a den) that was not detected may be exposed to disturbance from the proposed activities. Using a model which uses den simulations based on habitat and the location of project activities we derived an estimate of the number of dens that may be disturbed and hence the number of cubs that could be injured as a result of this disturbance.").

[106] Docket 17-5 at 14 (Case No. 3:20-cv-00290-SLG) (Declaration of Lisa Baraff).

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 25 of 28

Activities.[107]   Plaintiffs focus on the potential of harm to polar bears relating to denning and den sites but do not contest that this winter's planned construction activities are to occur principally outside of critical denning habit.[108]  SILA Plaintiffs allege that "the mine site is within habitat FWS recognized as characteristic of terrestrial denning habitat."[109]    However, that habitat is described as only "*[p]otential* terrestrial denning habitat," not actual critical habitat.[110]   Moreover, according to the BiOp, only "small numbers of dens have been documented within or just beyond the [entire Willow Project] Action Area within the last 100 years [and] almost all were concentrated in coastal areas" away from the Winter 2021 Construction Activities.[111]   The fact that some of this winter's construction is scheduled to occur partially within potential denning habitat falls short of

---

[107]  *Nat'l Wildlife Fed'n*, 886 F.3d at 819 ("There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection.") (quoting *Perfect 10, Inc.*, 653 F.3d at 981–82).

[108] Docket 17-1 at 11–15 (Case No. 3:20-cv-00290-SLG); *contra* FWS AR000758 ("[C]ritical habitat for polar bears includes three units: Unit 1, Sea Ice Habitat; Unit 2, Terrestrial Denning Habitat; and Unit 3, Barrier Island Habitat.").  The mine site, ice roads, and gravel road will be outside critical habitat; however, construction traffic will travel on existing roads within critical habitat.  *See* FWS AR 000726 (Figure 6.2); FWS AR000758–000760; *see also* AR 182399–182400 (Section 2.5.3 Access to the Project Area).

[109] Docket 40-1 at 19 (Case No. 3:20-cv-00290-SLG).

[110] FWS AR000726 (Figure 6.2) (emphasis added).

[111] FWS AR000748.

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 26 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 26 of 28

establishing *likely* irreparable harm to the protected species prior to a ruling on the merits.[112]

In conclusion, the Court finds that SILA Plaintiffs have not demonstrated that "irreparable injury [to SBS polar bears] is *likely* in the absence of an injunction" enjoining the Winter 2021 Construction Activities.[113]  Because SILA Plaintiffs have not satisfied this prong of the *Winter* test, the Court does not address the remaining elements.[114]

---

[112] SILA Plaintiffs alternatively assert that even if the Court does not find irreparable harm to polar bears, it can instead find irreparable harm to wetlands because BLM cannot rely on an invalid BiOp; however, the cases SILA Plaintiffs cite are inapposite.  Docket 40-1 at 19 n.94 (Case No. 3:20-cv-00290-SLG).  In *Center for Biological Diversity v. Bureau of Land Management*, the BiOp did not address the effect on endangered fish species of withdrawing 337.8 million gallons of groundwater.  698 F.3d 1101, 1124 (9th Cir. 2012).  Here, there is no clear nexus between the wetlands and polar bears.  And in *Alliance for Wild Rockies v. Marten*, plaintiffs sought to prevent logging, road construction, and prescribed burning within Canada lynx critical habitat.  253 F. Supp. 3d 1108, 1110 (D. Mont. 2017).  For Winter 2021 Construction Activities, only construction traffic will pass through critical habitat on existing roads. *See* FWS AR 000726 (Figure 6.2); FWS AR 000758–000760*; see also* AR 182399–182400 (Section 2.5.3 Access to the Project Area).

[113] *Winter*, 555 U.S. at 22 (emphasis in original).  Since SILA Plaintiffs have not demonstrated likely irreparable harm to polar bears, the Court need not determine whether SILA Plaintiffs have demonstrated likely irreparable harm to Plaintiffs' own interests.  *See Nat'l Wildlife Fed'n*, 886 F.3d at 822.

[114] *See Oakland Tribune, Inc. v. Chronicle Pub. Co., Inc.,* 762 F.2d 1374, 1378 (9th Cir. 1985) ("The district court's finding that plaintiff failed to show a significant threat of irreparable injury is not clearly erroneous. Because such a showing is a prerequisite to a preliminary injunction, we need not decide whether plaintiff will eventually prevail in its claims."); *see also Wooten v. BNSF Ry. Co.*, Case No. CV 16-139-M-DLC-JLC, 2017 WL 1066630, at *3 (D. Mont. Mar. 16, 2017) ("Because Wooten has not established the likelihood that he will suffer irreparable harm if a preliminary injunction or temporary restraining order is not issued, the court need not consider the three remaining *Winter* elements and his motion should be denied.").

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 27 of 28

**CONCLUSION**

In light of the foregoing, SILA Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction at Docket 17 in Case No. 3:20-cv-00290-SLG and CBD Plaintiffs' Motion for Preliminary Injunction at Docket 9 in Case No. 3:20-cv-00308-SLG are each DENIED.

DATED this 1st day of February, 2021 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

Case No. 3:20-cv-00290-SLG, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.*
Case No. 3:20-cv-00308-SLG, *Ctr. for Biological Diversity, et al. v. BLM, et al.*
Order Denying Motions for Preliminary Injunction and Temporary Restraining Order
Page 28 of 28

Case 3:20-cv-00308-SLG   Document 43   Filed 02/01/21   Page 28 of 28