Jeremy C. Lieb
Ian S. Dooley
EARTHJUSTICE
441 W 5th Avenue, Suite 301
Anchorage, AK 99501
T: 907.277.2500
E: jlieb@earthjustice.org
E: idooley@earthjustice.org

Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: ejorgensen@earthjustice.org

*Attorneys for Plaintiffs Center for Biological Diversity et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY *et al.*, ) <br><br> *Plaintiffs*, ) <br><br> v. ) <br><br> BUREAU OF LAND MANAGEMENT *et al.*, ) <br><br> *Defendants*, ) <br><br> CONOCOPHILLIPS ALASKA, INC. ) <br><br> and ) <br><br> NORTH SLOPE BOROUGH, ) <br><br> *Intervenor-Defendants*. ) | Case No. 3:20-cv-00308-SLG |

## PLAINTIFFS' PRINCIPAL BRIEF UNDER LOCAL RULE 16.3(c)(1)

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

BACKGROUND .............................................................................................. 2

I.    BLM's management of the Reserve and approval of the Willow Project .............. 2

II.   Climate change and BLM's assessment of greenhouse gas emissions from the Willow Project. .................................................................................. 6

III.  The Willow Project poses an unprecedented threat to the Teshekpuk Caribou Herd. ........................................................................................ 8

IV.   The Willow Project will exacerbate the harm polar bears already face from a changing climate. ........................................................................... 9

PLAINTIFFS' INTERESTS ........................................................................... 11

ARGUMENT.................................................................................................. 13

I.    BLM's approval of the Willow Project violated NEPA. ....................................... 13

      A.    The Reserves Act's statute of limitations does not bar Plaintiffs' NEPA claims. ...................................................................................... 13

      B.    BLM failed to adequately disclose and analyze the effects of greenhouse gas emissions. .................................................................. 20

      C.    The final EIS failed to consider reasonable alternatives. ........................... 23

      D.    BLM failed to take a hard look at the project's impacts to the Teshekpuk Caribou Herd. ....................................................................... 28

II.   FWS and BLM violated the ESA. .......................................................................... 30

      A.    FWS relied on unenforceable Marine Mammal Protection Act measures in its jeopardy and adverse modification conclusions. ............... 30

      B.    FWS unlawfully failed to specify the amount and extent of "take" in its incidental take statement. ....................................................... 35

C.     BLM violated the ESA by relying on FWS's unlawful biological opinion, thereby failing to ensure the project's implementation would protect threatened or endangered species and their critical habitat. ................................................................................ 36

III.    The Court should vacate the Willow Project record of decision and associated authorizations. ............................................................... 37

CONCLUSION ............................................................................................. 38

CERTIFICATE OF COMPLIANCE WITH WORD LIMITS ......................................... 39

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Andrus*,
580 F.2d 465 (D.C. Cir. 1978) .................................................................. 16

*Attia v. Google LLC*,
983 F.3d 420 (9th Cir. 2020) ................................................................... 14

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004).................................................................................. 17

*Blue Mountains Biodiversity Project v. Blackwood*,
161 F.3d 1208 (9th Cir. 1998) ................................................................. 30

*Cal. Wilderness Coal. v. U.S. Dep't of Energy*,
631 F.3d 1072 (9th Cir. 2011) ........................................................... 26, 37

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) (*CBD*)................2, 20, 21, 22, 23, 31, 32, 33, 34, 35, 37

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) ................................................................. 36

*Conner v. Burford*,
848 F.2d 1441 (9th Cir. 1988) ................................................................. 13

*Earth Island Inst. v. U.S. Forest Serv.*,
697 F.3d 1010 (9th Cir. 2012) ................................................................. 27

*Ecological Rights Found. v. Pac. Lumber Co.*,
230 F.3d 1141 (9th Cir. 2000) ................................................................. 13

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000).................................................................................. 11

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ................................................................. 24

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*,
378 F.3d 1059 (9th Cir. 2004) ................................................................. 25

*Kent v. Dulles*,
    357 U.S. 116 (1958) .................................................................................. 16

*Klamath-Siskiyou Wildlands Ctr. v. U.S. Forest Serv.*,
    373 F. Supp. 2d 1069 (E.D. Cal. 2004) ..................................................... 27

*Kleppe v. Sierra Club*,
    427 U.S. 390 (1976) .................................................................................. 17

*Love v. Thomas*,
    858 F.2d 1347 (9th Cir. 1988) .................................................................. 20

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 13

*Marble Mountain Audubon Soc'y v. Rice*,
    914 F.2d 179 (9th Cir. 1990) .................................................................... 20

*Massachusetts v. Clark*,
    594 F. Supp. 1373 (D. Mass. 1984) .......................................................... 16

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) .................................................................................... 16

*Morongo Band of Mission Indians v. Fed. Aviation Admin.*,
    161 F.3d 569 (9th Cir. 1998) .................................................................... 24

*N. Alaska Envtl. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) .................................................................... 14

*Nat. Res. Def. Council v. U.S. Forest Serv.*,
    421 F.3d 797 (9th Cir. 2005) .................................................................... 25

*Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*,
    606 F.2d 1261 (D.C. Cir. 1979) ............................................................... 17

*Native Ecosystems Council v. U.S. Forest Serv.*,
    418 F.3d 953 (9th Cir. 2005) .................................................................... 24

*Nielsen v. Preap*,
    139 S. Ct. 954 (2019) ............................................................................... 15

*Padash v. Immigration & Naturalization Serv.*,
    358 F.3d 1161 (9th Cir. 2004) ................................................................. 18

*Paulsen v. Daniels*,
    413 F.3d 999 (9th Cir. 2005) ................................................................... 26

*Pollinator Stewardship Council v. EPA*,
    806 F.3d 520 (9th Cir. 2015) ................................................................... 37

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*,
    481 F.2d 1079 (D.C. Cir. 1973) .............................................................. 17

*Se. Alaska Conservation Council v. Fed. Highway Admin.*,
    649 F.3d 1050 (9th Cir. 2011) ................................................................. 27

*Sierra Club v. Peterson*,
    717 F.2d 1409 (D.C. Cir. 1983) .........................................................13-14

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    No. 21-35085, slip op. (9th Cir. Feb. 13, 2021)................................. 16, 17

*Suffolk County v. Sec'y of the Interior*,
    562 F.2d 1368 (2d Cir. 1977)................................................................... 16

*United States v. LKAV*,
    712 F.3d 436 (9th Cir. 2013) ................................................................... 14

*Westlands Water Dist. v. U.S. Dep't of the Interior*,
    376 F.3d 853 (9th Cir. 2004) ................................................................... 24

**STATUTES**

5 U.S.C. § 706(2)(A) ..................................................................................... 37

16 U.S.C. § 1371(a)(5)(A)(i) ......................................................................... 32

16 U.S.C. § 1536(a) ................................................................................. 36, 37

16 U.S.C. § 1536(b) ...................................................................................... 37

42 U.S.C. § 6504(a) ............................................................................. 3, 25, 27

42 U.S.C. § 6504(c) ...................................................................................... 14

42 U.S.C. § 6505 ................................................................................................ 14

42 U.S.C. § 6506a(a) ......................................................................................... 14

42 U.S.C. § 6506a(b) ..................................................................................... 3, 25

42 U.S.C. § 6506a(i) .......................................................................................... 14

42 U.S.C. § 6506a(j) .......................................................................................... 14

42 U.S.C. § 6506a(k) .................................................................................... 14, 25

42 U.S.C. § 6506a(m) ........................................................................................ 14

42 U.S.C. § 6506a(n) ................................................... 13, 14, 15, 16, 17, 19, 20

43 U.S.C. § 1349(c) ........................................................................................... 14

Pub. L. No. 95-372, 92 Stat. (1978) ................................................................. 14

Pub. L. No. 96-514, 94 Stat. 2957 (1980) ................................................... 18, 19

