JEAN E. WILLIAMS
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
RICKEY TURNER
Senior Trial Attorney, Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1373
rickey.turner@usdoj.gov
CAITLIN CIPICCHIO
Trial Attorney, Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0503
caitlin.cipicchio@usdoj.gov
LAURA GLICKMAN
Trial Attorney, Environmental Defense Section
150 M Street NE
Washington, D.C. 20002
 (202) 514-6390
laura.glickman@usdoj.gov

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOVEREIGN IÑUPIAT FOR A LIVING ARCTIC, *et al.*, | |
| Plaintiffs, | Case No. 3:20-cv-00290-SLG |
| v. | |
| BUREAU OF LAND MANAGEMENT, *et al.*, | |
| Federal Defendants, | |
| and | |

CONOCOPHILLIPS ALASKA, INC. *et al.*,

            Intervenor-Defendants.

---

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*, <br><br>       Plaintiffs, <br><br>     v. <br><br> BUREAU OF LAND MANAGEMENT, *et al.*, <br><br>       Federal Defendants, <br>  and <br><br> CONOCOPHILLIPS ALASKA, INC. *et al.*, <br><br>       Intervenor-Defendants. | Case No. 3:20-cv-00308-SLG |

**FEDERAL DEFENDANTS' COMBINED BRIEF IN OPPOSITION PURSUANT TO LOCAL RULE 16.3(c)(2)**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND .......................................................................................................... 2

    I.    Legal Background ............................................................................... 2

        A.    Clean Water Act ...................................................................... 2

        B.    Endangered Species Act ......................................................... 3

        C.    Marine Mammal Protection Act.............................................. 4

        D.    National Environmental Policy Act ........................................ 6

    II.    Factual Background ........................................................................... 7

LEGAL STANDARDS ............................................................................................... 10

ARGUMENT ............................................................................................................. 11

    I.    BLM and the Corps Satisfied the Requirements of NEPA ........................ 11

        A.    Plaintiffs' NEPA Claims Are Barred by the NPRPA's Statute of Limitations ...................................................................... 11

        B.    BLMs' Greenhouse Gas Emissions Analysis Satisfies NEPA ........ 17

        C.    BLM Considered a Reasonable Range of Alternatives under NEPA .................................................................................. 21

        D.    Defendants Took the Requisite Hard Look at the Impacts of the Willow Project on the Environment................................. 25

            1.    BLM and the Corps Had the Information Necessary to Take a Hard Look at the Impacts of the Project .................. 25

            2.    BLM Adequately Considered the Impacts of the Project on Caribou ............................................................................ 29

            3.    The EIS Contains Sufficient Information Regarding Reasonably Foreseeable Future Actions to Satisfy NEPA .................................................................................. 31

4.     The EIS Adequately Analyzes the Project's Cumulative Effects on Fish and Polar Bears ............................. 34

II.     The Corps' Issuance of a Section 404 Permit Here Was Reasonable and Consistent with the CWA .................................................................. 35

     A.     Ample Evidence Supports the Corps' Conclusion that the Project Will Not Cause Significant Degradation ............................. 36

     B.     The Corps Appropriately Determined the Need for Compensatory Mitigation that Will Offset "Unavoidable Impacts" ............................................................................. 39

III.     The Service's Analysis Satisfies the ESA .................................................. 41

     A.     The Service's ESA Analysis Was Consistent with the ESA and Reasonable. ..................................................................... 41

              1.     BLM's proposed action appropriately defined the contours of the project. ......................................... 42

              2.     The Service's Section 7 jeopardy analysis on polar bears complied with the ESA. ....................................... 43

              3.     The Service conducted an appropriate Section 7 adverse modification analysis of the impacts on polar bear critical habitat. ......................................................... 45

              4.     The Service's Incidental Take Statement complies with the ESA ..................................................... 47

     B.     The Service's ESA Analysis Is Reasonable and Plaintiffs Offer Nothing to Rebut It. ............................................................. 48

              1.     The Service's Section 7 decisions did not rely on any MMPA protections. ............................................. 48

              2.     The Service properly analyzed and quantified possible ESA take. ................................................................ 55

IV.     The Appropriate Remedy is Remand Without Vacatur ............................. 58

CONCLUSION ........................................................................................... 59

# TABLE OF AUTHORITIES

**Cases**

*Alaska Env't. Ctr. v. Kempthorne,*
  457 F.3d 969 (9th Cir. 2006) ....................................................................... 14

*Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.,*
  126 F.3d 1158 (9th Cir. 1997) ..................................................................... 31

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) ........................................................................................ 11

*California v. Block,*
  690 F.2d 753 (9th Cir. 1982) ......................................................................... 6

*Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.,*
  399 F. Supp. 3d 888 (D. Alaska 2019) ................................................. 33, 35

*City of Sausalito v. O'Neill,*
  386 F.3d 1186 (9th Cir. 2004) ..................................................................... 10

*Conner v Burford,*
  848 F.2d 1441 (9th Cir. 1988) ..................................................................... 13

*Ctr. for Biological Diversity v. Bernhardt (Liberty),*
  982 F.3d 723 (9th Cir. 2020) .............................................. 17, 18, 19, 21, 48

*Ctr. for Biological Diversity v. Salazar,*
  695 F.3d 893 (2012) ..................................................................................... 50

*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.,*
  914 F.2d 1174 (9th Cir. 1990) ..................................................................... 22

*Hoosier Env't Council v. U.S. Army Corps of Eng'rs,*
  722 F.3d 1053 (7th Cir. 2013) ..................................................................... 37

*Idaho Farm Bureau Fed'n v. Babbitt,*
  58 F.3d 1392 (9th Cir. 1995) ....................................................................... 59

*Kern v. Bureau of Land Mgmt.,*
  284 F.3d 1062 (9th Cir. 2002) ..................................................................... 33

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ....................................................................................... 7

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ....................................................................... 10

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.,*
  689 F.3d 1060 (9th Cir. 2012) ..................................................................... 22

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF              iii

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 5 of 70

*Love v. Thomas*,
    858 F.2d 1347 (9th Cir. 1988) ............................................................... 12

*Marble Mountain Audubon Soc'y v. Rice*,
    914 F.2d 179 (9th Cir. 1990) ................................................................. 12

*Moapa Band of Paiute Indians v. Dep't of Interior*,
    747 F.2d 563 (9th Cir. 1984) ................................................................. 12

*Morongo Band of Mission Indians v. FAA*,
    161 F.3d 569 (9th Cir. 1998) .......................................................... 21, 22

*Motor Vehicle Mfrs. Ass'n., v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)............................................................................ 11, 18

*N. Alaska Env't. Ctr. v. Kempthorne*,
    457 F.3d 969 (9th Cir. 2006) ................................................................... 7

*Nat. Res. Def. Council, Inc. v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987)................................................................. 6

*Nat'l Wildlife Fed'n v. Espy*,
    45 F.3d 1337 (9th Cir. 1995) ................................................................. 59

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Service*,
    422 F.3d 782 (9th Cir. 2005) ................................................................. 59

*Native Ecosystems Council v. Dombeck*,
    304 F.3d 886 (9th Cir. 2002) ................................................................. 10

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
    117 F.3d 1520 (9th Cir. 1997) ............................................................... 22

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)........................................................................... 6, 27

*Rock Creek All. v. U.S. Forest Serv.*,
    703 F. Supp. 2d 1152 (D. Mont. 2010).................................................. 35

*Sierra Club v. Fed. Energy Regulatory Comm'n*,
    867 F.3d 1357 (D.C. Cir. 2017)............................................................. 19

*Smith v. U.S. Forest Serv.*,
    33 F.3d 1072 (9th Cir. 1994) ................................................................. 58

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*,
    Nos. 3:20-cv-290-SLG, 3:20-cv-308-SLG, 2021 WL 343925 (D. Alaska Feb. 1, 2021)
    .................................................................................... 11, 14, 15, 16

*Westlands Water Dist. v. U.S. Dep't of Interior*,

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              iv

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 6 of 70

376 F.3d 853 (9th Cir. 2004) ............................................................ 19, 21, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ........................................................................... 10

**Statutes**

16 U.S.C. § 1371(a)(5)(A) ................................................................... 5

16 U.S.C. § 1531(b) ............................................................................ 3

16 U.S.C. § 1532 (19) ................................................................... 47, 55

16 U.S.C. § 1536(a)(2) ....................................................................... 4

16 U.S.C. § 1536(b)(4) ....................................................................... 4

16 U.S.C. § 1536(b)(4)(C) ................................................................. 5

16 U.S.C. § 1536(o)(2) ....................................................................... 4

33 U.S.C. § 1251(a) ............................................................................ 2

33 U.S.C. § 1311(a) ............................................................................ 2

33 U.S.C. § 1344 ................................................................................. 2

33 U.S.C. § 1344(b)(1) ....................................................................... 2

33 U.S.C. § 1344(h)(1)(A)(i) .............................................................. 2

42 U.S.C. § 4332(2)(C) ....................................................................... 6

42 U.S.C. § 6506a .............................................................................. 16

42 U.S.C. § 6506a(n)(1) ............................................................... 11, 16

43 U.S.C. § 1337(b)(4) ..................................................................... 21

5 U.S.C. § 706(2) .............................................................................. 10

5 U.S.C. §§ 701-706 .......................................................................... 10

Pub. L. No. 94-258, 90 Stat. 303 (1976) ............................................ 7

Pub. L. No. 96-514 94 Stat. 2957 (1980) ........................................... 7

**Regulations**

33 C.F.R. § 320.4(r)(2) ....................................................................... 3

33 C.F.R. § 332.3(a)(1) ....................................................................... 3

33 C.F.R. pts. 323, 325 ...................................................................... 2

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 7 of 70

40 C.F.R. § 1501.3 ..................................................................................................... 6

40 C.F.R. § 1502.14(a) (2019) ................................................................................. 21

40 C.F.R. § 1502.21 (2019) ...................................................................................... 33

40 C.F.R. § 1502.9(c)(1)(i) (2019) ........................................................................... 29

40 C.F.R. § 1506.3(c) (2019) .................................................................................... 28

40 C.F.R. § 230.10(a) ................................................................................................. 2

40 C.F.R. § 230.10(c) ................................................................................................. 2

40 C.F.R. § 230.10(d) ................................................................................................. 2

40 C.F.R. § 230.91 ..................................................................................................... 2

40 C.F.R. § 230.91(a)(1) ............................................................................................. 3

40 C.F.R. § 230.93(a)(1) ............................................................................................. 3

40 C.F.R. pt. 230 ........................................................................................................ 2

40 C.F.R. pts. 1500-08 (2019) ................................................................................... 6

43 C.F.R. § 3101.1-2 ................................................................................................. 25

43 C.F.R. § 3130.2 .................................................................................................... 17

50 C.F.R. § 18.27 ........................................................................................................ 5

50 C.F.R. § 18.27(b) ................................................................................................... 5

50 C.F.R. § 18.27(f) .................................................................................................... 5

50 C.F.R. § 402.02 .................................................................................................... 45

50 C.F.R. § 402.14 ...................................................................................................... 5

50 C.F.R. § 402.14(g) ................................................................................................. 4

50 C.F.R. § 402.14(g)(8) ............................................................................... 4, 42, 54

50 C.F.R. § 402.14(h)(1)(iii) ....................................................................................... 4

50 C.F.R. § 402.14(i)(1) .............................................................................................. 4

50 C.F.R. § 402.16 .................................................................................................... 47

50 C.F.R. §17.3 ................................................................................................... 47, 56

50 C.F.R. pt. 228 ......................................................................................................... 5

50 C.F.R. pt. 402 ......................................................................................................... 4

**Other Authorities**

126 Cong. Rec. S29 (daily ed. Nov. 13, 1980) .................................................... 16

126 Cong. Rec. S31 (daily ed. Dec. 1, 1980) ..................................................... 17

43 Fed. Reg. 55,978-01 (Nov. 29, 1978) ............................................................. 6

46 Fed. Reg. 37,725 (July 22, 1981) ................................................................. 25

51 Fed. Reg. 15,618-01 (Apr. 25, 1986) ............................................................. 6

54 Fed. Reg. 40,338-01 (Sept. 29, 1989) ............................................................ 5

54 Fed. Reg. 40,346 (Sept. 29, 1989) ................................................................ 5

83 Fed. Reg. 38,725 (Aug. 7, 2018) ................................................................... 8

84 Fed. Reg. 44,976 (Aug. 27, 2019) ........................................................... 4, 54

84 Fed. Reg. 45,002 (Aug. 27, 2019) ........................................................... 4, 54

84 Fed. Reg. 45,801-01 (Aug. 30, 2019) ............................................................. 9

85 Fed. Reg. 49,677-01 (Aug. 14, 2020) ............................................................. 9

H. Rep. No. 96-1147 (1980) ............................................................................ 17

S. Rep. No. 96-985 (1980) .............................................................................. 17

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                        vii

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 9 of 70

# INTRODUCTION

The Willow Master Development Plan Project ("Willow Project") allows for the construction and operation of infrastructure needed to develop certain federal oil and gas resources under leaseholds in the National Petroleum Reserve in Alaska ("NPR-A"). These leaseholds exist because Congress directed the Department of the Interior to conduct an oil and gas leasing program in the NPR-A. To that end, the Bureau of Land Management ("BLM") established which lands in the NPR-A would be open for leasing, and then held lease sales and issued leases, none of which are challenged here. ConocoPhillips Alaska, Inc. ("Conoco")—the lessee in this case—seeks to develop the Willow Project in order to extract oil and gas pursuant to federal law and its valid lease rights.