**REGULATIONS**

40 C.F.R. § 1502.14(a) ...................................................................................... 24

40 C.F.R. § 1506.13 (Sept. 14, 2020) ............................................................... 24

40 C.F.R. § 1508.8(b) ........................................................................................ 21

43 C.F.R. § 2361.0-5(f) ..................................................................................... 27

43 C.F.R. § 2361.1(e)(1) ...................................................................................... 3

43 C.F.R. § 3130.2 ............................................................................................. 19

43 C.F.R. part 3150 ............................................................................................ 19

43 C.F.R. § 3150.0-3 .......................................................................................... 19

43 C.F.R. §§ 3152.1 to 3152.7 .......................................................................... 19

43 C.F.R. § 3152.2(a) ........................................................................................ 25

43 C.F.R. part 3160 ............................................................................................ 19

43 C.F.R. § 3160.0-1 to 3165.4 ........................................................................ 19

43 C.F.R. § 3160.0-3 .......................................................................................... 19

50 C.F.R. §§ 18.121-18.129 .............................................................................. 32

50 C.F.R. § 402.14(g) ........................................................................................ 32

## FEDERAL REGISTER NOTICES

42 Fed. Reg. 28,723 (June 3, 1977).............................................................. 3, 27

54 Fed. Reg. 40,338 (Sept. 29, 1989)............................................................... 32

74 Fed. Reg. 66,496 (Dec. 15, 2009)................................................................... 7

84 Fed. Reg. 45,801 (Aug. 30, 2019) .................................................................. 4

85 Fed. Reg. 17,094 (Mar. 26, 2020) .................................................................. 4

85 Fed. Reg. 49,677 (Aug. 14, 2020) .................................................................. 5

## LEGISLATIVE HISTORY

126 Cong. Rec. H6781, H6784 (1980)................................................................ 18

126 Cong. Rec. S29489, S31196 (1980) ............................................................ 18

Hearings on H.R. 7724 Before the S. Subcomm. of the Comm. on
    Appropriations, 96th Congress 367-71 (1981) .............................................. 18

## OTHER AUTHORITIES

*Concerning*, Merriam Webster Online Dictionary, http://www.merriam-
    webster.com/dictionary/concerning (last visited Apr. 21, 2021).................. 15

*Gerund*, Macmillan Dictionary,
    https://www.macmillandictionary.com/us/dictionary/american/gerund
    (last visited Apr. 21, 2021) ........................................................................... 13

## INTRODUCTION

This litigation challenges the defendants' decisions to approve a major oil development project in the National Petroleum Reserve-Alaska (Reserve) without adequately considering the project's consequences for the climate and the exceptional wildlife and other values of the region, or alternatives that could reduce those impacts. ConocoPhillips Alaska Inc.'s (ConocoPhillips)Willow Master Development Plan (the "Willow Project" or the "project") would be enormous. It may include, among other things, five drill sites, 37 miles of gravel roads, hundreds of miles of ice roads during construction, hundreds of miles of pipelines, an air strip, an operations center, and a gravel mine. BLM_AR182369, AR182389. It could produce approximately 590 million barrels of oil, adding hundreds of millions of metric tons of greenhouse gases to the atmosphere over its 30-year life. *Id.* at AR182355, AR182424. The project would disturb caribou and other wildlife and permanently alter traditional cultural practices dependent on caribou. BLM_AR176177; *infra* pp. 8-9. And it would further imperil polar bears that are already threatened from climate change and expanding oil and gas development in the Arctic.

Defendants' approval of the Willow Project is unlawful. The Bureau of Land Management's (BLM) Final Environmental Impact Statement (EIS) relied on analysis of greenhouse gas emissions that misrepresents global climate impacts and suffers from the same flaws as an analysis recently rejected by the Ninth Circuit in another Arctic oil

development case, *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020) (*CBD*). Similarly, the U.S. Fish and Wildlife Service's (FWS) biological opinion includes flaws functionally identical to the agency's analysis reversed by the Ninth Circuit in *CBD*—it relies on future, unspecified mitigation measures to conclude that the Willow Project will neither jeopardize the polar bear population nor adversely modify its designated critical habitat, and it fails to account for non-lethal take of polar bears in its incidental take statement. *See id.* at 747-50. BLM also arbitrarily refused to even look at alternative development approaches that could substantially reduce impacts, and it failed to examine threats to caribou from this first large development project fully within primary caribou winter habitat, despite its own previous recognition of the risks.

In accordance with the *CBD* decision and to ensure BLM and FWS meet their obligations under the National Environmental Policy Act (NEPA) and the Endangered Species Act (ESA) before making decisions on the project, the Court should vacate BLM's record of decision and final EIS and FWS's biological opinion.

## BACKGROUND

### I.      BLM's management of the Reserve and approval of the Willow Project

The Reserve is an extraordinary and ecologically important landscape of lakes, ponds, rivers, floodplains, wetlands, upland areas, and sensitive coastal habitats. It is home to a diversity of species, including polar bears, brown bears, muskoxen, caribou, moose, and millions of migratory birds, among many other species. This landscape and its wildlife are central to the livelihood and traditional practices of Alaska Native people

living in the region.  BLM_AR176171.

Because of the world-class wildlife, subsistence and other values of the Reserve, the National Petroleum Reserves Production Act (Reserves Act) requires the Secretary of the Interior (Secretary) to protect and conserve these natural values and uses in the Reserve any time the Secretary authorizes any oil and gas leasing, exploration, or development.  42 U.S.C. §§ 6504(a), 6506a(b).  The Reserves Act requires the Secretary to impose "conditions, restrictions, and prohibitions" on any activities undertaken pursuant to the Act "as the Secretary deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects on the surface resources of the [Reserve]."  *Id.* § 6506a(b).  Surface values of the Reserve may be protected by limiting, restricting, or prohibiting the use of and access to lands within the Reserve.  43 C.F.R. § 2361.1(e)(1).

Additionally, Congress designated certain areas, and authorized the Secretary to designate others, for "maximum protection" of "subsistence, recreational, fish and wildlife, or historical or scenic value[s]."  42 U.S.C. § 6504(a).  Pursuant to this authority, in 1977, the Secretary designated areas around Teshekpuk Lake and the Colville River, among others, as Special Areas within the Reserve.  42 Fed. Reg. 28,723 (June 3, 1977).  The Teshekpuk Lake Special Area protects essential caribou habitat, subsistence resources and uses, and shorebird nesting, staging, and molting habitat. BLM_AR176174.  The area provides calving, insect relief, and wintering areas for the approximately 56,000 caribou of the Teshekpuk Caribou Herd.  *Id.*; BLM_AR182553-54,

BLM_AR182801.  The Colville River Special Area protects the largest and most

productive river delta in Arctic Alaska, which supports populations of pink and chum

salmon, broad whitefish, arctic cisco, and other fish species, and provides habitat for

peregrine falcons, gyrfalcons, golden eagles, and rough-legged hawks.

BLM_AR176174-75, AR176294.

Although portions of the Reserve have been available for oil and gas leasing since

1980, oil development projects on federal land only began in the last decade, with BLM's

approval of ConocoPhillips' Greater Mooses Tooth 1 and Greater Mooses Tooth 2

developments.  BLM_AR176176.  The Willow Project represents a significant expansion

of oil and gas development into the ecologically sensitive and culturally important

northeastern portion of the Reserve, including parts of the Teshekpuk Lake and Colville

River Special Areas.  BLM_AR182385-86, AR182390.

On August 30, 2019, BLM issued a draft EIS for the Willow Project, 84 Fed. Reg.

45,801 (Aug. 30, 2019), and on March 26, 2020, BLM gave notice of the availability of a

supplemental draft EIS, 85 Fed. Reg. 17,094 (Mar. 26, 2020).  The draft and

supplemental draft EISs considered a no-action alternative and three action alternatives.

BLM_AR167935-37; BLM_AR178273.  Each of the action alternatives would permit

ConocoPhillips to construct the five drill sites it proposed in the locations it proposed,

along with a central processing facility, an operations center, an air strip, a gravel mine,

and the same basic transportation and pipeline layout.  BLM_AR167937-42.

Public comments were submitted on BLM's draft and supplemental draft EISs

detailing numerous serious deficiencies in the agency's analysis. *See, e.g.*,

BLM_AR176171-73, AR176192-205, AR176247-61, AR176304-10, AR179314-16;

BLM_AR179325-28, AR179334-37, AR179344-38; BLM_AR179447-48, AR179450,

AR179455-59, AR179462-66. Among other things, the comments discussed serious

failures in the EISs' estimation and evaluation of greenhouse gas emissions resulting

from the project, including an inaccurate and misleading analysis of energy substitution

that excluded the reasonably foreseeable effect of foreign oil consumption, *infra* pp. 7-8,

and deficiencies in the analysis of the project's potential effects on caribou, *infra* pp. 8-9.