The Willow Project was approved after years of analysis, consultation with cooperating agencies including the U.S. Fish and Wildlife Service ("the Service") and the U.S. Army Corps of Engineers ("the Corps"), significant public input, and the completion of an environmental impact statement ("EIS") and biological opinion ("BiOp"). Plaintiffs seek to stop the extraction of resources from the Petroleum Reserve by cherry-picking the records of BLM, the Service, and the Corps, to suggest that the federal agencies' analyses violated the National Environmental Policy Act ("NEPA"), Clean Water Act ("CWA"), and Endangered Species Act ("ESA"). To the contrary, Federal Defendants complied with the requirements of these statutes and other applicable legal requirements, and Plaintiffs' claims should be rejected.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                    1

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 10 of 70

## BACKGROUND

### I. Legal Background

#### A. Clean Water Act

The Clean Water Act is designed "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Consistent with this purpose, the CWA prohibits the discharge of pollutants, including dredged or fill material, from a point source into navigable waters, unless authorized by a CWA permit. 33 U.S.C. § 1311(a). CWA Section 404 gives the Corps authority to permit discharges of dredged and fill material into navigable waters, including wetlands. 33 U.S.C. § 1344. The Corps may issue individual permits on a case-by-case basis after extensive site-specific documentation and review, an opportunity for public hearing, a public interest review, and a formal determination. *See generally* 33 C.F.R. pts. 323, 325.

Regulations known as the Section 404(b)(1) Guidelines (the "Guidelines") govern the Corps' evaluation of permit applications. 33 U.S.C. § 1344(b)(1), (h)(1)(A)(i); *see* 40 C.F.R. pt. 230. In evaluating a permit application under the Guidelines, the Corps undertakes a multi-step process. First, the Corps determines if impacts to wetlands can be avoided by considering offsite alternatives. *See* 40 C.F.R. § 230.10(a). Second, the Corps determines whether the project would cause "significant degradation" to waters of the United States. *See id.* § 230.10(c). Third, if impacts cannot be avoided, the Corps attempts to minimize those impacts. *See id.* § 230.10(d). Finally, the Corps considers how any unavoidable impacts can be mitigated through compensatory mitigation. *See id.* § 230.91.

The Guidelines require compensatory mitigation to offset "unavoidable impacts" to waters of the United States caused by work authorized by Section 404 permits. 40 C.F.R. § 230.91(a)(1). Compensatory mitigation is required for "significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment." 33 C.F.R. § 320.4(r)(2). The permit applicant is responsible for proposing an appropriate compensatory mitigation option. *Id.* § 332.3(a)(1). When evaluating the proposed compensatory mitigation option, the Corps determines which option is environmentally preferable based on an assessment of a number of factors, including: (1) the likelihood for ecological success and sustainability; (2) the location of the compensation site relative to the impact site and the significance within the watershed; and (3) the costs of the compensatory mitigation project. 40 C.F.R. § 230.93(a)(1); *see also* Memorandum of Agreement Between the Department of the Army and the Environmental Protection Agency Concerning Mitigation Sequence for Wetlands in Alaska Under Section 404 of the Clean Water Act at 2–3 (June 15, 2018) (outlining specific principles for mitigation projects in Alaska) (https://www.epa.gov/sites/production/files/2018-06/documents/epa_army_moa_alaska_mitigation_cwa_404_06-15-2018_0.pdf).

## B. Endangered Species Act

Congress enacted the ESA to protect and conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). "Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                    3

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 12 of 70

continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat . . . ."  16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. pt. 402.[1]

Formal consultation, which was the process followed here, culminates in a biological opinion ("BiOp"), which includes a "detailed discussion of the effects of the action on listed species or critical habitat."  50 C.F.R. § 402.14(h)(1)(iii).  The BiOp assesses the likelihood of the proposed action resulting in jeopardy to a listed species or destruction or adverse modification to designated critical habitat.  50 C.F.R. § 402.14(g). If an action is not likely to result in jeopardy or destruction or adverse modification of critical habitat, but is reasonably likely to result in "take" incidental to the proposed action, then the Service includes an incidental take statement in the BiOp.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1).  If the action agency implements the project as proposed and complies with the terms and conditions of the incidental take statement, ESA Section 7(o)(2) exempts the specified level of take from the ESA Section 9 take prohibition.  16 U.S.C. § 1536(o)(2).

## C.  Marine Mammal Protection Act

The Marine Mammal Protection Act ("MMPA") prohibits the take of marine

---

[1] On October 28, 2019, new implementing regulations for the ESA went into effect regarding how the Service accounts for mitigation measures included in a proposed action.  *See* 50 C.F.R. § 402.14(g)(8); Regulations for Interagency Cooperation, 84 Fed. Reg. 44,976-01, 45,002-07 (Aug. 27, 2019).  These revised regulations govern the Service's Section 7 analysis at issue in this case.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              4

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 13 of 70

mammals, but its scope is narrower and its procedures distinct from those of Sections 7 and 9 of the ESA. "Take" in the MMPA is similar to, but not the same as "take" under Section 9 of the ESA.

The MMPA allows the Service to permit the incidental take of "small numbers" of marine mammals pursuant to a specified activity for a limited period. The total incidental take must have a "negligible impact" on the species or stock and cannot have an "unmitigable adverse impact" on the availability of the species or stock for specified subsistence uses. 16 U.S.C. § 1371(a)(5)(A)(i)(I); *see also* 50 C.F.R. § 18.27(b). If the incidental take meets these requirements, the Service will upon request prescribe regulations setting forth permissible methods of taking the species in question and other means of effecting the least adverse impact possible on the species and its habitat. *See* 50 C.F.R. § 18.27(b). Proposed regulations are subject to public notice-and-comment. 16 U.S.C. § 1371(a)(5)(A)(I). Once the regulations are finalized and promulgated, the Service issues individual letters of authorization to authorize the incidental take from activities conducted pursuant to established regulations. 50 C.F.R. § 18.27(f).

With respect to marine mammals, the Service cannot issue an incidental take statement authorizing the take of an endangered or threatened species under the ESA until the take has been authorized under the MMPA. 16 U.S.C. § 1536(b)(4)(C); *see also* Incidental Take of Endangered, Threatened, and Other Depleted Marine Mammals, 54 Fed. Reg. 40,338-01, 40,346 (Sept. 29, 1989), codified at 50 C.F.R. §§ 18.27, 402.14, and 50 C.F.R. pt. 228.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
Defs.' Opposition to Plaintiffs Merits Brief                                                    5

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 14 of 70

**D. National Environmental Policy Act**

NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to members of the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). To meet these dual purposes, NEPA requires that an agency prepare a comprehensive EIS for "major Federal actions significantly affecting the quality of the human environment . . . ." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.3.[2] NEPA imposes purely procedural requirements, and "does not require that certain outcomes be reached as a result of the evaluation." *Nat. Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 129 (D.C. Cir. 1987). "Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed – rather that unwise – agency action." *Robertson*, 490 U.S. at 351 (footnote omitted). A reviewing court is not to "substitute its judgment for that of the agency." *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Rather, "[o]nce satisfied that a proposing agency has taken a 'hard look' at a decision's

---

[2] The Council on Environmental Quality (CEQ) promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978-01 (Nov. 29, 1978), and a minor substantive amendment to those regulations in 1986, *see* 51 Fed. Reg. 15,618-01 (Apr. 25, 1986). More recently, the Council published a new rule, effective September 14, 2020, substantially revising the 1978 regulations. The claims in this case arise under the 1978 regulations, as amended in 1986. All citations to the Council's regulations in this brief refer to those regulations as codified at 40 C.F.R. Parts 1500-08 (2019).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
Defs.' Opposition to Plaintiffs Merits Brief                          6

Case 3:20-cv-00308-SLG    Document 99    Filed 05/26/21    Page 15 of 70

environmental consequences, the review is at an end." *Id.* (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

## II.    Factual Background

The nearly 23 million acres that comprise the NPR-A were originally designated a naval petroleum reserve by executive order in 1923. *N. Alaska Env't. Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006). The U.S. Navy managed the Petroleum Reserve until 1976, when Congress enacted the Naval Petroleum Reserves Production Act ("NPRPA"), Pub. L. No. 94-258, 90 Stat. 303 (1976), re-designating the reserve as the "National Petroleum Reserve in Alaska," withdrawing it from operation of the mining and mineral leasing laws, and placing it under the jurisdiction of the Secretary of the Interior. NPRPA, 90 Stat. 303. Congress amended the NPRPA in the Department of the Interior Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, 2964–65 (1980) ("1980 Rider"), by directing the Secretary of the Interior to undertake "an expeditious program of competitive leasing of oil and gas in the [NPR-A]." *Id.* at 2964.

In November 2012, BLM issued an Integrated Activity Plan/Environmental Impact Statement ("IAP/EIS") covering the entire NPR-A as a single planning area, to address the "nation's need for production of more oil and gas through additional leasing in the NPR-A, and to protect surface values consistent with the exploration and development of oil and gas." BLM_AR268917. The February 2013 record of decision ("ROD") for the 2012 IAP/EIS made 11.8 million acres of NPR-A available for oil and gas leasing, subject to numerous lease stipulations and best management practices

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF    7

Case 3:20-cv-00308-SLG    Document 99    Filed 05/26/21    Page 16 of 70

imposing requirements on lessees when constructing facilities and conducting oil and gas operations. BLM_AR271559, BLM_AR271562-63, BLM_AR271596-650. In June 2020, BLM issued a new Final IAP/EIS for the NPR-A. BLM_AR286553. On December 31, 2020, the Secretary of the Interior signed the ROD adopting Alternative E, the preferred alternative in the 2020 IAP/EIS, opening an additional 6.8 million acres in NPR-A to oil and gas leasing subject to numerous lease stipulations and required operating procedures (formerly called best management practices). BLM_AR287107-09, BLM_AR287125-67.

Conoco has valid leases within the NPR-A, issued prior to the 2020 IAP that "provide the right to develop the oil and gas resources therein." BLM_AR182372. Conoco requested that BLM prepare an EIS for the Willow Master Development Plan, which proposes to build "infrastructure components for the purpose of oil and gas development." BLM_AR182389. The Willow Project may include up to five drill sites, a central processing facility, an operations center pad, up to thirty seven miles of gravel roads, ice roads, one to two airstrips, up to 385.5 miles of pipelines, and a gravel mine, as well as the transportation of modules for hauling project materials to the Project area. *Id*. The Willow Project is anticipated to produce approximately 586 million barrels of oil over its lifetime. *Id.* In response to Conoco's request, on August 7, 2018, BLM issued a Notice of Intent to Prepare an EIS for the Willow Master Development Plan Oil and Gas Prospect, Alaska. 83 Fed. Reg. 38,725-01, 38,725-26. BLM held an extended scoping period ending September 20, 2018, with an additional extension for the Community of Nuiqsut to comment. BLM_AR182391.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                        8

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 17 of 70

On August 30, 2019, BLM issued a notice of availability of the Willow Draft EIS

("DEIS").  84 Fed. Reg. 45,801-01.  The comment period was open until October 29,

2019, and multiple public meetings were held during that comment period.

BLM_AR182392.  BLM received 935 submissions during the DEIS public comment

period.  *Id.*  In response to subsistence-related concerns raised during the public comment

period, Conoco amended its application to incorporate a new module delivery option (via

an ice bridge across the Colville River), as well as other modifications to its project

design.  *Id.*  BLM issued a Supplement to the DEIS ("SDEIS") on March 20, 2020,

reflecting these changes.  *Id.*  BLM held an additional forty-five-day comment period for

the SDEIS, during which BLM held eight virtual meetings via Zoom (due to the COVID-

19 pandemic) and received a total of 31,015 submissions.  BLM_AR182393.  On August

14, 2020, BLM issued a Notice of Availability of the Final EIS ("FEIS").  85 Fed. Reg.

49,677-01.  On October 26, 2020, then-Secretary of the Interior Bernhardt signed the

ROD adopting Alternative B of the FEIS (Conoco's proposed project) and Module

Delivery Option 3 (the Colville River Crossing).  BLM_AR186073.