Plaintiffs, and others, also requested that BLM consider alternatives with substantially

different layouts and elements that would minimize environmental impacts while still

meeting the purpose of oil development. These included an alternative that would

prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special

Areas and that would permit drilling only during the winter season and eliminate

construction of permanent roads. BLM_AR176199-200, AR176188. On August 14,

2020, BLM released a final EIS that failed to correct these problems. 85 Fed. Reg.

49,677 (Aug. 14, 2020).

Because the Willow Project may affect threatened or endangered species,

including polar bears, BLM consulted with FWS pursuant to section 7 of the ESA. FWS

issued a biological opinion addressing the effect of the Willow Project on polar bears and

several other species on October 16, 2020. FWS_AR000813. The biological opinion

concluded that the Willow Project was likely to adversely affect, but not jeopardize the

continued existence of, polar bears.  *Id.* at AR000941-44.

On October 26, 2020, BLM signed a record of decision approving ConocoPhillips'
Willow Project.  BLM_AR186056-57, AR186073.  The Willow Project, as described in
the final EIS, will include up to five drill sites; a central processing facility; an operations
center; up to 37 miles of gravel roads; up to 700 miles of ice roads during construction,
including an 80-mile heavy-haul ice road crossing the Colville River; 262 miles of
resupply ice roads during operations; an airstrip; up to 386 miles of pipelines; and a
gravel mine in the Reserve.  BLM_AR182369, AR182374, AR182389;
BLM_AR186055.  BLM predicts the project will have peak production of over 160,000
barrels of oil per day, and produce approximately 590 million barrels of oil over its
30-year life.  BLM_AR182369, AR182389.

## II.  Climate change and BLM's assessment of greenhouse gas emissions from the Willow Project.

The proposal to develop the Willow Project happens against the backdrop of a
dramatically changing climate, and an urgent need to transition away from fossil fuel
energy.  The world has warmed substantially over the last 150 years, with remarkable
acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic
temperatures, and in melting glaciers, reduced snow cover, shrinking sea ice, rising sea
levels, ocean acidification, and changes in precipitation patterns, among other effects.
BLM_AR176242-44.  The climate is changing faster in the Arctic than any other region
in the world.  BLM_AR173265-68.  Human activity, especially emissions of greenhouse

*CBD et al. v. BLM et al.,*
Case No. 3:20-cv-00308-SLG

6

Case 3:20-cv-00308-SLG   Document 92   Filed 04/23/21   Page 14 of 48

gasses, are primarily responsible for this change. 74 Fed. Reg. 66,496 (Dec. 15, 2009); BLM_AR176242-43. Extensive research demonstrates the urgent need to reduce greenhouse gas emissions to levels that will limit warming to 1.5°C above pre-industrial levels to avoid catastrophic impacts to people and life on Earth. BLM_AR320961-81; BLM_AR176247-48. To avoid exceeding 1.5°C of warming, global net carbon dioxide ($CO_2$) emissions would need to decline by 45 percent relative to 2010 levels by 2030, and reach net zero by 2050. BLM_AR320969; BLM_AR176247. This necessary transition leaves no room in the global carbon budget for developing new fossil fuel discoveries, especially in the Arctic. BLM_AR176247-50; BLM_AR179336-37; BLM_AR305211 (most known fossil fuel reserves must stay in the ground for a 50 percent chance of limiting temperature rise to 1.5°C).

BLM acknowledges that the production, processing, and consumption of the estimated 590 million barrels of oil to be extracted over the life of the Willow Project will result in greenhouse gas emissions. BLM_AR182420-25. The final EIS purports to estimate the project's "net" greenhouse gas emissions by modeling what portion of oil from the project will substitute for (or displace) production of other energy sources that would result in their own emissions under a no-action alternative. BLM_AR182422-23. In the final EIS, BLM acknowledges that oil from the project would affect the global energy market, and therefore, foreign oil consumption and resulting emissions. BLM_AR183504-09. It nevertheless excluded foreign oil consumption and emissions from its analysis. *Id.*; BLM_AR176250-55; BLM_AR177770-75; BLM_AR182421-25;

Case 3:20-cv-00308-SLG   Document 92   Filed 04/23/21   Page 15 of 48

BLM_AR183504-09. Based on this analysis, BLM concluded that the Willow Project will result in a "net" change from baseline greenhouse gas emissions (i.e., in the absence of the project) of 35 million metric tons of $CO_2$equivalent, only about 14 percent of the project's actual direct and indirect emissions. BLM_AR182423-24.

## III. The Willow Project poses an unprecedented threat to the Teshekpuk Caribou Herd.

The Willow Project poses a particularly significant threat to the Teshekpuk Caribou Herd. The project falls within the highest-use portion of the Teshekpuk Caribou Herd's range. BLM_AR182801. The Teshekpuk Caribou Herd uses areas within and near the project area year-round, including for overwintering, migration, calving, post-calving, and insect relief. BLM_AR182553-54; BLM_AR182804. Roads, vehicle traffic, pipelines, and air traffic from the project all will disturb and displace caribou year-round, including during the winter. BLM_AR182552-55, AR182565-67; BLM_AR176306-08; BLM_AR179456-57. The Teshekpuk Caribou Herd is the only Alaska caribou herd in which the majority of its members regularly overwinter on the coastal plain. BLM_AR182553-54. According to BLM, no herd has previously been exposed to intensive development in its winter range. *Id.*; BLM_AR269646.

The final EIS indicates that the volume of vehicle traffic, noise, and flights from the project will be highest in winter. BLM_AR182566-67. Winter is a critical time for caribou, and disturbance during this time can have very significant consequences. BLM_AR179344-45. Foraging opportunities are limited during the winter, and caribou

rely on body stores of energy for survival and gestation.  BLM_AR179344-45.

Disturbances can lead to flight responses in caribou, causing them to expend additional

energy.  *Id.* at AR179344-45; BLM_AR175723-29.  This additional energetic cost may

lead to loss of body mass and depletion of vital energy reserves.  BLM_AR179345;

BLM_AR175731-35.  Any extra expenditure of energy that caribou undertake as a result

of interaction with oil and gas activities or infrastructure is of concern, as reproductive

success in caribou is strongly correlated with nutritional stress.  BLM_AR176156-63;

BLM_AR179345; BLM_AR175668-81.  Late winter body mass of female caribou is

strongly linked to calf production and survival, potentially influencing population growth

rates.  BLM_AR176307; BLM_AR179345.  There is no evidence that caribou habituate

to disturbance during the winter.  BLM_AR176307-08; BLM_AR176164-70.

## IV.    The Willow Project will exacerbate the harm polar bears already face from a changing climate.

The project will exacerbate the ongoing and increasing stress polar bears are

experiencing from climate change in the Arctic.  Loss of sea ice habitat is already putting

significant stress on the Southern Beaufort Sea polar bear subpopulation.  Southern

Beaufort Sea polar bears declined by approximately 50 percent between 1986 and 2010.

FWS_AR000898.  Bear size and body condition have also declined.  *Id.*  Scientists have

linked these problems to sea ice decline.  *Id.*

The loss of sea ice causes polar bears to den more often on land,

FWS_AR000885-86, a trend that is expected to continue, with inland areas of the

Reserve, including the Willow Project area, becoming more critical to the Southern

Beaufort Sea subpopulation.  BLM_AR176317; FWS_AR000942.  The increase in land

denning makes denning mothers and cubs more vulnerable to human-polar bear conflicts,

and to industrial development like the Willow Project.  FWS_AR008900.  Bears that den

on land in areas near industrial activities may abandon their dens, causing loss of the

cubs.  *Id.* at AR000925-26.  The loss of sea ice also makes it harder for polar bears to

hunt and increases their energetic costs of traveling.  *Id*. at AR000899.  These changes

make polar bears more susceptible to industrial activities, which means that projects such

as the Willow Project will have more significant impacts than they would in the absence

of climate change.