In March 2020, BLM also requested ESA Section 7 consultation with the Service

on the potential effects of the Willow Project on ESA-listed species, including the polar

bear at issue in this lawsuit, and certain designated critical habitat.  FWS_AR000097.  In

October 2020, the Service issued its BiOp and concluded consultation.  With respect to

the polar bear, the Service determined that the Willow Project was not likely to

jeopardize the continued existence of the polar bear or adversely modify its designated

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                            9

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 18 of 70

critical habitat.  FWS_AR000763-66.[3]

The U.S. Army Corps of Engineers was a cooperating agency in the development of the FEIS.  Corps_AR000150.  In addition, the Corps evaluated Conoco's application for a permit under Section 404 of the CWA to discharge fill and dredged material, as well as perform work in waters of the United States ("WOUS"), including wetlands, for purposes of constructing the Willow Project.  *Id.*  The permit granted by the Corps authorizes the permanent discharge of fill and dredged materials into 481.1 acres of WOUS, and the temporary discharge of fill and dredged material into 157.9 acres of WOUS.  Corps_AR000151.  In addition, 135.8 acres of wetlands would permanently be converted to open water.  *Id.*

## LEGAL STANDARDS

Review on the merits is governed by the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA"); *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-06 (9th Cir. 2004).  Under the APA, final agency action is reviewed under 5 U.S.C. § 706(2), and such review is highly deferential.  *Lands Council v. McNair*, 537 F.3d 981, 992-94 (9th Cir. 2008) (en banc), *overruled in part on other grounds*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).  Agency decisions may be overturned only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 891 (9th Cir. 2002) (citation

---

[3] Also, under the existing MMPA Southern Beaufort Sea Incidental Take Regulation, the Service issued a Letter of Authorization to Conoco for the Willow project on December 21, 2020.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                10

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 19 of 70

omitted).  An agency action will be upheld if the agency has considered the relevant

factors and articulated a rational connection between the facts found and the choice made.

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 105-06 (1983).  The

court may not substitute its judgment for that of the agency.  *Motor Vehicle Mfrs. Ass'n.,*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**ARGUMENT**

I.    **BLM and the Corps Satisfied the Requirements of NEPA**

   A. **Plaintiffs' NEPA Claims Are Barred by the NPRPA's Statute of Limitations**

   The NPRPA states that "[a]ny action seeking judicial review of the adequacy of any

program or site-specific environmental impact statement . . . concerning oil and gas

leasing in the [NPR-A] shall be barred unless brought in the appropriate District Court

within 60 days after notice of the availability of such statement is published in the

Federal Register."  42 U.S.C. § 6506a(n)(1).  As this Court has explained, the FEIS in

this case is both "site-specific" and "concern[s] oil and gas leasing."  *Sovereign Iñupiat*

*for a Living Arctic v. BLM*, Nos. 3:20-cv-290-SLG, 3:20-cv-308-SLG, 2021 WL 343925,

at *9 (D. Alaska Feb. 1, 2021).  And it is undisputed that Plaintiffs filed their Complaints

95 days (Sovereign Iñupiat for a Living Arctic ("SILA")) and 129 days (Center for

Biological Diversity ("CBD")) after the August 14, 2020 Federal Register notice of

availability for the Willow Project FEIS.  Complaint, *SILA v. BLM*, No. 3:20-cv-290-

SLG (D. Alaska Nov. 17, 2020), ECF No. 1; Complaint, *CBD v. BLM*, No. 3:20-cv-308-

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          11

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 20 of 70

SLG, ECF No. 1 (D. Alaska Dec. 21, 2020).[4] Plaintiffs' NEPA claims are thus barred by the sixty-day statute of limitations.

This Court rejected Plaintiffs' various arguments to the contrary in the preliminary injunction stage of the case, and should do so again here. As a preliminary matter, both Plaintiffs' arguments rest on what they describe as a "strong presumption in favor of judicial review of administrative actions." SILA Pls.' Opening Br. for Summ. J. 9, ECF No. 95 ("SILA Br."); *see also* CBD Pls.' Principal Br. 19-20, ECF No. 92 ("CBD Br."). On that basis, Plaintiffs ask this Court to narrowly construe the NPRPA's limitations provision—which they describe as a "prohibition" of judicial review—and to resolve any ambiguity in favor of allowing review here. The argument fails because the cases Plaintiffs cite address whether a statute should be interpreted to preclude *any* judicial review of certain agency actions (or of certain agency actions under certain circumstances). *See Love v. Thomas*, 858 F.2d 1347, 1354, 1356 (9th Cir. 1988) (addressing whether a plaintiff's failure to seek an administrative hearing barred judicial review under the Federal Insecticide, Fungicide, and Rodenticide Act); *Moapa Band of Paiute Indians v. Dep't of Interior*, 747 F.2d 563, 565-66 (9th Cir. 1984) (addressing whether a matter was committed to the agency's sole discretion such as to bar judicial review under 5 U.S.C. § 701); *Marble Mountain Audubon Soc'y v. Rice*, 914 F.2d 179, 181 (9th Cir. 1990) (addressing whether a challenge to a timber sale was barred by a

---

[4] Hereinafter, pleadings from the SILA docket (3:20-cv-290) and pleadings from the CBD docket (3:20-cv-308) will be prefaced with "SILA" or "CBD" to distinguish them.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    12

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 21 of 70

statute barring claims "on the sole basis that the plan in its entirety is outdated" (internal citation omitted)). Unlike the statutes in those cited cases, the NPRPA does not preclude judicial review; it merely conditions that review by imposing a deadline, so that challenges do not frustrate Congress's desire for an expeditious program of competitive leasing of oil and gas in the Petroleum Reserve.

Turning to Plaintiffs' specific arguments, there is no support in the NPRPA's text for Plaintiffs' contention that the statute of limitations applies only to EISs "analyzing the impacts of lease sales." SILA Br. 9; *see also* CBD Br. 13-14. Plaintiffs rely on grammar rules and cherry-picked dictionary definitions to arrive at the same unavailing conclusion—that leasing is defined only as the act of granting a lease or conveying a right to lessee. SILA Br. 9-10; CBD Br. 13. But other dictionaries define leasing as an ongoing act, i.e., "the act of using or letting somebody use something, especially property or equipment, in exchange for rent or a regular payment."[5] This latter definition comports with the term's common usage; in plain language, leasing an apartment to a tenant does not conclude the moment the lease is signed, but instead when the lease is terminated. And while it is true that the "sale of a lease" is a "point of commitment," at which point a lessee obtains certain legal rights, nothing in *Conner v. Burford* supports the CBD Plaintiffs' contention that the act of leasing ends when a lease is issued. 848 F.2d 1441, 1451 (9th Cir. 1988); *see* CBD Br. 13.

---

[5] *Leasing, Oxford Learner's Dictionaries,*
https://www.oxfordlearnersdictionaries.com/us/definition/english/leasing?q=leasing (last visited May 25, 2021).

As this Court and others have recognized, BLM's leasing programs (a phrase adopted by Plaintiffs, SILA Br. 10) encompass more than simply entering into leases, but also the subsequent stages of development and production. *N. Alaska Env't Center v. Kempthorne*, 457 F.3d at 977-78 (describing "the exploration and permit stages of the leasing program"); *SILA*, 2021 WL 343925, at *7. The literal act of issuing a lease does not cause impacts to the environment; instead, it is the subsequent activity on the leasehold following the issuance of the lease that impacts the environment and must be analyzed under NEPA. Additionally, even under Plaintiffs' proffered definition of the word "concerning"—i.e., "relating to" or "regarding"— an EIS addressing exploration and development work, which is conducted pursuant to an oil and gas lease, plainly regards and relates to "oil and gas leasing." SILA Br. 10; CBD Br. 15.

The NPRPA's application of the limitations period to "site-specific" EISs also shows that Congress intended for the provision to apply to exploration and development EISs. Interior's practice has long been to first address overarching lease sale decisions in a program EIS, and then to address exploration and development resulting from lease issuance (both of which involve more detailed plans and fine-grained review) in site-specific EISs or environmental assessments. *See, e.g.,* BLM_AR268935-36 (stating the 2012 IAP/EIS would fulfill NEPA requirements for lease sales, but "future actions requiring BLM approval, including a proposed exploratory drilling plan, proposed construction of infrastructure for development of a petroleum discovery . . . would require further NEPA analysis" based on site specific information). The statute's express reference to "site-specific" EISs indicates that Congress intended for the 60-day period to

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                14

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 23 of 70

apply both to the program EISs underlying the sale of leases and to the EISs analyzing

exploration and development activities on those leases.  *SILA*, 2021 WL 343925, at *7.

The Willow EIS that Plaintiffs challenge is a site-specific EIS drafted solely for the

purpose of analyzing an oil and gas development project proposed pursuant to Conoco's

oil and gas leases in the NPR-A.  The EIS's evaluation of these lease-based activities

implements the NPR-A leasing program and therefore falls within the plain language of

Section 6506a(n)(1).

In addition to lacking textual support, Plaintiffs' narrow interpretation of the

limitations period finds no support in the statute's context, history, or statements of

legislative intent.  In response to a 1979 oil crisis and reflecting a desire to quickly move

from federal to private oil and gas exploration and development, Congress amended the

NPRPA in 1980, directing the Secretary to undertake "an expeditious program of

competitive leasing of oil and gas in the [NPR-A]."  1980 Rider, 94 Stat. at 2964-65.  The

1980 Rider itself is entitled "*Exploration* of [NPR-A]," (emphasis added) and it

contemplates not just leasing, but also oil and gas exploration and production and the

payment of royalties to the government.  *Id.* at 2964-65.

The SILA Plaintiffs nonetheless insist that "Congress was focused on accelerating

the timeframe around leasing," —not production or development.  SILA Br. 11.  But

leasing itself—as narrowly defined by Plaintiffs—would not result in oil production, the

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              15

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 24 of 70

ultimate "object and policy" of the 1980 Rider. *SILA*, 2021 WL 343925, at *8.[6]  SILA

Plaintiffs further argue that Section 6506a's title, "Competitive leasing of oil and gas,"

shows that the statute of limitations applies only to decisions concerning lease issuance.

SILA Br. 10 (citing 42 U.S.C. § 6506a).  In fact, that title demonstrates that "leasing"

refers to more than the mere issuance of leases, as evidenced by the various provisions in

Section 6505a that relate to exploration and production.  *See* 42 U.S.C. § 6506a(b)

(addressing mitigation of impacts to surface resources); *id.* § 6506a(i) (addressing lease

extensions and expiration depending on production); *id.* § 6506a(k) (addressing

exploration incentives).  The limitations period in Section 6506a(n)(1) likewise covers

exploration and production EISs because they "concern[] leasing" in the same way that

all provisions under the broad "Competitive leasing of oil and gas" title also "concern[]

leasing."  Congress did not use the word "leasing" (or "exploration") to the strict

exclusion of the other phases of a leasing program.

Finally, although the comments of individual legislators do not demonstrate the

intent of Congress as a whole, the record here shows that the shared goal of expedited

review was not artificially limited to lease issuance decisions.  *See, e.g.*, 126 Cong. Rec.

S29,485, S29,489 (daily ed. Nov. 13, 1980) (individual statements of Sen. Huddleston

and Sen. Stevens emphasizing the need for expediting leasing, exploration, and

---

[6] SILA Plaintiffs are simply wrong in stating that a general prohibition on production and development existed in the NPR-A until 2005.  SILA Br. 11-12.  Among other things, the assertion cannot be reconciled with the presence of language in the 1980 Rider specifically contemplating oil production.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                    16

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 25 of 70

development); 126 Cong. Rec. S31,196 (daily ed. Dec. 1, 1980) (same); S. Rep. No. 96-985, at 34 (1980) & H. Rep. No. 96-1147, at 32–33 (1980) (indicating an intent to quickly shift from federal to private exploration and development).  Plaintiffs provide no competing evidence that legislators took a more limited view of the scope of the limitations period.[7]

CBD Plaintiffs point out that only BLM's leasing regulation at 43 C.F.R. § 3130.2 refers to the limitations provision, whereas other BLM regulations regarding exploration and development do not.  CBD Br. 19.  But Plaintiffs fail to recognize that the leasing regulation they cite is within regulations *specific to the NPR-A*, whereas the exploration and development regulations they cite concern onshore oil and gas activates on federal lands, *generally*.  There is nothing to make of the fact that these general regulations do not mention an NPR-A-specific statute of limitations.

For all of these reasons, Plaintiffs' NEPA claims are barred by the NPR-A's statute of limitations and this Court should dismiss those claims with prejudice.

## B.  BLM's Greenhouse Gas Emissions Analysis Satisfies NEPA

Both Plaintiffs argue that BLM's analysis of greenhouse gas emissions ("GHG") violated NEPA because BLM "used the same modeling approach" recently rejected by the Ninth Circuit in *Center for Biological Diversity v. Bernhardt (Liberty)*, 982 F.3d 723 (9th Cir. 2020).  SILA Br. 23; *see* CBD Br. 21-23.  That decision involved the Bureau of

---

[7] CBD Plaintiffs cite statements by Representative Dicks (CBD Br. 18), but even those selected quotes show the interest in seismic exploration and "early production," not a focus on lease issuance alone.  *Id.* (citation omitted).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                        17

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 26 of 70

Ocean Energy Management's ("BOEM") approval of offshore oil drilling and production facility, *viz.*, the Liberty Project. But BLM's decision to approve the Willow Project is a different decision, based on a different record, and BLM reasonably explained its chosen method, thus avoiding the shortcomings identified in the *Liberty* decision.