Against this backdrop, ConocoPhillips has proposed to build a large oil

development near polar bear critical habitat.  FWS_AR000904.  FWS's biological

opinion acknowledges that the Willow Project may affect polar bears through

disturbance, human-polar bear  interactions, impacts to prey species, and oil spills.  *Id.* at

AR000925-35.  The final EIS admits the project could disturb denning females, which

are more sensitive to disturbance, BLM_AR182590,

> by obstructing or altering movements of pregnant females as
> they prospect for den sites, by disturbing females at den sites
> before cubs are born, which could force the female to search
> for an alternate site, or, by causing premature den or den site
> abandonment after cubs are born, which could cause the
> immediate death of cubs or reduced probability of survival
> over time, which would be difficult to detect or measure.

 FWS_AR000926.  "The nearest known historically used polar bear maternal den sites

are approximately [three miles] from proposed gravel and ice infrastructure" and less than 0.1 mile from a proposed ice road.  BLM_AR182578.

## PLAINTIFFS' INTERESTS

Plaintiffs have standing to bring this case because their members have standing in their own right, the interests at stake are germane to Plaintiffs' organizational purposes, and the lawsuit does not require the participation of individual members.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  Members of plaintiff groups use and enjoy—and intend to continue to use and enjoy—the Reserve, including areas affected by the Willow Project, for various purposes, including subsistence, recreation, wildlife viewing, education, research, photography, and/or aesthetic and spiritual enjoyment.  *See* Ex. 1 ¶¶10-12, 29, 31; Ex. 2 ¶¶8-10, 13-15, 20-21; Ex. 3 ¶¶9-13, 15-21; Ex. 4 ¶¶13.

Members of plaintiff groups also enjoy or otherwise use migratory wildlife from the Reserve, both in the areas affected by the Willow Project, and in the species' broader ranges.  *See* Ex. 1 ¶36 ("We hunt caribou where the mine is going to be located.  That area, like the whole Willow Project area, is part of our traditional use areas.").  The Willow Project will harm future use of the area by Plaintiffs' members.  Ex. 1 ¶¶11-12, 29, 31-32, 58, 60; Ex. 2 ¶¶10, 16, 20, 22-26, 28; Ex. 3 ¶¶15-16, 25, 27-28; Ex. 4 ¶¶19-20; Ex. 5 ¶¶13-14; Ex. 6 ¶¶10-12; Ex. 7 ¶¶15-17.  As one member explains,

> [i]f Willow's development moves forward, I would reconsider
> my plans to visit the Reserve.  Certainly my trip to observe

> birds in the Teshekpuk Lake Special Area would be impacted by Willow because I would very likely hear the sounds of Willow's construction and operation. . . . [N]oise from the Willow development would harm the wilderness experience of my trip and could disturb the birds and wildlife I would expect to see in the area.

Ex. 2 ¶22; *see also id.* ¶10 ("Willow's expansion of industrial activity . . . [will] harm my ability to continue to recreate and view wildlife in the Reserve.").

Defendants' unlawful actions adversely affect Plaintiffs' organizational interests in their members' use and enjoyment of the Reserve's lands and sustainable resources. Each of the plaintiff groups monitors the use of public lands and wildlife in the Reserve and compliance with the laws respecting these lands, educates its members and the public concerning the management of these lands, and advocates policies and practices that protect the natural values and sustainable resources of these lands. *See* Ex. 5 ¶¶3-13; Ex. 6 ¶¶4-6, 10; Ex. 7 ¶¶3-9, 15-17.

It is impossible to fully achieve these organizational purposes without adequate information and public participation in the processes required by law for the management of these public lands. *See* Ex. 7 ¶17. Plaintiffs' interests and organizational purposes will therefore be directly and irreparably injured by the defendants' violations of law in permitting the Willow Project. *See* Ex. 5 ¶14; Ex. 7 ¶16.

The harm and threat of harm from the Willow Project to Plaintiffs' members' subsistence, recreational, educational, research, and/or aesthetic and spiritual enjoyment and other interests in and around the project area, as well as to Plaintiffs' educational and

informational interests in a lawful public administrative process, represent a concrete injury in fact that is fairly traceable to the actions challenged in this litigation and redressable by the relief Plaintiffs seek. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).

## ARGUMENT

I.      **BLM's approval of the Willow Project violated NEPA.**

   A.      **The Reserves Act's statute of limitations does not bar Plaintiffs' NEPA claims.**

The Reserves Act's statute of limitations, 42 U.S.C. § 6506a(n)(1), applies only to judicial review of EISs "concerning oil and gas *leasing*." *Id.* (emphasis added). The section's text, context, and history demonstrate that the provision does not bar Plaintiffs' NEPA challenge to the final EIS concerning the Willow oil and gas *development* project.

The provision's text is clear: its use of the word "leasing" demonstrates that it does not bar Plaintiffs' claims. "Leasing" describes an action with a discrete end point,[1] namely when rights are conveyed to lessees. *See Conner v. Burford*, 848 F.2d 1441, 1451 (9th Cir. 1988) (describing leasing as an agency action with a defined "point of commitment—when the leases are issued" (quoting *Sierra Club v. Peterson*, 717 F.2d

_____

[1] "Leasing" is the gerund form of the verb "to lease." A "gerund" is "a noun formed by adding '-ing' to a verb, that describes an action." *Gerund*, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/gerund (last visited Apr. 21, 2021).

1409, 1415 (D.C. Cir. 1983)). After completing the act of leasing by issuing leases, BLM can engage in other actions—approving a development plan, for example. But the act of leasing does not encompass these other actions. Each is a separate and distinct action, governed by separate provisions in the Reserves Act. 42 U.S.C. § 6506a(a), (i), (n) (leasing); *id.* §§ 6504(c), 6505, 6506a(j)(3), (k), (m) (exploration, development, production); *see N. Alaska Envtl. Ctr. v. Kempthorne*, 457 F.3d 969, 974, 977 (9th Cir. 2006) (describing distinct stages of decision-making under the Reserves Act).

Congress' contemporaneous amendment of the Outer Continental Shelf Lands Act (OCSLA), Pub. L. No. 95-372, 92 Stat. 629, 657-59 (1978), further demonstrates that the word "leasing" in section 6506a(n)(1) does not cover development. "[Courts] look to . . . the language of related or similar statutes to aid in interpretation." *See Attia v. Google LLC*, 983 F.3d 420, 425 (9th Cir. 2020) (quoting *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013)). Like the Reserves Act does in the Reserve, OCSLA governs leasing, exploration, and development of oil in the outer continental shelf. In amending OCSLA in 1978, just two years prior to the Reserves Act amendment at issue here, Congress treated leasing and development as separate actions—it adopted judicial review provisions separately for each. *See* 92 Stat. at 658 (codified at 43 U.S.C. § 1349(c)(1), (2) & (3)) (establishing separate review provisions for challenges to "a leasing program" and challenges to "any exploration plan or any development and production plan"). This demonstrates that Congress was explicit when it wanted to address judicial review of development; it did not treat the word "leasing" as encompassing separate, future

development and exploration decisions for purposes of judicial review (or any other purpose).

For all these reasons, Congress' use of the word "leasing" in section 6506a(n)(1) demonstrates that the provision does not apply to the development decision at issue here. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) (stating that in interpreting a statute, "[w]ords are to be given the meaning that proper grammar and usage would assign them" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012))).

The terms "[a]ny action" and "concerning," do not introduce ambiguity as to section 6506a(n)(1)'s scope. The phrase "[a]ny action" refers to a lawsuit, not the proposed activity that is the subject of an EIS. 42 U.S.C. § 6506a(n)(1) ("Any action seeking judicial review of . . . ."). The preposition "concerning" that connects "environmental impact statement" with "leasing" means "relating to [or] regarding" and is synonymous with "about." *Concerning*, Merriam Webster Online Dictionary, http://www.merriam-webster.com/dictionary/concerning (last visited Apr. 21, 2021). It does not suggest that leasing EISs are a subset of the EISs subject to section 6506a(n)(1), as a preposition like "including" would, for example. And, critically, Congress' use of "concerning" does not expand the category of actions the section addresses or change the meaning of "leasing." Leasing is not exploring or developing or producing.

Nor does the reference to "program or site-specific" EISs suggest the provision applies beyond EISs for leasing actions. Rather, it supports Plaintiffs' position. As the

*CBD et al. v. BLM et al.,*
Case No. 3:20-cv-00308-SLG                                                                 15

Court of Appeals explained in granting an injunction pending appeal in this case,

Congress would have been aware when it enacted section 6506a(n)(1) in 1980 that site-

specific EISs can be required for leasing decisions. *See Sovereign Iñupiat for a Living*

*Arctic v. Bureau of Land Mgmt.*, No. 21-35085, slip op. at 3-4 (9th Cir. Feb. 13, 2021).