BLM's analysis of lifecycle GHG emissions associated with the Willow Project does not suffer from the flaws identified by the court in *Liberty*. As that court explained, "BOEM's conclusion that *not* drilling will result in more carbon emissions than drilling is counterintuitive." *Liberty*, 982 F.3d at 739. The *Liberty* panel rejected BOEM's conclusion at a visceral level, finding "[a]n agency acts arbitrarily and capriciously when it reaches a decision that is 'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Id*. (quoting *State Farm*, 463 U.S. at 43). BLM made no comparable conclusion in its FEIS here. Unlike in *Liberty*, where the agency concluded that the absence of the proposed project would cause *increased* GHG emissions, BLM in the Willow EIS explained that

> The absence of the Project itself would not lead directly to emissions. Therefore, for ease of comparison to the action alternatives, GHG emissions in the No Action Alternative are assigned a baseline value of zero in the EIS, reflecting the status quo and current GHG emissions trends in the absence of the Project.

BLM_AR182422-23. In comparison, BLM estimated total direct and indirect $CO_{2e}$ emissions from the Proposed Project to be approximately 260,000 (in thousand metric tons). BLM_AR182424. BLM's approach forecasted a plausible result and provided the decision maker an understanding of the GHG emissions expected to be associated with

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
Defs.' Opposition to Plaintiffs Merits Brief                                                      18

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 27 of 70

the Willow Project from the No Action Alternative. Thus, the Willow EIS provided what is required under NEPA, a reasonable analysis of environmental impacts across alternatives. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004).

Faced with what it considered a "counterintuitive" and "implausible" underlying assumption by BOEM, the panel in *Liberty* found it could not defer to the agency's expertise, and moved on to question BOEM's explanation for not attempting to calculate the impacts of Liberty on foreign GHG emissions. *Liberty*, 982 F.3d at 736, 739. The panel criticized BOEM for providing an explanation that "did not summarize existing research addressing foreign oil emissions nor attempt to estimate the magnitude of such emissions," and that "ignore[d] basic economics principles and state[d]—without citations or discussion—that the impact of the Liberty project on foreign oil consumption will be negligible." *Liberty*, 982 F.3d at 740. The panel rejected this approach, holding "the EIS 'should have either given a quantitative estimate of the downstream greenhouse gas emissions' that will result from consuming oil abroad, or 'explained more specifically why it could not have done so[.]'" *Id*. (quoting *Sierra Club v. Fed. Energy Regulatory Comm'n*, 867 F.3d 1357, 1374 (D.C. Cir. 2017)).

Contrary to Plaintiffs' assertions, BLM explained in the Willow FEIS why it could not perform a reliable quantitative estimate of downstream GHG emissions in foreign countries, thus avoiding the key shortcoming the court identified in *Liberty*. *See* SILA Br. 24; CBD Br. 21. BLM specifically explained that it could not extend the modeling of foreign oil markets and price to global GHG emissions estimates because of "uncertainty

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF     19

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 28 of 70

and lack of reliable data" for a number of crucial factors for that analysis. BLM_AR182957, BLM_AR182963.  That analysis would require "detailed data on proportional consumption changes and the most likely energy substitutions." BLM_AR183508.  Calculating global GHG emissions estimates would also require detailed data on "emissions from refineries, natural gas systems, [and] coal processing." *Id.*  An estimate of downstream GHG emissions based on foreign consumption would also require detailed data and information on "emissions factors specific to the energy substitutes for all countries worldwide" as "the GHG emissions rates for even the same class of fuels can vary significantly from country to country."  BLM_AR182957.

BLM, in sum, adequately explained that it lacked data necessary for a reliable quantitative estimate of downstream emissions in foreign countries, in contrast to the inadequacies identified in *Liberty*.  And this explanation is not undermined by Plaintiffs' observation that BLM was able to forecast changes in the demand for energy from the Willow Project.  CBD Br. 7-9.  Plaintiffs contend that BLM could simply have taken the extra step of quantifying global emissions stemming from those forecasted changes in demand, but this ignores the unpredictability discussed above concerning likely energy substitutions, variability in GHG emission rates, and other associated emission factors. The Court should defer to BLM's choice of methodology, and its determination that it lacked reliable data necessary to conduct Plaintiffs' preferred methodology.

Finally, contrary to CBD Plaintiffs' assertion, CBD Br. 23, the lack of quantification of foreign emissions in the Willow EIS does not have the same potential consequences as it did in *Liberty*.  The estimated amount of oil to be produced (and

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    20

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 29 of 70

therefore impacts on GHG emissions) is the same across the action alternatives considered in the Willow EIS.  BLM_AR182389, BLM_AR183506.  BLM would not have approved another alternative on the basis of a quantification of foreign emissions because this impact would have been the same across the action alternatives.  *See Liberty*, 982 F.3d at 740 ("If [BOEM] later concludes that [foreign GHG] emissions will be significant, it may well approve another alternative included in the EIS . . . .").  Plaintiffs have not, therefore, explained how omissions in the GHG analysis resulting from uncertainty equates to arbitrary decision making, nor have they have alleged that BLM had discretion to adopt the no action alternative, given that Conoco's existing lease rights under the NPRPA entitle it to develop its leases subject to reasonable regulation by BLM, (BLM_AR182372, BLM_AR183185)[8] and the purpose and need of the project (discussed further below).

## C.  BLM Considered a Reasonable Range of Alternatives under NEPA

NEPA's implementing regulations prescribe that an agency "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14(a) (2019).  "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate."  *Westlands Water*, 376 F.3d at 868 (citation omitted).  But this requirement is not rigid.  Otherwise, "an agency could generate countless alternatives."  *Morongo Band of Mission Indians v. F.A.A.*, 161 F.3d 569, 575 (9th Cir. 1998) (citation

---

[8] The leases at issue in *Liberty* were issued under the Outer Continental Shelf Lands Act, which conditions development and production rights on BOEM's discretionary approval of a development and production plan.  43 U.S.C. § 1337(b)(4).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                21

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 30 of 70

omitted). Instead, an agency's choice of alternatives is governed by a "rule of reason,"
under which an EIS "need not consider an infinite range of alternatives, only reasonable
or feasible ones." *Westlands Water Dist.*, 376 F.3d at 868 (citation omitted); *see also*
*Headwaters, Inc. v. Bureau of Land Mgmt., Medford Dist.*, 914 F.2d 1174, 1180 (9th Cir.
1990) (Agency need not "consider alternatives which are infeasible, ineffective, or
inconsistent" with its objectives). An agency's consideration of alternatives is dictated
by the "nature and scope of the proposed action." *Nw. Env't Def. Ctr. v. Bonneville*
*Power Admin.*, 117 F.3d 1520, 1538 (9th Cir. 1997) (citation omitted). An agency need
not analyze alternatives that do not meet the agency's purpose and need. *League of*
*Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d
1060, 1070-71 (9th Cir. 2012). The "touchstone for [a court's] inquiry is whether an
EIS's selection and discussion of alternatives fosters informed decision-making and
informed public participation." *Morongo Band*, 161 F.3d at 575 (citation omitted).

The purpose of the Proposed Action is "to construct the infrastructure necessary to
allow the production and transportation to market of federal oil and gas resources under
leaseholds in the northeast area of the NPR-A, consistent with the proponent's federal oil
and gas lease and unit obligations." BLM_AR182390. The need for BLM's action is to
issue authorizations under the NPRPA to conduct oil and gas development in the NPR-A.
*Id.*

Consistent with this purpose and need, the FEIS analyzed in detail four
alternatives. Alternative A, the No Action Alternative, was provided for baseline
comparison but BLM found it did not "have the authority to select this alternative

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          22

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 31 of 70

because [Conoco's] leases are valid and provide the right to develop the oil and gas resources therein," a view that the Plaintiffs have not challenged. BLM_AR182372. Alternative B is Conoco's proposed project, ultimately adopted by BLM's ROD. That alternative extends an "all season gravel road from the Greater Mooses Tooth 2 development toward the Project area" and connects all Project facilities, including the processing facility, with gravel roads. *Id.* Alternatives C and D include fewer gravel roads in different locations, and were intended to minimize the Project's effects on caribou movement and subsistence users (Alternative C), and reduce impacts to hydrology and wetlands (Alternatives C and D). BLM_AR182372-73. The FEIS also analyzed three different options for delivering prefabricated modules to the Project area, any of which could be combined with any action alternative. BLM_AR182373-74.

CBD Plaintiffs contend BLM's alternatives analysis is flawed because it did not consider specific additional alternatives. CBD Br. 23-25. Specifically, they complain that BLM did not consider an alternative prohibiting permanent infrastructure in the Teshekpuk Lake[9] and Colville River Special Areas,[10] or an alternative that would permit

---

[9] Similar to the 2020 NPR-A ROD, *see generally* BLM_AR287133-44, the 2013 NPR-A ROD includes lease stipulations and best management practices, including a series to provide "Additional Protections that Apply in Select Biologically Sensitive Areas." BLM_AR271630-48. Several of these restrictions do prohibit certain types of permanent infrastructure within the Teshekpuk Lake Special Area including near Teshekpuk Lake or the Teshekpuk Lake Caribou Habitat Area. *See* BLM_AR271662, BLM_AR271630-34, BLM_AR2716638-41, BLM_AR271643-44.
[10] The 2020 IAP ROD eliminates the Colville River Special Area entirely. BLM_AR287108.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
Defs.' Opposition to Plaintiffs Merits Brief                                                      23

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 32 of 70

drilling only during the winter season and eliminate construction of permanent roads. CBD Br. 23. But BLM explained that the purpose and need of the project could not be met without infrastructure in the Teshekpuk Lake Special Area because two of the drill sites (Bear Tooth 2 and 4) are within that Special Area. BLM_AR183012. As to the proposal that Conoco be limited to winter-only drilling, BLM explained that drilling only during the winter season would reduce drilling to approximately two months per year and that this would significantly threaten the economic feasibility of the Willow Project. *Id.* BLM noted that "leases are subject to a limited term of years," and reasonably concluded such a short drilling season would extend the life of the project (and its associated impacts) for decades, and likely beyond the term of the lease. *Id.* BLM need not consider infeasible alternatives. Further, during the alternatives development, BLM concluded an ice road or tundra access only option would "create unacceptable hazards for safety and emergency response and limit the number of wells that could be drilled per season." BLM_AR183188. BLM, in sum, reasonably found that neither of Plaintiffs' proposed alternatives would achieve the project's purpose and need, and it permissibly excluded them on that basis from detailed analysis in the FEIS.

Nowhere does BLM claim that Conoco's leases allow them to "grant rights to drill and build infrastructure wherever, whenever, and however the company wants." CBD Br. 25. But, Conoco does have valid lease rights. The Mineral Leasing Act regulations provide that a "lessee shall have the right to use so much of the leased lands as is necessary to explore for, drill for, mine, extract, remove and dispose of all the leased resources in a leasehold," subject to stipulations and measures to minimize adverse

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              24

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 33 of 70

impacts.[11] 43 C.F.R. § 3101.1-2.  BLM appropriately considered Conoco's lease rights in structuring its NEPA analysis.

### D. Defendants Took the Requisite Hard Look at the Impacts of the Willow Project on the Environment

The FEIS consists of seven volumes, spanning over 3,600 pages, and took over two years and over six million dollars to draft, evaluate, and finalize.  BLM_AR182353-186037.  It analyzes in detail four alternatives, and three delivery options, and the impacts of those options on the climate and climate change, air quality, soil and gravel resources, noise, visual resources, water resources, wetlands and vegetation, fish, birds, terrestrial mammals, marine mammals, economics, subsistence, and sociocultural systems, among other resources.  This analysis provided a reasonable basis to support BLM's decision.

#### 1. BLM and the Corps Had the Information Necessary to Take a Hard Look at the Impacts of the Project

The SILA Plaintiffs contend that BLM and the Corps failed to take a hard look at Willow's impacts because "[t]he agencies lacked critical project design and baseline information."  SILA Br. 12.  In fact, the agencies took a hard look at the Willow Project's impacts, including impacts from the alternative proposed water crossings and impacts from building gravel roads and other infrastructure.  The analysis did not suffer for lack of specific project information.

----

[11] While the NPRPA regulations do not have a comparable provision, the MLA influenced and served as a model for the NPR-A leasing regulations. *See, e.g.*, 46 Fed. Reg. 37,725 (July 22, 1981).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
<span style="font-variant: small-caps">Defs.' Opposition to Plaintiffs Merits Brief</span>                                         25

Beginning with the analysis of impacts to water resources and wetlands, the FEIS describes the proposed bridges for the Willow Project, including the number of bridges in Alternative B (BLM_AR182484-85), the length of the bridges, their clearance above 100-year design-flood elevation or highest documented flood elevation, and corresponding construction details. BLM_AR182400. Section 3.8.2.3.4 of the FEIS describes the potential effects of all in-water structures on surface waters, including on suspended sediment, turbidity, backwater, riverbed erosion, sediment deposit, and changed morphology. BLM_AR182484-85. And while Plaintiffs describe these as "generalized summaries" (SILA Br. 12-13), their criticism ignores the existence of the Water Resources Technical Appendix (Appendix E.8A), which provides a detailed explanation of the potential impacts of the Project to streams, including sediment deposition, sediment transport, and changes in channel morphology downstream from bridges. BLM_AR185506-35.