In fact, courts and agencies routinely referred to EISs for lease sales as "site-specific"

around that time. *See, e.g.*, *Suffolk County v. Sec'y of the Interior*, 562 F.2d 1368, 1377

(2d Cir. 1977) (discussing programmatic and site-specific EISs and noting agency intent

to "prepare a more detailed site-specific impact statement for each [lease] sale area");

*Alaska v. Andrus*, 580 F.2d 465, 468-69 (D.C. Cir. 1978) (referring to an agency's

preparation of a "site-specific EIS" for a proposed lease sale), *vacated in part sub*

*nom.*, *W. Oil & Gas Ass'n v. Alaska*, 439 U.S. 922 (1978); *Massachusetts v. Clark*, 594 F.

Supp. 1373, 1383 (D. Mass. 1984) (lease sale EIS found not to be sufficiently

"site[-]specific").  Congress is presumed to have been aware of these interpretations

when it chose to include the term "site-specific" in the statute. *See Merrill Lynch, Pierce,*

*Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) (presuming Congress is aware of

agency and court constructions of a term when it adopts a new statute using that term);

*Kent v. Dulles*, 357 U.S. 116, 127-28 (1958) (interpreting a statutory provision based on

Congress' presumed awareness of "prior administrative practice").  Thus, a lease sale EIS

might be either programmatic or site-specific, depending on the circumstances, so

Congress' use of both descriptions does not expand the category of actions subject to the

provision beyond lease sales.

The three cases this Court cited in its preliminary injunction order, Doc. 43 at 16 n.68, are not to the contrary. *Kleppe v. Sierra Club* supports the point that leasing can be a site-specific action. 427 U.S. 390, 414 & n.26 (1976) (list of "specific" projects includes approval of a lease); *id.* at 394-95 ("issuing coal leases" among list of activities). The other cases arise in settings not related to leasing, and to the extent they equate "site-specific" with "facilities," it is a consequence of their particular contexts and they shed no light on Congress' use of the term in section 6506a(n)(1). *See Nat. Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 606 F.2d 1261, 1270-71 & n.32 (D.C. Cir. 1979) (distinguishing programmatic EIS for a nuclear waste management plan from a "site-specific" EIS that "focuses on particular facilities"); *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1095-96 (D.C. Cir. 1973) (distinguishing environmental impacts of liquid metal reactor research program from impacts from "specific facilities").

Section 6506a(n)(1)'s plain language, supported by contemporaneous legislation and court decisions, thus demonstrates that the limitation period applies to EISs concerning the particular action of "leasing," not future actions on leases. *See Sovereign Iñupiat*, No. 21-35085, slip op. at 3 (concluding that the "plain words" of section 6506a(n)(1) lend support to the contention that it "applies only to actions challenging the sale or issuance of the leases themselves"). Since the text is clear, the inquiry should end there. *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (plurality op.).

Moreover, section 6506a(n)(1)'s context and history also support Plaintiffs'

interpretation.  *See Padash v. Immigration & Naturalization Serv.*, 358 F.3d 1161, 1170 (9th Cir. 2004).  Congress enacted section 6506a(n)(1) as part of its adoption of an "expeditious program of competitive leasing of oil and gas" in the Reserve intended to help address the energy crisis at the time.  Pub. L. No. 96-514, 94 Stat. 2957, 2964-65 (1980); *see* 126 Cong. Rec. S29489, S31196 (1980) (statements of Sen. Stevens) (stating need to increase domestic oil supply and supporting expediting leasing and exploration).  Legislative history suggests that Congress focused the rider on leasing based on testimony that leasing would spur private exploration of the Reserve, including seismic surveying, which it saw as a more efficient way to locate oil in the Reserve than previous government drilling efforts.  *See* 126 Cong. Rec. H6784 (1980) (statement of Rep. Dicks) ("I am told that the most important element in a transition to private exploration activity and early production is high quality, detailed seismic information suitable for making private leasing, exploratory drilling decisions, and for Government tract evaluation."); *id.* at H6781 (statement of Rep. Dicks) ("All the exploration companies that testified before our committee said that getting better seismic information was much more critical to expediting the exploration program than drilling four more wells"); Hearings on H.R. 7724 Before the S. Subcomm. of the Comm. on Appropriations, 96th Congress 367-71 (1981) (statement of Charles P. Eddy, Deputy Assistant Sec'y-Energy & Minerals, U.S. Dep't of the Interior) (noting that "if leasing is initiated this year, if legislation is passed, some companies could be ready to undertake some seismic work this coming season" and that "in our discussions with a number of companies who have expressed an interest in

this area, they would be ready to undertake the seismic work").  In this context—where Congress acted on testimony that a leasing program itself would achieve its aim of spurring exploration for oil in the Reserve—it is not surprising that it would also focus its judicial review provision on leasing decisions.

That Congress would treat leasing and on-the-ground activity like development differently in the statute of limitations also makes practical sense.  A significant amount of time might pass between leasing and on-the-ground activity.  Expediting any review of leasing decisions provides early certainty to lessees that their leases are valid.  No such limit is needed for later stages, because on-the-ground activity follows more quickly after an agency's approval and anyone opposed to drilling would sue promptly.

Finally, BLM's implementing regulations are consistent with Plaintiffs' argument.  Only its leasing regulations refer to section 6506a(n)(1)'s limitations provision.  43 C.F.R. § 3130.2.  Its exploration and development regulations do not.  *See id.* §§ 3152.1 to 3152.7 (governing oil and gas exploration without mention of the limitation provision); *id.* § 3150.0-3 (noting that the regulations in part 3150 implement the Reserves Act); *id.* §§ 3160.0-1 to 3165.4 (governing oil and gas exploration, development, and production without mention of the limitation provision); *id.* § 3160.0-3 (noting that the regulations under part 3160 implement the 1980 rider, 94 Stat. 2964).

For all these reasons, section 6506a(n)(1) is unambiguous and does not bar Plaintiffs' challenge to the adequacy of the final EIS here.  However, even were the Court to find some ambiguity, it should resolve it in favor of granting review.  The Ninth

Circuit has "long recognized . . . a presumption in favor of judicial review of administrative actions." *Love v. Thomas*, 858 F.2d 1347, 13556 (9th Cir. 1988) (citing cases). Accordingly, it "construe[s] provisions against judicial review narrowly." *Id.* Citing these principles, it has construed a statute for which "neither side advance[d] an entirely satisfactory construction" to allow review where plaintiffs' interpretation was "plausible." *Id.* at 1355-56; *see also Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 181 (9th Cir. 1990) (citing principles and construing a provision barring certain claims against a forest plan "in its entirety" to bar only claims that "brought into question decisions that . . . governed the entire forest"). As in *Love* and *Marble Mountain*, the principle of judicial review of administrative actions counsels granting review here even were the Court to conclude section 6506a(n)(1) is ambiguous.