The SILA Plaintiffs incorrectly state that this "technical memorandum" only analyzed a hypothetical data set (SILA Br. 16); in fact, the technical appendix incorporates data BLM asked for and received from Conoco relating to flow data at proposed crossing locations on the Colville River. BLM_AR185512-13; *see also* BLM_AR144675, BLM_AR145089, BLM_AR145464. The additional data points provided by Conoco allowed BLM to extrapolate additional stream flow data for analysis using a commonly accepted hydrological analysis method (the drainage-area ratio method), BLM_185513, as explained thoroughly in Appendix E.8, BLM_185538-45. Both appendices (E.8 and E.8A) were generated to address EPA comments suggesting

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          26

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 35 of 70

additional information was necessary. BLM_AR183133. Thus, the agencies did not lack

any critical project design and baseline information regarding impacts to water resources,

but instead provided that information in the FEIS, satisfying NEPA's requirement to

"carefully consider[] detailed information concerning significant environmental impacts"

and provide the public with "relevant information." *Robertson*, 490 U.S. at 349.

Plaintiffs appear to allege that because the Section 404 permit application was

received after the DEIS was published, the Corps could not rely on the FEIS, and, as a

result, the Corps' NEPA review is somehow deficient.[12] SILA Br. 14. They are wrong.

The Corps was a cooperating agency on the FEIS. Corps_AR000150. NEPA regulations

provide for adoption by a cooperating agency of the EIS by a lead agency if the

cooperating agency reviews and "concludes that its comments and suggestions have been

satisfied." 40 C.F.R. § 1506.3(c) (2019). Here, the Corps conducted a review of and

adopted the FEIS. Corps_AR000151, Corps_AR000156. And, the FEIS incorporated

and addressed all project changes postdating the publication of the DEIS, including those

reflected in the CWA 404 permit application. BLM_AR182392-93; Corps_AR000151;

Corps_AR000154. Thus, it was appropriate for the Corps to rely on the FEIS when

making its decision, and, as discussed above, the FEIS adequately disclosed information

relating to impacts of the project on water resources.

---

[12] To the extent Plaintiffs imply that the Section 404(b)(1) Guidelines analysis had to be completed in the EIS, they are wrong as discussed below. Instead, the 404(b)(1) Guidelines analysis was appropriately included in the Corps' Record of Decision. Corps_AR000197-215.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                        27

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 36 of 70

In addition to analyzing impacts to wetlands and water from the Project, the FEIS also includes sufficient information regarding the proposed roads and infrastructure that the agencies considered in their analyses. The FEIS details in numerous places the total length of roads and amount of gravel needed for those roads. *See, e.g.*, BLM_AR182375-76, BLM_AR183232, BLM_AR183242, BLM_AR183277. Similarly the location of gravel roads is identified in Figures 2.4.1-3. BLM_AR182754, BLM_AR182755, BLM_AR182756. As to specifics on drill pads, the EIS analyzes a range of number of wells per pad and sizes of pads, and the associated impacts of each pad. BLM_AR182398, BLM_AR182410. This information reflects BLM's hard look at the impacts of the Willow Project, and contrary to Plaintiffs' contentions, goes beyond a mere "summary." SILA Br. 13.

Finally, the SILA Plaintiffs suggest that BLM has improperly deferred aspects of its NEPA analysis. They are wrong. First, Plaintiffs misinterpret a response to a public comment—stating that BLM might do additional NEPA analysis later in time—as suggesting the agencies flouted their obligation to complete a NEPA analysis prior to project approval. SILA Br. 14-15. But the referenced response to comment merely explains that BLM would review any right of way application or applications for permit to drill when received "for completeness and [to] determine whether the scope of the Project falls within what was analyzed in the EIS." BLM_AR182995. This recognizes that an application for a project inconsistent with the originally analyzed proposal or going beyond the scope of the EIS may require additional NEPA analysis pursuant to 40 C.F.R. § 1502.9(c)(1)(i) (2019) (requiring supplemental analysis when the agency

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          28

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 37 of 70

"makes substantial changes in the proposed action that are relevant to environmental concerns"). Similarly, Plaintiffs misinterpret BLM's mitigation design criteria as lacking finite form because it required consideration of two alternative criteria. But the two referenced criteria simply reflect that sometimes during the year conditions include snow and ice, and other times in the year conditions are "ice-free", and thus mitigation design must account for both types of site-specific conditions. BLM_AR182481. There is no "plan for a plan," as Plaintiffs suggest, SILA Br. 15, just a requirement that Conoco take into account seasonal weather patterns in its design.

### 2. BLM Adequately Considered the Impacts of the Project on Caribou

CBD Plaintiffs argue that, while the FEIS includes "detailed analysis of some aspects of the project's potential impacts to caribou," it nevertheless does not satisfy NEPA because it does not consider the effect on the Teshekpuk Lake Herd's winter habitat. CBD Br. 29. They are wrong for several reasons.

First, the Teshekpuk Herd is not being displaced from its winter habitat. The herd's winter habitat covers a broad area, and the Project area only overlaps with a small portion of that area. BLM_AR182802.

Second, the FEIS does analyze winter impacts to caribou. Section 3.12.2.3.2 describes "disturbance or displacement" to caribou. BLM_AR182565-67. And the entire subchapter 3.12 focuses on impacts to caribou, including in which seasons and specific locations impacts are likely to occur. *Id.; see e.g.*, BLM_AR182569-70 (describing a second airstrip located in an area "with lower densities of caribou" but recognizing the noise from the airstrip would "disturb more caribou during the calving season.") The

FEIS recognizes that "noise would be greatest during winter construction," and that noise from human activity "would disturb and displace caribou from around the mine site during all periods of human activity." BLM_AR182566. The FEIS states that ice roads, which would be constructed each winter under each of the action alternatives, "could have long-lasting effects on disturbance and displacement of caribou in winter." BLM_AR182570-71. The FEIS also compares the impacts of noise from air and ground traffic during the winter on caribou. BLM_AR182566-70. Additionally, the FEIS tiers to the 2012 NPR-A IAP/EIS which provides additional discussion of the winter impacts to caribou in the NPR-A. *See, e.g.,* BLM_AR269645, BLM_AR269859.

Third, the CBD Plaintiffs assert the FEIS violates NEPA because it does not include an acknowledgement that there is "unprecedented exposure" to the Teshekpuk Herd. CBD Br. 29. Relying on the 2012 NPR-A IAP/EIS, they contend that no herd has previously been exposed to development in its winter range, and they contend there is no evidence that caribou habituate to disturbance in the winter. *Id.* But the IAP/EIS they cite predates the GMT1 and GMT2 development approvals, and the ongoing existence of the herd following those development projects undermines Plaintiffs' contentions. *See, e.g.*, BLM_AR182567 (recognizing subsistence hunters use "roads in the GMT and Alpine area to hunt caribou"). And, BLM did analyze the exposure of the herd and potential risk to its winter habitat; whether or not the EIS characterizes the exposure as "unprecedented" amounts to mere flyspecking. "[T]he reviewing court may not 'fly speck' an EIS and hold it insufficient on the basis of inconsequential, technical deficiencies." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          30

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 39 of 70

F.3d 1158, 1183-84 (9th Cir. 1997) (citation omitted).

### 3. The EIS Contains Sufficient Information Regarding Reasonably Foreseeable Future Actions to Satisfy NEPA

The SILA Plaintiffs' argument that the EIS did not provide sufficient information to analyze the reasonably foreseeable future actions ("RFFAs") is wrong. The agencies described each of the RFFAs at a high level, then incorporated each into their cumulative impacts analysis, as required by NEPA.

Chapter 3.19 of the Willow FEIS provides the cumulative effects analysis of the proposed project and the alternatives, examining the impacts of the project together with the past, present, and reasonably foreseeable future actions. BLM_ AR182668-87. Table 3.19.1 identifies and describes, in summary fashion, each of the RFFAs considered in the cumulative effects analysis throughout the chapter. BLM_AR182669-71. Insofar as the SILA Plaintiffs complain that the table itself lacks adequate detail for those RFFAs, they improperly ignore that the information appears elsewhere in the FEIS.

Beginning with the Greater Willow RFFA, the FEIS provides ample information, including the very information Plaintiffs insist the EIS omitted. SILA Br. 18. Greater Willow is at this point only a potential expansion of Willow. BLM_AR182670. As such, all information SILA Plaintiffs cite is preliminary given that Conoco may not even choose to apply to develop the two potential drill sites. Even so, the information Plaintiffs claim the agencies had, and presumably should have disclosed, (i.e., proposed drill site locations, estimates for production amount and timing from Greater Willow), is *already included in the FEIS. See* BLM_AR183610- 14 (Chapter 2.2 of Appendix E.3

describing and quantifying cumulative emissions for the Greater Willow potential drill sites); BLM_AR183202-03 (Appendix D.1 addressing potential use of the proposed pipeline by the Greater Willow project).[13]  The FEIS also includes the Greater Willow Project in its cumulative impacts analysis, *see e.g.*, BLM_AR182671 (addressing Greater Willow project's emissions in a discussion of cumulative climate impacts).  To the extent Plaintiffs complain that the Greater Willow was not included in other sections of the FEIS, it is because the project had no relevant effects within the time frame analyzed. BLM_AR182673.

The record also contains adequate information relating to Nanushuk because the corresponding EIS was incorporated into the Willow EIS by reference. BLM_AR182668; *see also* BLM_AR276692-96.  Incorporating an EIS by reference has the same effect as if the information in the incorporated EIS were duplicated in the FEIS. *See* 40 C.F.R. § 1502.21 (2019).  Plaintiffs have not challenged the adequacy of the Nanushuk EIS in litigation directed at that project, and they have no basis for challenging the agencies' reliance on that same EIS in this new context.  The Nanushuk EIS, moreover, did consider Willow as an RFFA in its own cumulative impacts effects analysis, and that analysis is likewise incorporated by reference in the Willow EIS.

---

[13] SILA Plaintiffs brief cites to an administrative version of the FEIS which is actually non-final.  *See* SILA Br. 18, & nn. 91, 94-96.  Here, they cite to BLM_AR180440, included in the published FEIS at BLM_AR182862, BLM_AR180881, included in the FEIS at BLM_AR183610, and BLM_AR180524, included in the published FEIS at BLM_AR183202- 03.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                    32

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 41 of 70

BLM_AR276965, BLM_AR277632.

Finally, the FEIS appropriately considered known exploration projects as RFFAs. Nowhere does the FEIS describe exploration as speculative.[14]  Instead, exploration activity was grouped "as one RFFA due to the disparate and constantly changing details about activities by a wide variety of projects."  BLM_AR182669.  The FEIS provides an explanation for the agencies' method of analysis and the Court should defer to their expertise about why this was appropriate.  *See Kern v. U.S. Bureau of Land Mgmt.,* 284 F.3d 1062, 1075 (9th Cir. 2002) ("When an agency's determination of what are reasonably foreseeable future actions and appropriate component parts is fully informed and well-considered, we will defer to that determination." (internal quotation marks and citation omitted)).  Plaintiffs suggest that grouping exploration activities somehow obscures the associated cumulative impacts of those exploration activities, but the FEIS makes clear that exploration activities and their impacts are anticipated over the life of the Project, and BLM reasonably explained why a more granular analysis would not have been feasible.  BLM_AR182669.

---

[14] Plaintiffs' citation, SILA Br. 19, is to an email, BLM_AR100578–79, not the FEIS. Additionally, if these projects were speculative, they would by definition not be reasonably foreseeable, and thus would not have been included in the cumulative effects analysis.  *See Chilkat Indian Vill. of Klukwan v. Bureau of Land Mgmt.*, 399 F. Supp. 3d 888, 920 (D. Alaska 2019) ("[W]here plans remain speculative and have not been reduced to specific proposals, cumulative impacts analysis is not required." (internal quotation marks and citation omitted)), *aff'd* 825 F. App'x 425 (9th Cir. 2020).

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    33

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 42 of 70

### 4. The EIS Adequately Analyzes the Project's Cumulative Effects on Fish and Polar Bears

SILA Plaintiffs also argue the FEIS did not adequately analyze the cumulative effects from Willow on fish and polar bears. SILA Br. 20-23. This is incorrect.