> **B.** **BLM failed to adequately disclose and analyze the effects of greenhouse gas emissions.**

BLM violated NEPA by failing to adequately disclose and analyze greenhouse gas emissions associated with the Willow Project. In *CBD*, 982 F.3d 723, the Ninth Circuit recently struck down an Interior Department decision that made the same choice on the same core rationale and record. In both cases the agency excluded emissions from foreign oil consumption from its analysis of an oil and gas development project's greenhouse gas emissions. *Id.* at 736; BLM_AR183508. The *CBD* court held that emissions from foreign oil consumption are a "reasonably foreseeable" effect of the project that NEPA requires the agency to consider. 982 F.3d at 737-38 (quoting

40 C.F.R. § 1508.8(b)).  The court's decision in *CBD* requires the same result here.

In *CBD*, the court addressed a Bureau of Ocean Energy Management (BOEM) assessment of downstream greenhouse gas emissions from burning oil that would be produced at another proposed oil development project in Alaska's Arctic.  To assess these impacts, BOEM predicted how the absence of oil and gas from the project would affect demand for energy and resulting greenhouse gas emissions.  *CBD*, 982 F.3d at 736. Rather than assessing global emissions, however, it limited its analysis only to U.S. emissions.  *Id.*  Rejecting this self-imposed constraint, the court concluded that "[e]missions resulting from the foreign consumption of oil are surely a 'reasonably foreseeable' indirect effect of drilling."  *Id.* at 738.  It held that NEPA requires an agency to quantitatively evaluate these emissions unless it "thoroughly explain[s] why such an estimate is impossible."  *Id.* at 739.  Even then, it still must "attempt to estimate the magnitude of such emissions."  *Id.* at 740.  BOEM's failure to comply with either requirement in the face of record evidence showing that an assessment was feasible was fatal to its EIS.  *Id.*

BLM conducted the same analysis here that the court rejected in *CBD*.  Using the same market-simulation approach, BLM undertook an analysis of how oil and gas that may be produced from the Willow Project would increase demand for energy and resulting greenhouse gas emissions.  *Compare* BLM_AR182423-25, AR183504-09 (describing the use of BOEM's market simulation model to predict emissions consequences), *with CBD*, 982 F.3d at 736.  Despite acknowledging that "the Willow

[project] would affect both domestic and foreign energy consumption,"
BLM_AR183508, BLM excluded foreign oil and gas consumption from this model on the same basis that the *CBD* court squarely rejected: that it lacked reliable data or methods to assess global emissions. *Compare* BLM_AR183508 ("This estimation would require detailed data on proportional consumption changes and the most likely energy substitutions . . . for all countries worldwide."); BLM_AR182957 ("The issue is the uncertainty and lack of reliable data as to the likely distribution of demand changes among countries."), and *id.* at AR182963 ("[I]nformation on which countries would consume less oil was not available."), *with CBD*, 982 F.3d at 737 (rejecting BOEM's assertion that it "did not have sufficiently 'reliable information on foreign emissions factors and consumption patterns'"), and *id.* at 738 (rejecting BOEM's undocumented assertion that "'[e]xcluding the foreign oil and gas markets is reasonable' because '[o]il consumption in each country is different, and BOEM does not have information related to which countries would consume less oil'" (alterations in original)).

The Court in *CBD* relied on studies in the record that "confirm the effect of increasing domestic oil supply on foreign consumption and the feasibility of its estimation." 982 F.3d at 738-39 (citing studies). The record here confirms the same. *See* BLM_AR176251-53 (citing studies that supported the *CBD* court's conclusion, and others demonstrating the feasibility of assessing foreign energy consumption); BLM_AR179450 (same); BLM_AR173546-47; BLM_AR318426; BLM_AR319401-04; BLM_AR319437-39; BLM_AR319366-67. As in *CBD*, the record here "belies [the

agency's] contention that it could not have summarized or estimated foreign emissions with accurate or credible scientific evidence." 982 F.3d at 738.

Because BLM's analysis, its excuses for excluding the project's effect on foreign emissions, and the relevant portions of the record are functionally indistinguishable from those in *CBD*, that opinion establishes that BLM's analysis is unlawful and dictates the result here. Moreover, BLM's failure to consider foreign emissions is a consequential error going to the heart of the final EIS. *See id.* at 740 ("If [the agency] concludes that such emissions will be significant, it may well approve another alternative included in the EIS or deny the [approval] altogether.").

### C. The final EIS failed to consider reasonable alternatives.

BLM violated NEPA by failing to consider reasonable alternatives to ConocoPhillips' proposed project, including reasonable alternatives proposed by Plaintiffs that would prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas or that would eliminate the construction of permanent roads and permit drilling only during the winter season. BLM's primary reason for refusing to consider such alternatives—asserted limits on its authority to restrict ConocoPhillips' activities—is unsupported and not consistent with its broad authority to impose restrictions on activities to protect the values of the Reserve.

An agency must "[r]igorously explore and objectively evaluate all reasonable

alternatives" to a proposed action, 40 C.F.R. § 1502.14(a),[2] including alternatives that would avoid or minimize harm to the environment, *see Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005). An EIS must consider alternatives that are meaningfully different from one another "to allow for a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008). "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. U.S. Dep't of the Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 574 (9th Cir. 1998)).

Here, the alternatives BLM considered are similar and do not allow for an informed choice about options with substantially greater protections. Instead, each action alternative considered in the final EIS would have a similar footprint and would permit ConocoPhillips to construct all of its proposed drill sites in the locations it proposed, along with the same basic transportation and pipeline layout. BLM_AR182387, AR182395-401. None of the alternatives would significantly limit environmental impacts.

BLM failed to consider reasonable alternatives proposed by Plaintiffs, including alternatives that would: (1) prohibit permanent infrastructure in the Teshekpuk Lake and Colville River Special Areas, BLM_AR176199-200, which would limit impacts to these

---

[2] The NEPA regulations in effect prior to September 14, 2020, apply here. *See* 40 C.F.R. § 1506.13 (Sept. 14, 2020).

areas that have been designated for "maximum protection" of their surface values, 42 U.S.C. § 6504(a); and (2) permit drilling only during the winter season and prohibit permanent roads, which would mitigate disturbance to wildlife and subsistence users, and reduce well blowout risks, BLM_AR176199.

BLM repeatedly asserted that it may not consider alternatives that require different configurations of drill sites or otherwise limit ConocoPhillips' plans because ConocoPhillips has a right to "extract all the oil and gas possible within the leased areas." BLM_AR183012, AR183110, AR183185. This assertion is unsupported. ConocoPhillips' leases are not in the record, and there is no evidence they grant rights to drill and build infrastructure wherever, whenever, and however the company wants. Nor could the leases grant such rights. BLM has broad authority, and indeed a clear obligation, to condition or restrict oil and gas activity on leases within the Reserve as it determines necessary to protect other resources and to mitigate adverse environmental effects. *See* 42 U.S.C. § 6506a(b), (k)(3); 43 C.F.R. § 3152.2(a)(1), (3). Considering meaningfully different alternatives, as required by NEPA, is consistent with, and in fact essential for, the proper exercise of the agency's management authority in the Reserve. *See* 42 U.S.C. § 6506a(b).

This error alone establishes the final EIS's range of alternatives is inadequate. "The role of harmless error in the context of agency review is constrained." *Nat. Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 807 (9th Cir. 2005) (citing *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1071 (9th Cir. 2004)).

An error is harmless only if it "had no bearing on the procedure used or the substance of [the] decision reached." *Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1092 (9th Cir. 2011) (alteration in original) (quoting *Paulsen v. Daniels*, 413 F.3d 999, 1006 (9th Cir. 2005)).  Even if BLM stated other valid reasons supporting its refusal to consider other alternatives, its unsupported assertion regarding ConocoPhillips' lease rights and arbitrary limitation on its statutory authority under the Reserves Act permeated its decision-making.  Without this fundamental error, BLM may well have considered entirely different alternatives.

In any case, none of the other reasons mentioned by BLM in response to comments justify its refusal even to consider excluding infrastructure in Special Areas. BLM asserts that an alternative without infrastructure in Special Areas would be inconsistent with the project's purpose and need.  BLM_AR183012.  This is incorrect. The purpose of the project—"to construct the infrastructure necessary to allow the production and transportation to market of federal oil and gas resources under leaseholds in the northeast area of the [Reserve], consistent with the proponent's federal oil and gas lease and unit obligations," *id.* at AR182390—does not preclude an alternative prohibiting infrastructure in Special Areas.  BLM fails to explain otherwise.  BLM also asserts that because the Teshekpuk Lake Special Area is "only an administrative boundary," impacts within the boundary "would not necessarily be greater" than those outside the boundary.  *Id.* at AR182927, AR183012.  BLM fails to acknowledge that the boundary was set because Congress and the Secretary recognized explicitly the need to

provide "maximum protection" to surface resources located within that boundary.

42 U.S.C. § 6504(a); 43 C.F.R. § 2361.0-5(f); 42 Fed. Reg. at 28,723.  This recognition

alone provides ample basis for considering an alternative that treats land open to oil and

gas development within Special Areas differently than land outside of Special Areas.