As an initial matter, the FEIS determines that the direct and indirect impacts to both fish and polar bears from the Willow Project will be minor. *See* BLM_AR182506-25; BLM_AR182575- 602. The FEIS states that "the RFFAs would have similar types of effects on fish" as the Willow Project. BLM_AR182675. The FEIS details the different cumulative effects of the Willow Project combined with the RFFAs on fish from water removal, climate change, increased temperature, and vessel traffic. BLM_AR182675-76. Similarly, the FEIS includes a section analyzing the cumulative effects of the Willow Project on marine mammals, including polar bears. BLM_AR182679-80. These impacts are described as incremental from other projects in the area with the main effect resulting from climate change resulting in a loss of sea-ice habitat. *Id.* The FEIS does provide quantification of those impacts when appropriate (for example, the FEIS quantifies the GHG emissions from RFFAs, BLM_AR182671-72). While the FEIS does recognize the potential effects of the Willow Project and its RFFAs on fish, nowhere does the FEIS suggest that these would "significantly impact fish and polar bears." SILA Br. 20-21.

And, as described above, the FEIS did include sufficient information on the RFFAs in its cumulative effects analysis. While Nanushuk and other nearby exploration projects are not called out by name in the cumulative effects analysis for these two resources, those sections clearly include an analysis of RFFAs. It is within the agencies'

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF 34

Case 3:20-cv-00308-SLG Document 99 Filed 05/26/21 Page 43 of 70

discretion to describe the RFFAs in the cumulative effects analysis as a unit, rather than specifying each RFFA by name when analyzing the cumulative effects to each resource considered. *Chilkat Indian Vill. of Klukwan*, 399 F. Supp. 3d at 919–20 (""[T]he scope and nature of the . . . cumulative impacts analysis is a matter committed to the sound discretion of the agency." (quoting *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1173 (D. Mont. 2010)).

## II. The Corps' Issuance of a Section 404 Permit Here Was Reasonable and Consistent with the CWA

The Corps issued a Section 404 permit to Conoco following the Corps' proper determination under the Section 404(b)(1) Guidelines that (1) the Project will not cause or contribute to significant degradation of waters of the United States; (2) the discharge is the least environmentally damaging practicable alternative; and (3) appropriate and practicable steps were taken to minimize potential adverse impacts of the discharge on the aquatic ecosystem. *See* Corps_AR000204, Corps_AR000234. SILA Plaintiffs do not argue that there is a less environmentally damaging practicable alternative to the Project, or that there were practicable steps to minimize adverse impacts of the discharge that the Corps failed to require. Nor do they argue that the Project is not in the public interest. Instead, SILA Plaintiffs argue that issuance of a Section 404 permit was unlawful because the Corps improperly concluded that the Project "will not cause or contribute to significant degradation." SILA Br. 26–33. Specifically, SILA Plaintiffs contend that the Corps lacked sufficient information for that finding, and that it was based in part on an unsupported conclusion that the Project's impacts would be adequately mitigated. *Id.* To

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    35

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 44 of 70

reach this conclusion, SILA Plaintiffs misconstrue the Corps' ROD and Permit, the FEIS, and other parts of the record. When considered in full, these documents show that the Corps' decision was reasonable and well-supported.

## A. Ample Evidence Supports the Corps' Conclusion that the Project Will Not Cause Significant Degradation

SILA Plaintiffs allege that the Corps violated the Guidelines because it failed to analyze the loss of functions of wetlands from the Willow Project. SILA Br. 26–27. But that argument comes up short. First, nothing in the Guidelines requires the Corps to undertake an in-depth analysis of the functional values of wetlands.[15] *See* Corps_AR000169. SILA Plaintiffs cannot point to any requirement that the Corps undertake the type of analysis of wetland functions that SILA Plaintiffs demand. Second, the Corps' ROD nevertheless evaluated impacts to wetlands, concluding that the Project would result in 616.9 acres of permanent impacts to waters of the United States, 157.9 acres of temporary impacts, and 3,351.9 acres of secondary impacts. Corps_AR000209–10; *see also* Corps_AR000144, 187, 197–202. The Corps identified eighteen types of wetlands and four types of waters that would be affected. Corps_AR000209. The Corps' ROD also relied upon and incorporated the FEIS, which further evaluates potential impacts to wetlands. *Id.* (citing the FEIS at BLM_AR182493–506, BLM_AR182675, BLM_AR185550-57); *see Hoosier Envt'l Council v. U.S. Army Corps of Eng'rs*, 722

---

[15] Nor did the Corps request, as SILA Plaintiffs assert (*see* SILA Br. 27), that BLM pause the permitting process so that the Corps could undertake such an assessment. *See* BLM_AR103085–86 (requesting a "pause[]" solely to address "technical issues").

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              36

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 45 of 70

F.3d 1053, 1061 (7th Cir. 2013) ("If another agency has conducted a responsible analysis the Corps can rely on it in making its own decision.").

As described in the ROD, the Corps determined that the creation of uplands due to the discharge of fill material would result in the direct loss of a range of wetland functions and services, including water storage, fish and wildlife habitat, shoreline stabilization, and nutrient production. Corps_AR000209. The Corps also determined that linear features such as access roads and work pads could adversely impact wetland hydrology by intercepting natural drainage and preventing the flow of water downhill. *Id.* In its assessment of impacts to permafrost-supported wetlands, the Corps concluded that the disruption of natural hydrology and addition of fill material could cause thermokarsting[16] and affect the accumulation and decomposition of soil organic matter. Corps_AR000209.

Both the Corps' ROD and the FEIS also address secondary impacts to wetlands, including from dust and culverts. The Corps concluded that the construction and use of gravel roads and pads would create a "dust shadow" that could smother vegetation, alter soil composition and moisture levels, and contribute to thermokarsting. Corps_AR000210; *see also* BLM_AR182444–53, BLM_AR182503–04. The Corps estimated that 3,351.9 acres of wetlands will be impacted by the dust shadow. Corps_AR000210. SILA Plaintiffs contend that this figure is an underestimate because

_____

[16] Thermokarsting is the process by which permafrost thaws, causing changes to topographical features such as the formation of lakes, sinkholes and pits. *See* BLM_AR182449–50.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              37

the Corps arbitrarily set a 100-meter radius for its dust shadow analysis. SILA Br. 28. SILA Plaintiffs ignore, however, that the FEIS explained that approximately 95% of dust settles within 100 meters of a road surface. BLM_AR182503. The radius the Corps used for the dust shadow therefore was reasonable. The Corps addressed concerns about the dust shadow in Special Permit Condition No. 27, which requires Conoco to minimize dust discharges to the maximum extent possible, and to implement dust abatement practices for the life of the Project. Corps_AR000009. Conoco's compliance with this Condition will be determined by visible dust and gravel presence on tundra wetland areas. *Id.*

Contrary to SILA Plaintiffs' assertion (SILA Br. 28), the Corps did assess the impacts of culverts on surface flow and natural drainage patterns, including the possibility that any culverts might malfunction. Corps_AR000167. The Corps addressed these concerns in Special Permit Condition No. 26, which required Conoco to submit annual monitoring reports for three years that include an evaluation of all areas where additional culverts are necessary to maintain existing drainage patterns and where culvert maintenance or repair are necessary. Corps_AR000008. This Condition requires Conoco to maintain all culverts for the life of the Project. *Id.*

Because the record shows that the Corps properly assessed and addressed the impacts to wetlands as required by the Guidelines, its conclusion that the Willow Project would not cause significant degradation was reasonable.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              38

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 47 of 70

**B. The Corps Appropriately Determined the Need for Compensatory Mitigation that Will Offset "Unavoidable Impacts"**

Conoco proposed a compensatory mitigation plan (the "Mitigation Plan") that will implement a combination of wetland preservation and wetland restoration to offset direct and indirect "unavoidable impacts" to waters of the United States, including wetlands. Corps_AR000326–612. The Corps evaluated the Mitigation Plan consistent with the Guidelines and the 2018 Joint USACE-EPA Memorandum of Agreement, and determined that the Plan was appropriate and practicable. Corps_AR000183. SILA Plaintiffs allege without basis that the Corps failed to explain its decision not to require Conoco to offset impacts from fill in a majority of affected wetlands. *See* SILA Br. 31. In fact, the Corps conducted a detailed, watershed based-analysis to determine whether any given impact required mitigation. Corps_AR000183–86. Specifically, the Corps evaluated impacts within ten individual watersheds as delineated by the U.S. Geological Survey. Corps_AR00185–86 (listing new and existing disturbed acres for each watershed by Hydrological Unit Code). For each watershed, the Corps assessed both the acreage expected to be impacted by the Willow Project and the total acreage expected to be disturbed by any human activity. *Id.* The Corps reasonably determined based on a literature review that the lowest percentage of impervious cover that could cause a measurable impact to stream health was 4.4%, and that it would require compensatory mitigation for any watershed with cumulative disturbance above that threshold. *Id.* Because no watersheds approached the 4.4% level, compensatory mitigation was not required on that basis. Corps_AR000186.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                    39

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 48 of 70

The Corps did identify significant unavoidable impacts requiring compensatory mitigation within: (1) 500 feet of anadromous waterways; (2) the Colville River Special Area; and (3) the Teshekpuk Lake Special Area. Corps_AR000186-87. For each of these three areas, the Corps evaluated and concurred with Conoco's calculation of debits for direct and indirect impacts, which included an analysis, by National Wetlands Inventory ("NWI") type, of all acres directly and indirectly impacted in each area. Corps_AR000187–88. SILA Plaintiffs nevertheless point to an EPA comment letter as support for their argument that the Corps did not adequately explain its decision to require compensatory mitigation only within these areas. SILA Br. 31; *see also* Corps_AR003973–77). However, that letter predated the final Mitigation Plan, and, as the Corps explained in its response to comments, the analysis in the record demonstrates that the Plan satisfies the Guidelines. Corps_AR000161–63.

Conoco's Mitigation Plan proposed (1) two permittee-responsible compensatory mitigation projects that will enhance 209.1 acres of palustrine wetlands functions, and (2) the preservation of 800 acres of pristine Arctic Coastal Plain wetlands at one of two possible locations. Corps_AR000336–38. SILA Plaintiffs argue that the mitigation in this Plan and its supporting analyes are inadequate. SILA Br. 32–33. SILA Plaintiffs ignore, however, that at the Corps' request, the Mitigation Plan included a detailed evaluation of the condition of wetlands in these areas using the Corps' North Slope Rapid Assessment Method and the Alaska District: Credit Debit Methodology. Corps_AR000338–62. This evaluation included characterizations of wetlands by NWI type, a comparison of wetlands that would be impacted with wetlands at the proposed

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          40

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 49 of 70

mitigation sites, and for the two potential preservation sites, an analysis of ecological significance and threat of development. *Id.* The Corps evaluated the Mitigation Plan and concluded that it "would provide appropriate and sufficient compensatory mitigation required to offset unavoidable losses to aquatic resources." Corps_AR000188.

Finally, SILA Plaintiffs contend (SILA Br. 32–33) that the Mitigation Plan does not ensure permanent protection of the preserved areas because it does not require the utilization of any specific legal instrument; however, Special Condition No. 21 of the Permit requires the Corps to approve the site protection instrument, thereby providing adequate oversight over the implementation of this aspect of the Plan. *See* Corps_AR000008.

The record shows that the Corps properly assessed both the need for compensatory mitigation and the adequacy of the proposed mitigation the Guidelines. Its conclusion that the Mitigation plan was "appropriate and sufficient" therefore was reasonable.

## III. The Service's Analysis Satisfies the ESA

### A. The Service's ESA Analysis Was Consistent with the ESA and Reasonable.

Plaintiffs' arguments that the Service inappropriately relied on uncertain MMPA mitigation measures for its ESA Section 7 determinations concerning polar bears and failed to adequately assess and quantify incidental take, *see* SILA Br. 34-40, CBD Br. 30-37, are wrong. The Service fully complied with the ESA and the relevant implementing regulations. 50 C.F.R. § 402.14(g)(8). And the Service's expert Section 7 opinion that the authorization of Conoco's Willow Project would not jeopardize the polar bears' continued existence nor would it adversely modify any designated critical habitat is

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              41

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 50 of 70

similarly reasonable.  FWS_AR000763-66.  Likewise, the Service's determinations concerning anticipated levels of take are reasonable.  Contrary to Plaintiffs' assertions, the Service's ESA Section 7 determinations are consistent with the ESA, reasonable, supported by the administrative record, and should be upheld.

**1.  BLM's proposed action appropriately defined the contours of the project.**

Before authorizing the Willow Project, BLM requested Section 7 consultation due in part to its identification of potential effects to the polar bear and its designated critical habitat.  FWS_AR000097.  BLM's proposed action includes numerous specific and enforceable protective and mitigation measures, including:

- Required lease stipulations and required operating procedures that directly or indirectly avoided and/or reduced adverse effects to ESA-listed species and designated critical habitat.  FWS_AR000144-48; *see also* FWS_AR000660-77.