BLM similarly fails to provide any adequate justification for rejecting a winter-

only drilling alternative.  An agency must provide a reasoned explanation for excluding

an alternative from detailed consideration.  *See Earth Island Inst. v. U.S. Forest Serv.*,

697 F.3d 1010, 1022-23 (9th Cir. 2012); *Se. Alaska Conservation Council v. Fed.*

*Highway Admin.*, 649 F.3d 1050, 1058-59 (9th Cir. 2011).  Here, though, BLM included

only a single comment response that asserts the alternative would not be economically

feasible and notes that the project is different from the existing, seasonally operated CD-3

drill site that has its own airstrip and river access.  BLM_AR183012.  This response,

without further support, is inadequate to reject the alternative.  *See Klamath-Siskiyou*

*Wildlands Ctr. v. U.S. Forest Serv.*, 373 F. Supp. 2d 1069, 1088-89 (E.D. Cal. 2004)

(choice to reject alternatives that would reduce or eliminate timber harvest based on

statement that such alternatives would be uneconomical, without supporting analysis, was

arbitrary).  BLM provides no analysis to support the assertion that the alternative would

not be economically feasible, and it does not explain why independent river access and an

airstrip are important, or why independent airstrips for drill sites in place of permanent

roads could not be considered for the Willow Project.

### D. BLM failed to take a hard look at the project's impacts to the Teshekpuk Caribou Herd.

The final EIS fails to adequately assess the impacts of potential displacement of caribou from their winter habitat. The Willow Project is within important winter habitat for the Teshekpuk Caribou Herd. BLM_AR237082 (the area west of Nuiqsut is a particularly concentrated area of caribou habitat); BLM_AR269637 (during the winter, large numbers often congregate in the central and eastern portions of the Reserve); BLM_AR182554 ("Most [Teshekpuk Caribou Herd] caribou remain in the [Arctic Coastal Plain] between Wainwright and Nuiqsut during winter."). Because no other caribou herd winters on the coastal plain, where Arctic oil and gas development has historically occurred in Alaska, no herd has previously been exposed to intensive development in its winter range. BLM_AR182553-54; BLM_AR269646. The information available, however, indicates that wintertime disturbance of caribou can have significant negative effects by increasing energetic costs during this critical time when foraging is limited. *Supra* pp. 8-9. The final EIS includes detailed analysis of some aspects of the project's potential impacts to caribou, but its failure to address this unprecedented winter disturbance is a significant error.

In the 2013 EIS for the management plan covering the entire Reserve, BLM acknowledged the potential impacts to caribou from development activities during the winter, including to energy balance, lower calving success, and winter mortality. BLM_AR269645-46. BLM also acknowledged that the degree of these impacts would

depend on the value of habitat where the development occurs. *Id.* at AR269655 ("If oil and gas activities occurred in areas with an abundance of caribou or other mammals, or in areas with high-quality habitat, impacts could be greater than those based strictly on number of acres of habitat impacted."); *see also id.* at AR269858 ("Overall, the level of impact would depend on the specific location of any oil or gas field."). There is also information in the record which identifies characteristics of high-quality caribou habitat which BLM could use to assess the locations affected by this project. For example, the importance of the habitat depends on site-specific factors such as the presence of lichen. BLM_AR176043-53; BLM_AR223433-41; BLM_AR176112-23.

Despite the importance of this winter habitat, BLM's prior recognition of potential impacts from development in the area and the agency's recognition that the severity of impacts would depend on location, the final EIS fails completely to evaluate the winter impacts of this specific development proposal. It only briefly acknowledges that the project may disturb caribou during winter. BLM_AR182565-67. It includes no acknowledgement or discussion of the unprecedented exposure of the Teshekpuk Caribou Herd to oil and gas development during winter resulting from project. *Id.* And, most importantly, it fails to analyze whether the construction of the project in the particular areas it will affect would displace caribou from important areas within their broader winter range. BLM_AR269646.

BLM's two sentence explanation in response to comments raising these concerns also fails to grapple with this problem. BLM asserted that altered distribution and

lowered access to some areas of winter habitat "would be limited by the large size of the winter range during most years." BLM_AR183127. This response arbitrarily assumes that sufficient alternative areas exist and fails to account for differing habitat quality within the winter range. With regard to energetic impacts specifically, BLM indicated that "[t]ravel conditions are generally good in the [area] during winter, so energetic implications from locomotion are unlikely to be high," BLM_AR183127, but it offered no support for this statement.

Using information in the record about aspects of winter habitat most important to caribou, BLM could have evaluated the specific impacts of disturbance caused by the Willow Project, in light of the particular importance of the actual areas affected. BLM instead avoided the issue almost entirely, except for inadequate attempts at justification in the response to comments. By failing to analyze the potential additional effects of winter disturbance, BLM failed to consider all of the factors relevant to the project's impacts to caribou. Its decision is therefore arbitrary. *See Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998).

## II. FWS and BLM violated the ESA.

### A. FWS relied on unenforceable Marine Mammal Protection Act measures in its jeopardy and adverse modification conclusions.

Despite the Southern Beaufort Sea polar bears' precarious state and the known impacts from oil and gas development in polar bear habitat, FWS's biological opinion for the polar bear concludes that the Willow Project will not jeopardize the continued

existence of polar bears or adversely modify their critical habitat. To reach these conclusions, FWS relied on mitigation measures that it said would be formulated in Marine Mammal Protection Act (MMPA) letters of authorization that do not yet exist. The Ninth Circuit recently struck down a FWS biological opinion that made the same error in its assessment of critical habitat modification. *See CBD*, 982 F.3d at 744-47. That decision compels the same result here, but in this case for both the jeopardy and adverse modification determinations in FWS's biological opinion, because unlike in *CBD,* the same error infects both determinations.

In the *CBD* case, the court addressed a FWS biological opinion also conducted to assess impacts to polar bears from an Arctic oil development. The court followed a two-step process. It first examined whether mitigation measures referenced in the biological opinion were enforceable and found that unspecified conditions to be included in future authorizations under the MMPA were not. *Id*. at 744-45. Then, the court examined the jeopardy and critical habitat conclusions to determine whether the agency relied on the measures, and found that the critical habitat conclusion, by including the MMPA as one of the factors on which its decision was based, impermissibly relied on that measure. *Id*. at 747-48. On this basis, the court found the biological opinion unlawful.

In the first step, the *CBD* court considered whether the mitigation measures in FWS's biological opinion were sufficiently enforceable. *Id.* at 743. Measures, it made clear, "must describe, in detail, the action agency's plan to offset the environmental damage caused by the project," to ensure that if those measures are not carried out, the

agency will re-initiate consultations. *Id.* at 743. The court found that two of FWS's "measures rel[ied] principally on yet unapproved and undefined mitigation measures under the MMPA," *id.* at 744, and it concluded that "[t]he agency cannot refer to future, unstated authorizations under the MMPA to fulfill its obligations under section 7," *id.* at 745. The court explained that although compliance with the MMPA will satisfy the ESA's separate section 9 take requirements, it does not fulfill the agency's separate and independent section 7 obligations. *Id.* This is because the ESA and the MMPA establish partially overlapping but distinct processes and standards. *Id.* at 732. For example, under the MMPA, the mitigation measures FWS issues are geared toward ensuring that only small numbers of marine mammals are taken and that there will be no more than a negligible impact over the five-year period covered by the regulations only and without considering the cumulative impacts from other activities. *See* 16 U.S.C. § 1371(a)(5)(A)(i); *see also* 50 C.F.R. §§ 18.121-18.129 (polar bear regulations); 54 Fed. Reg. 40,338, 40,339, 40,342 (Sept. 29, 1989) (stating that the evaluations under the ESA and NEPA are where FWS considers cumulative impacts). Under the ESA, by contrast, section 7 consultation must consider all of the impacts that will result from the entirety of a project, not just the impacts for the next five years, *see CBD*, 982 F.3d at 745-46 (finding reliance on future MMPA measures "particularly inappropriate to satisfy the agency's section 7 obligations" since five-year period of MMPA take authorizations was shorter than the 15-20 year project), and must consider cumulative impacts with other actions, *see* 50 C.F.R. § 402.14(g)(2), (g)(3).

In the second step, the court in *CBD* turned to the question of whether FWS relied on the unspecified mitigation measures to reach its no-jeopardy and no-adverse-modification findings. 982 F.3d at 747. Although the biological opinion referenced other factors supporting the agency's conclusions, the court focused its analysis on whether the conclusions for no jeopardy and no adverse modification of critical habitat referenced the MMPA measures. Because the critical habitat conclusion included references to the MMPA measures, the court found that this conclusion improperly relied on unenforceable mitigation. *Id*. at 748. The jeopardy conclusion, by contrast, did not rely on the future MMPA measures, so the court determined it to be lawful. *Id.* at 747-48.