- Required "Project Design Criteria" adopted from the governing land management plan (Integrated Activity Plan) for the NPR-A like Project Design Criteria 4 which states, "The lease area and/or potential project areas may now or hereafter contain marine mammals.  The BLM may require modifications to exploration and development proposals to ensure compliance with Federal laws, including the Marine Mammal Protection Act (MMPA).  The BLM would not approve any exploration or development activity absent documentation of compliance under the MMPA." FWS_AR000677; *see also* FWS_AR000148.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              42

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 51 of 70

- Project design features built into Conoco's application to avoid and minimize adverse effects on polar bear and designated critical habitat. FWS_AR000143; *see also* FWS_AR000219-34.

   **2. The Service's Section 7 jeopardy analysis on polar bears complied with the ESA.**

As part of its Section 7 jeopardy analysis, the Service first looked at potential adverse effects of the Willow Project on polar bears in the action area. FWS_AR000747-58. The Service determined that the primary potential adverse effect from the Willow Project would be disturbance to both non-denning (transient) and denning polar bears. With respect to non-denning bears, the Service explained that any potential disturbance would be infrequent due to the following: (1) the location of the Willow Project as the vast majority of the action area is located far from the coast and in areas of low polar bear abundance; (2) the timing of activities as many activities would occur only during summer when very few transient bears would be present; and (3) required specific and enforceable mitigation measures built into the Willow Project like minimum flight altitudes and plans to avoid attracting bears, among others. FWS_AR000749. The Service further explained that if non-denning polar bears are subjected to disturbance, they would likely move away from the source of that disturbance, resulting only in minor, temporary changes in behavior. *Id*.

The Service next analyzed potential disturbance effects on denning bears. The Service identified potential types of adverse effects to denning bears from the Willow Project but found that such effects would be minimal and/or unlikely because the vast

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                           43

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 52 of 70

majority of the Project would occur in areas of very low denning density and because "BLM [Required Operating Procedure] C-1 and 3 require den detection surveys prior to initiating winter operations and the establishment of a 1-mile operational exclusion zone around any detected dens." FWS_AR000748. Additionally, while acknowledging the fact that *no* survey is perfect and captures every den, the Service used a sophisticated model to account for the probability that a den is not detected through surveys and then exposed to disturbance. FWS_AR000747-49. The Service's model estimated a >84% probability of zero denning bears suffering injury or mortality occurring over the 30-year life of the Willow Project, and on that basis concluded that disturbance resulting in injury or mortality to any denning bears is not reasonably certain to occur. FWS_AR000748-49.

After analyzing this data regarding non-denning and denning bears, the Service acknowledged that the Willow Project could "intermittently incidentally expose small numbers of polar bears of the [Southern Beaufort Sea] stock to disturbance." FWS_AR000764. But the Service also determined that "most of those exposures would not be biologically significant," that "[t]he spatial and temporal distance between disturbance events would limit the potential for impacts to be biologically significant to individual bears," and further reduced "the potential for biologically significant impacts to individual bears to compound to effects at the [Southern Beaufort Sea] stock level, let alone the species level" at which the potential for jeopardy is assessed. *Id*. The Service concluded that, even when accounting for potential climate change-related stressors in the future, "we anticipate that the activities authorized under the Proposed Action would

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    44

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 53 of 70

continue to impact small numbers of individual polar bears within the [Southern Beaufort Sea] stock and would not appreciably affect the survival and recovery of the polar bear species as a whole." *Id.* For these reasons, the Service determined that the Willow Project would not jeopardize the polar bear. *Id*; *see also* 50 C.F.R. § 402.02. Additionally, after concluding "no jeopardy," the Service acknowledged the Willow Project's additional protective measures like future compliance with the standards of the MMPA which only bolstered the Service's confidence in the already-established "no jeopardy" determination. FWS_AR000764. The Service's "no jeopardy" determination was consistent with the ESA, reasonable, supported by the record, and should be upheld.

### 3. The Service conducted an appropriate Section 7 adverse modification analysis of the impacts on polar bear critical habitat.

After determining that the Willow Project would have minimal or no adverse effects on individual polar bears, the Service next analyzed potential impacts to designated critical habitat. FWS_AR000758-60, FWS_AR000765-66. The Service determined that only a very small portion of the Willow Project would occur within or near designated critical habitat, that the Willow Project has a very limited capacity to affect such habitat through a few specific activities, and that adverse effects, if any, would be minor. FWS_AR000758-60, FWS_AR000765-66. The Service explained its conclusions for each critical habitat unit:

- **Unit 1 – Sea Ice**: The Service determined that the only manner in which the Willow Project could affect sea ice was through project-related vessels spilling oil or other petroleum product into marine waters. FWS_AR000765. The Service determined

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    45

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 54 of 70

that the potential for a marine oil spill would be minimized by compliance with specific and enforceable operating procedures built into the proposed action, to include Conoco's spill prevention plans. *Id.*

- **Unit 2 – Terrestrial Denning Habitat**: The Service concluded that the Willow Project would not appreciably diminish the conservation value of terrestrial denning habitat based on the "very small" overlap between the Willow Project and terrestrial denning habitat, and because the proposed activities are of "similar scope to ongoing routine use and upgrades" in the only area where overlap does occur. FWS_AR000765, FWS_AR000760 (stating that "no impacts to designated critical habitat for terrestrial denning will result from the proposed project.").

- **Unit 3 – Barrier Islands**: The Service explained that barrier islands could be affected through disturbance and/or marine oil spills, but determined any potential effects to be minor and temporary. FWS_AR000765.

For these reasons, the Service determined that the Willow Project would not result in adverse modification because the limited and minor effects would not appreciably diminish the conservation value of the bear's critical habitat. FWS_AR000765-66. Additionally, like its jeopardy analysis, the Service opined that compliance with future MMPA standards would provide "additional" and "further assurance" that actual adverse effects would not exceed already-established "minor" levels. *See e.g.*, FWS_AR000760, FWS_AR000765-66. The Service's "no adverse modification" analysis is consistent with the ESA, reasonable, supported by the administrative record, and should be upheld.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                          46

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 55 of 70

### 4. The Service's Incidental Take Statement complies with the ESA

Finally, with its "jeopardy" and "no adverse modification" analyses as a backdrop, the Service specifically addressed and quantified the amount of incidental take anticipated to result from the Proposed Action. FWS_AR000766-67. Among other things, the Service acknowledged potential exposure and disturbance to non-denning (transient) and denning polar bears before determining that all associated effects from the Project were "expected to be in the form of short-term, minor changes in behavior which do not create a likelihood of injury (much less cause injury), or are not reasonably certain to occur and therefore would not constitute harassment or [any other] form of take as defined by the ESA and implementing regulations (16 U.S.C. 1532 (19), 50 C.F.R. §17.3)." FWS_AR000767. The Service next determined that, based on data reported from similar operations in the region, "up to 2 bears may be hazed with non-lethal contact rounds over the life of the project" in order to protect the lives of workers. *Id*.; *see also* FWS_AR000930.

Accordingly, the Service quantified all non-hazing and hazing incidental take at zero and two, respectively. In other words, per 50 C.F.R. § 402.16, any exceedance of these two limits – *i.e.*, *any* non-hazing incidental take or more than two incidental hazing events – would require reinitiation of Section 7 consultation. In light of the thorough effects analyses, as outlined above, the Service's incidental take determinations were reasonable, consistent with the ESA, supported by the administrative record, and should be upheld.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                                    47

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 56 of 70

**B. The Service's ESA Analysis Is Reasonable and Plaintiffs Offer Nothing to Rebut It.**

Dissatisfied with the Service's well-reasoned Section 7 determinations, Plaintiffs levy a variety of challenges, but none resonate. SILA Br. 34-40; CBD Br. 30-37. Each is addressed in turn below.

**1. The Service's Section 7 decisions did not rely on any MMPA protections.**

Plaintiffs argue that the Service improperly relied on future unspecified MMPA mitigation measures that are not reasonably certain to occur to reach its Section 7 conclusions. SILA Br. 34-37; CBD Br. 30-34. In support of this argument, Plaintiffs rely heavily on a recent Ninth Circuit decision, *Center for Biological Diversity v. Bernhardt* ("*Liberty*"), 982 F.3d 723 (9th Cir. 2020). Plaintiffs, however, are mistaken that the Service's Section 7 determination relied on future MMPA compliance. The Service's Section 7 determinations are founded only on inherent attributes of the Willow Project (*e.g.*, the location and timing of project activities) and specific mitigation measures that are already incorporated into the proposed action (*e.g.*, lease stipulations, land management plan requirements, commitments in Conoco's application, etc.) and are thus specific, binding, and certain to occur. None of the factors upon which the Service based its Section 7 determinations are contingent or dependent on future MMPA mitigation measures. Furthermore, contrary to Plaintiffs' suggestion, even if the Service did rely on future MMPA mitigation (it did not), the *Liberty* decision does not apply here because subsequently revised ESA regulations do not require a specific and binding plan with respect to future MMPA mitigation measures.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                      48

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 57 of 70

### a. The Service did not rely on future MMPA compliance for its Section 7 determinations.

Plaintiffs incorrectly suggest that because the BiOp discussed the MMPA, it must have relied on uncertain future mitigation measures to reach its ESA determinations. SILA Br. 34-37; CBD Br. 30-34. A fair reading of the BiOp demonstrates that this is not the case. The Service discussed extensively the MMPA and its requirement for BLM and Conoco to comply with the statute's broad substantive standards to ensure (1) small number of take, (2) negligible impacts to the Southern Beaufort Sea polar bear stock, and (3) no unmitigable adverse impacts on the availability of the stock for subsistence uses. That is to be expected given the close interplay between the ESA and MMPA with respect to the polar bear, an ESA-listed marine mammal, and the fact the BLM would affirmatively require documentation of MMPA compliance prior to the conduct of activities that could affect polar bears. But, as demonstrated in the conclusion sections of the BiOp, the Service based its Section 7 determinations only on the fact that due to the location of the Willow Project and the minimal presence of polar bear individuals or designated critical habitat, adverse effects, if any, would be minor. FWS_AR000764-66. For these reasons alone, the Willow Project would not jeopardize the polar bear or adversely modify its designated critical habitat. *Id.*

### i. The Service's jeopardy determination did not rely on future MMPA mitigation measures.

As discussed, the Service based its "no jeopardy" determination *only* on the following: (1) the location of the project as the vast majority of the action area is located far from the coast and in areas of low polar bear abundance; (2) the timing of activities as

many activities would occur only during summer when very few bears would be present; (3) mitigation measures built into the proposed action itself like minimum flight altitudes and plans to avoid attracting bears, among others; (4) required den surveys; (5) required one-mile operational exclusion zone around any detected dens; and (6) sophisticated modeling indicating >84% probability of zero disturbance or injury to denning bears occurring over the 30-year life of the Willow Project. FWS_AR000764. After already concluding "no jeopardy," the Service acknowledged the Willow Project's additional protective measures like future compliance with the substantive standards of the MMPA, which only served to bolster the Service's already-determined "no jeopardy" conclusion. *Id*.[17] Plaintiffs' assertion that the Service relied on future, uncertain MMPA mitigation measures is simply incorrect.

> ii. **The Service's no adverse modification determination did not rely on subsequent MMPA mitigation measures.**

Like the Service's jeopardy determination, its adverse modification determination did not rely on future MMPA mitigation measures.

_____

[17] Under BLM's Proposed Action, BLM would require Conoco to provide documentation of MMPA compliance (most likely a Letter of Authorization) prior to conducting activities. Per the MMPA, the Service may authorize Conoco to take of small number of polar only if it finds, among other things, that the taking would have no more than a "negligible impact" on the Southern Beaufort Sea stock of polar bears. The Ninth Circuit has acknowledged that activities having a negligible impact on the SBS stock of polar bears (one of the 19 stocks which comprise the polar bear species) should have "little potential" to jeopardize the continued existence of the polar bear species. *CBD v. Salazar*, 695 F.3d 893, 913 (2012). The Service's acknowledgement of that concept here should not be surprising or controversial, but in any event the BiOp did not rely on this point when rendering its "no jeopardy" determination.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF 50

Case 3:20-cv-00308-SLG Document 99 Filed 05/26/21 Page 59 of 70

- **Unit 1 – Sea Ice**: The Service determined that the potential for a marine oil spill would be low and any potential adverse effects further minimized by compliance with specific required operating procedures and spill prevention plans. FWS_AR000765. There is no mention of the MMPA in this portion of the BiOp with respect to oil spills, much less a reliance upon any MMPA mitigation measures. With respect to impacts to seals, the Service does mention the MMPA's substantive standards – *i.e.*, small number of take, negligible impacts to the Southern Beaufort Sea polar bear stock, and no unmitigable adverse impacts on the availability of the stock for subsistence uses – as opposed to actual mitigation measures that "provide further assurance" that the conservation value of sea ice critical habitat would not be appreciably diminished. *Id.* The "provide further assurance" language makes clear that MMPA-related considerations increase the Service's confidence in the relative lack of adverse impacts to sea ice but were not needed to reach that conclusion in the first instance.