In the Willow Project biological opinion, FWS made the same error that the court rejected in *CBD*, relying on authorizations issued under the MMPA to protect denning and non-denning bears, but compounded it by making the error in both the jeopardy and adverse modification conclusions. FWS_AR000925, AR000928-29, AR000942-44. As a result, both the jeopardy and adverse modification conclusions of the Willow biological opinion violate the agency's section 7 obligations. *CBD*, 982 F.3d at 745-46.

The Willow Project biological opinion's reliance on unspecified, undetailed measures in its conclusion that the project would not adversely modify critical habitat is even more pronounced than in *CBD*. Unlike the multi-factor analysis in *CBD*, the Willow Project critical habitat conclusion relies solely on future MMPA measures. FWS_AR000944 ("In particular, we expect the requirement to obtain MMPA incidental and intentional take authorizations . . . would contribute to the protection of critical

habitat."). The biological opinion is, therefore, unlawful.

Unlike in *CBD*, the Willow Project biological opinion's no jeopardy conclusion also refers to mitigation measures, "most importantly BLM's commitment to ensure compliance with the MMPA." FWS_AR000942. Though the Willow Project biological opinion also points to additional factors supporting its no-jeopardy conclusion, such as the spatial and temporal distance between disturbance events, the distance from the coast of most new infrastructure, and BLM stipulations, *id.*, such additional factors do not remedy its improper reliance on future MMPA authorizations. In *CBD*, the court struck down the critical habitat conclusion because it relied in part on MMPA measures even though it also identified other independent factors supporting its conclusion. 982 F.3d at 748 (examining only the MMPA measures, although they were one of three factors the agency identified).[3] The reliance in part on authorizations under the MMPA to reach its no jeopardy conclusion was unlawful. *Id.* The no jeopardy determination in the Willow Project biological opinion similarly relies in part on MMPA measures, and is therefore unlawful as well.

---

[3] As in *CBD*, the Willow Project biological opinion also refers to possible den detection surveys. FWS_AR000929; *see also id.* at AR000836 (noting that ConocoPhillips would conduct den detection surveys "[w]here necessary"), but these measures, as in *CBD*, are "noncommittal assurances" which "do[] nothing to bind [the agency] when the need for those measures apply." 982 F.3d at 747.

**B.** **FWS unlawfully failed to specify the amount and extent of "take" in its incidental take statement.**

The Ninth Circuit in *CBD* also found that FWS unlawfully failed to specify the amount and extent of take in its incidental take statement. 982 F.3d 723. Because the Willow Project biological opinion similarly omits the amount and extent of take from disturbance, the court's decision in *CBD* requires the same result here.

In *CBD*, the court found the biological opinion unlawful because it neglected to quantify incidental take unless it resulted in injury or death, *id.* at 749, even though for a variety of reasons the court concluded FWS itself contemplated incidental take from disturbances rising to the level of non-lethal harassment. *Id.* at 749-50. In particular, the court cited FWS's discussion of compliance with future MMPA measures aimed at mitigating non-lethal harassment as "suggest[ing] that FWS considered that such indirect harassment would rise to the level of 'incidental, non-intentional take' under the MMPA," unless mitigated. *Id.* at 750. The anticipated take included disruptions to behavioral patterns such as breeding and sheltering, which are considered harassment under the ESA as well. *Id.* at 749-50. In addition, the *CBD* court pointed to FWS's reliance on "levels of interactions" with polar bears as a trigger for further consultations. "Considering 'levels of interaction' as a trigger suggests that this type of non-lethal harassment amounts to incidental take and requires FWS to provide an estimate for such take." *Id.* at 750.

In the Willow Project biological opinion, FWS similarly contemplated non-lethal

take and similarly failed to specify it in the incidental take statement.  FWS_AR000945.

As it did in *CBD*, FWS contemplated take from disturbance to behavioral patterns,

including to breeding and sheltering.  *Id.* at AR000925-29, AR0000942.  Also as in *CBD*,

the biological opinion relied on future MMPA measures and otherwise contemplated

potential take from disturbance.  It similarly suggested such disturbance would rise to the

level of take under the MMPA, and that mitigation measures might alleviate the severity

of such take.  *Id.* at AR000945.  The biological opinion also identified "levels of

interaction" as a basis for re-consultation.  *Id.* at AR000946-47 (requiring re-consultation

if interaction "is increasing significantly over time, or is resulting in chronic or repeated

interference with normal polar bear behavior.").  Despite this, the Willow Project

opinion's incidental take statement fails to specify the amount of take from disturbance.

Because FWS conducted the same flawed analysis as it did in *CBD*, the outcome in that

case controls here.  The Willow Project biological opinion's incidental take statement is,

therefore, unlawful.

C.     **BLM violated the ESA by relying on FWS's unlawful biological
        opinion, thereby failing to ensure the project's implementation would
        protect threatened or endangered species and their critical habitat.**

       After consulting with FWS, the action agency has an independent obligation to

ensure against jeopardy and adverse modification of critical habitat.  16 U.S.C.

§ 1536(a)(2); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101,

1127-28 (9th Cir. 2012) (holding that an agency "cannot meet its section 7 obligations by

relying on a Biological Opinion that is legally flawed").  In this case, BLM authorized the

Willow Project based on a biological opinion that unlawfully relied on uncertain, future

MMPA authorizations and conditions to support its no-jeopardy and no-adverse-

modification determinations and failed to account for sublethal harassment in its

incidental take statement for polar bears.  BLM is therefore violated the ESA.  16 U.S.C.

§ 1536(a)(2), (b)(3)(A), (b)(4).

### III.    The Court should vacate the Willow Project record of decision and associated authorizations.

The normal remedy under the APA for an unlawful agency action is vacatur.

5 U.S.C. § 706(2)(A); *see Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th

Cir. 2015); *Cal. Wilderness Coal.*, 631 F.3d at 1095-96, 1106.  The deficiencies in

Defendants' NEPA and ESA analyses are significant and go to the heart of BLM's

decision.  Indeed, the Ninth Circuit has already recognized that vacatur is the appropriate

remedy for several of the violations here.  *CBD*, 982 F.3d at 751; *see id.* at 740 ("If [the

agency] concludes that [greenhouse gas] emissions will be significant, it may well

approve another alternative included in the EIS or deny the [approval] altogether."); *id.* at

751 ("An agency cannot meet its section 7 duties by relying on a legally flawed

biological opinion or failing to discuss information that might undercut the opinion's

conclusions.").  Accordingly, the Court should vacate the Willow Project record of

decision and any associated authorizations.

## CONCLUSION

BLM's NEPA analysis supporting its approval of the Willow Project record of decision was arbitrary and unlawful. FWS's biological opinion and incidental take statement, and BLM's reliance on FWS's opinion to support its record of decision, were arbitrary and unlawful. Plaintiffs therefore request that this Court vacate BLM's Willow Project record of decision and final EIS, and FWS's biological opinion.

Respectfully submitted this 23rd day of April, 2021.

*s/ Jeremy Lieb*
Jeremy C. Lieb (Alaska Bar No. 1810088)
Eric P. Jorgensen (Alaska Bar No. 8904010)
Ian S. Dooley (Alaska Bar No. 2006059)
EARTHJUSTICE

*Attorneys for Plaintiffs Center for Biological Diversity, Friends of the Earth, and Greenpeace, Inc.*

## CERTIFICATE OF COMPLIANCE WITH WORD LIMITS

I certify that this document contains 9,398 words, excluding items exempted by Local Civil Rule 7.4(a)(4), and complies with the word limits of Local Civil Rule 7.4(a)(1).

Respectfully submitted this 23rd day of April, 2021.

*s/ Jeremy Lieb*
Jeremy Lieb

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| --- | --- |
| 1 | Declaration Rosemary Ahtuangaruak |
| 2 | Declaration of Daniel Ritzman |
| 3 | Declaration of Jeffrey Scott Fair |
| 4 | Declaration of Richard G. Steiner |
| 5 | Declaration of Brendan Cummings |
| 6 | Declaration of Marcie E. Keever |
| 7 | Declaration of Timothy Donaghy |