- **Unit 2 – Terrestrial Denning Habitat**: The Service concluded that the proposed action would not appreciably diminish the conservation value of terrestrial denning critical habitat based on the "very small" overlap between the Willow Project and terrestrial denning habitat, and because the proposed activities are of "similar scope to ongoing routine use and upgrades" in the only area where overlap does occur. FWS_AR000765. The Service does not mention – much less rely upon – the MMPA or any mitigation measures in making this finding.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*      Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              51

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 60 of 70

- **Unit 3 – Barrier Islands**: The Service determined that barrier island critical habitat could be affected by disturbance and/or marine oil spills, but also characterized any potential effects as minor and temporary. *Id.* The Service does acknowledge that Project Design Feature 4 and associated MMPA substantive compliance would provide "significant additional protection for polar bears," and that substantive MMPA standards (*i.e.*, small numbers, negligible impact, and no unmitigable adverse impact on subsistence uses) would provide "assurance" that the conservation value of barrier islands would not be appreciably diminished. FWS_AR000766. But these statements simply expand upon the Service's prior determination that any impacts would only be "minor and temporary," and were not included in what the Service "relied on" in determining that the Willow Project has limited capacity to adversely affect barrier islands in the first instance.

Ultimately, the Service determined that only a very small subcomponent of the Willow Project's activity would occur within or near designated critical habitat, that the project has a limited opportunities to affect critical habitat, and, as a result, adverse effects (if any) would be minor and would not result in adverse modification. FWS_AR000765-66. While the Service recognized that compliance with future MMPA standards would provide "additional" and "further assurance" that actual adverse effects would not exceed already-established minor levels, it did not rely on compliance with the MMPA (or any specific mitigation measures that may or may not be imposed through

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF    52

Case 3:20-cv-00308-SLG    Document 99    Filed 05/26/21    Page 61 of 70

future take authorizations) in the first instance. Plaintiffs fail to demonstrate how the

Service's Section 7 determinations are inconsistent with the ESA or unreasonable.

### iii. The Service's discussion of MMPA substantive standards was appropriate.

The Service's discussion and acknowledgement that future MMPA processes

would occur and are an important means of reducing impact is appropriate – and an

expected and appropriate discussion given the interconnected relevance of both statutes

governing an ESA-listed marine mammal – and does not demonstrate a reliance for the

purposes of rendering a "no jeopardy" or "no adverse modification" determination.

Plaintiffs' repeated statements that the Service relied on future MMPA mitigation

measures and one citation to BLM's biological assessment, *see* SILA Br. 36;

BLM_AR301897, while ignoring context and intent of the Service's BiOp, do not make

those assertions true. Taking Plaintiffs' argument to its logical extreme would effectively

preclude the Service from ever discussing the interconnected nature of MMPA

substantive standards within a Section 7 consultation. That simply cannot be correct.

Setting aside Plaintiffs' hyperbole and selective reading of the BiOp, it is clear that

their repeated assertions that the Service relied on future MMPA compliance, are simply

incorrect. The Service premised its Section 7 determinations only on inherent attributes

of the Willow Project and specific mitigations measures already built into the proposed

action itself. None of the factors underpinning the Service's Section 7 conclusion is

contingent or dependent on future uncertain MMPA mitigation measures.

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                      53

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 62 of 70

### b. The 2019 ESA regulations would allow the analysis that Plaintiffs claim occurred.

Even if the Service relied on future MMPA mitigation measures to reach its determination (it did not), its actions are consistent with the 2019 ESA consultation regulations (which Plaintiffs do not challenge in this case). As a result, the Ninth Circuit's recent *Liberty* decision is inapposite as it interprets the requirements of pre-2019 and now superseded ESA consultation regulations. Revised regulation 50 C.F.R. § 402.14(g)(8) (effective October 28, 2019) governed the Willow Project Section 7 consultation and explicitly required the Service to consider future mitigation measures incorporated into an action agency's proposed action – here, BLM's authorization of the Willow Project – "that are intended to avoid, minimize, or offset the effects of an action" just like any other portions of the proposed action, including actions with adverse effects, "and do not require any additional demonstration of binding plans." The ESA does not require the Service to ignore beneficial effects of measures included in the proposed action to avoid, minimize, or offset adverse effects unless BLM meets some heightened bar of documentation regarding their commitment – like specific binding plans with a clear commitment of resources. 84 Fed. Reg. 44,976, 45,002-07.

To the contrary, the ESA requires the Service to consider the effects of the Willow Project in its entirety, including aspects of the proposed action with adverse or beneficial effects. 84 Fed. Reg. at 45,002-03. The Service is then required to issue an expert opinion, using the best available science and data, on the potential effects of the Willow Project on the polar bear and its designated critical habitat. *Id.* The revised regulation

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF    54

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 63 of 70

makes clear that it is BLM's responsibility, as the action agency, to ultimately implement the proposed action's future mitigation measures to comply with both the ESA and the Service's expert opinion to avoid jeopardy and adverse modification. *Id*. Even if the Service had relied on BLM's and Conoco's future compliance with MMPA substantive standards for its Section 7 determinations here (and again, it did not), this would have been permissible under the relevant implementing regulations. Plaintiffs' argument that the Service's Section 7 determinations inappropriately relied on future MMPA mitigation measures fails.

### 2. The Service properly analyzed and quantified possible ESA take.

Plaintiffs argue that the Service failed to adequately account for and quantify ESA incidental take from the Willow Project. SILA Br. 37-40; CBD Br. 35-36. To support this argument, Plaintiffs rely on a handful of record cites that acknowledge or contemplate possible exposure or disturbance of polar bears, but ignore other portions of the BiOp explaining why such exposures and disturbances either (1) are not reasonably expected to occur, or (2) would not affect polar bears in the manners necessary to constitute "harassment" or other forms of "take" as defined under the ESA. Plaintiffs' arguments regarding take are meritless.

Under the ESA, "[t]he term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532 (19). The ESA's implementing regulations further define "harass" as "an intentional or negligent act or omission *which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns . . .*

." 50 C.F.R. § 17.3 (2019) (emphasis added).  Therefore, an exposure or disturbance of a polar bear would not constitute "harassment" under the ESA *unless* the polar bear were "annoyed to such an extent as to significantly disrupt normal behavioral patterns" and a likelihood of injury resulted.  *Id.*

Here, the Service identified various mechanisms through which polar bears could be exposed to the proposed activities, acknowledged that various forms of exposures could disturb small numbers of polar bears, assessed the potential for such disturbances to occur, and analyzed whether any anticipated disturbances would harass other otherwise take any polar bears.  The Service then concluded that while "a few polar bears may experience consequences resulting from the Proposed Action," such consequences are unlikely to rise to the level of "take" as defined by the ESA.  FWS_AR000758; FWS_AR000767; *see also supra* Section III.A.  The incidental take statement in the BiOp further explains the Service's expectation that incidental effects to polar bears would be limited to "short-term, minor changes in behavior which do not create a likelihood of injury (much less cause injury)," and thus do not rise to the level of "harassment or [any other] form of take as defined by the ESA and implementing regulations."  FWS_AR000767.  Based on this analysis, the Services estimated that number of incidental takes via disturbances to be zero.  With respect to hazing, the Service, based on the best available data, determined that this likely over the 30-year life of the Willow Project and set the hazing incidental take limit at two.  FWS_AR000767.  These conclusions are reasonable and supported by the record.

SILA Plaintiffs further accuse the Service of inappropriately altering data

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*    Nos. 3:20-cv-00290; 308-SLG
Defs.' Opposition to Plaintiffs Merits Brief                                                      56

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 65 of 70

indicating a "wide range of take" in the form of exposure and disturbance found in prior draft versions of the BiOp. SILA Br. 39-40. Nothing could be further from the truth. In fact, the opposite is true. Rather than "ignore" the likelihood of take, the Service squarely confronted the issue. With respect to denning bears, which are more sensitive to disturbance, the Service ran 1,000 different iterations of a sophisticated model for the specific purpose of objectively and quantitatively estimating the likelihood of take. FWS_AR000747-49; FWS_AR000797; FWS_AR000926-27; FWS_AR000975. The fact that 1,000 different model iterations suggest a wide range of hypothetical outcomes is hardly surprising. The data allowed the Service to reasonably predict the probability of zero incidental take of denning polar bears occurring was >84%, and thus supported the Service's conclusion that "while it is possible that an undetected den or family group could be impacted which would result in injury or mortality to one or more polar bears, given the high probability of zero bears suffering injury or mortality over the life of the project, such a scenario is not reasonably certain to occur." FWS_AR000749; FWS_AR000927. Not only did the Service reasonably conclude that a scenario with <14% chance of occurring was not anticipated to occur, it was also reasonable for the Service to "alter" – *i.e.*, clarify – its explanation of the modeling results in the final BiOp (especially given the apparent confusion that the draft BiOp language caused the Plaintiffs). SILA Plaintiffs' arguments fall short.

Next, SILA Plaintiffs' assertion that the Service's statement that Willow will not cause "any form of take as defined by the ESA" is contradicted by its subsequent statement that the Service "anticipate[s] that up to two bears may be hazed with non-

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF     57

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 66 of 70

lethal contact rounds" over Willow's project life, *see* SILA Br. 38, fares no better. There is no contradiction; these conclusions refer to two different incidental take analyses and quantifications (non-hazing take and hazing take). The Service thoroughly explained why, while slightly possible, it did not expect any non-hazing incidental take, and why it did expect hazing incidental take. There is no contradiction. If anything, providing separate take estimates for non-hazing take (zero) and hazing take (up to two) is more protective to polar bears, because it requires BLM to re-initiate consultation if even *one* polar bear is incidentally harassed or otherwise taken through any means other than hazing.

In sum, the Service analyzed and accounted for all possible polar bear take. After acknowledging that the Willow Project could disturb some polar bears, the Service explained its expectation that no significant disruptions in behavioral patterns or likelihood of injury (much less actual injury) would result, and reasonably concluded that zero incidental takes via disturbance were anticipated to occur. FWS_AR0000766-67. Meanwhile, the Service separately concluded that up to two takes via hazing were anticipated. *Id.* The Service thus reasonably accounted for and quantified all possible forms of take, and Plaintiffs' arguments on this issue fail.

## IV. The Appropriate Remedy is Remand Without Vacatur

If the Court concludes that Defendants have failed to fully comply with the CWA, ESA, or NEPA, Federal Defendants request an opportunity to provide additional briefing as to the appropriate remedy. In short, the Court should remand the matter to the agencies to fix any errors, not vacate the Project decision. *See Smith v. U.S. Forest Serv.*,

33 F.3d 1072, 1079 (9th Cir. 1994). "Although the district court has power to do so, it is not required to set aside every unlawful agency action. The court's decision to grant or deny injunctive or declaratory relief under APA is controlled by principles of equity." *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). When equity demands, the regulation or action "can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (citation omitted). Further, any remedy needs to be narrowly tailored to address the specific violation identified. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Service*, 422 F.3d 782, 799-80 (9th Cir. 2005).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary Judgment, and grant Summary Judgment in favor of Federal Defendants.

Respectfully submitted this 26th day of May, 2021.

JEAN E. WILLIAMS
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Div.

RICKEY TURNER
Senior Trial Attorney
Wildlife and Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
(303) 844-1373
rickey.turner@usdoj.gov

  */s/ Caitlin Cipicchio*
CAITLIN CIPICCHIO
Trial Attorney, Natural Resources Section
P.O. Box 7611

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.* Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF 59

Case 3:20-cv-00308-SLG Document 99 Filed 05/26/21 Page 68 of 70

Washington, D.C. 20044
(202) 305-0503
(202) 305-0506 (fax)
caitlin.cipicchio@usdoj.gov

LAURA GLICKMAN
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Defense Section
4 Constitution Square
150 M Street NE
Washington, D.C. 20002
(202) 514-6390
(202) 514-8865 (fax)
laura.glickman@usdoj.gov

*Counsel for Defendants*

Of Counsel:

Mike Gieryic
Office of the Regional Solicitor
U.S. Department of the Interior
4230 University Drive, Suite 300
Anchorage, AK 99508
907-271-1420
mike.gieryic@sol.doi.gov

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Civil Rule 7.4(a)(3), I hereby certify that this memorandum complies with the type-volume limitation of Local Civil Rule 7.4(a)(1), as modified by ECF No. 100 (3:20-cv-00290-SLG) and ECF No. 96 (3:20-cv-308-SLG), because this memorandum contains 15,318 words, excluding the parts exempted by Local Civil Rule 7.4(a)(4). This memorandum has been prepared in a proportionately spaced typeface, Times New Roman 13-point font, and I obtained the word count using Microsoft Word.

*/s/ Caitlin Cipicchio*
Caitlin Cipicchio

*Sovereign Iñupiat for a Living Arctic et al. v. BLM et al.*     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                           60

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 69 of 70

## CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2021, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

_/s/ Caitlin Cipicchio_
Caitlin Cipicchio

_Sovereign Iñupiat for a Living Arctic et al. v. BLM et al._     Nos. 3:20-cv-00290; 308-SLG
DEFS.' OPPOSITION TO PLAINTIFFS MERITS BRIEF                                              61

Case 3:20-cv-00308-SLG   Document 99   Filed 05/26/21   Page 70 of 70